1  Molly M. White, Bar No. 171448
   MWhite@McGuireWoods.com
2  Cheryl L. Haas (*pro hac vice* forthcoming)
   CHaas@McGuireWoods.com
3  Alex Madrid (*pro hac vice* forthcoming)
   AMadrid@McGuireWoods.com
4  Brittney M. Angelich, Bar No. 313011
   BAngelich@McGuireWoods.com
5  MCGUIREWOODS LLP
   1800 Century Park East
6  Los Angeles, California 90067
7  Tel.:  (310) 315-8200

8

9  Jeffrey K. Compton Bar No. 142969
   JCompton@MZClaw.com
10 MARKUN ZUSMAN & COMPTON LLP
   16255 Ventura Blvd.
11 Suite 910
   Encino, California 91436
12 Tel.: (310) 454-5900

13

14 Attorneys for Plaintiff
   LPL FINANCIAL LLC
15

16              **UNITED STATES DISTRICT COURT**

17             **SOUTHERN DISTRICT OF CALIFORNIA**

18

19 LPL FINANCIAL LLC,                Case No. **'25CV0880 JO   MSB**

20              Plaintiff,           **PLAINTIFF LPL FINANCIAL LLC'S
                                     COMPLAINT**
21      v.

22 AMERIPRISE FINANCIAL
   SERVICES, LLC,
23
                Defendant.
24

25

26

27

28

---
                          **COMPLAINT**

# I.    NATURE OF THE ACTION

1.    A recruiting dispute between two financial services providers should not leave thousands of customers with the false impression that their data has been stolen. But Ameriprise Financial Services, LLC ("Ameriprise") has done that, and LPL Financial LLC ("LPL") seeks urgently to remedy this wrong with its account holders. Because Ameriprise is unlawfully and inappropriately attempting to hinder LPL's attempt to do so, LPL seeks this Court's immediate intervention and assistance.

2.    LPL seeks immediate relief from this Court because of an unwarranted and dangerous escalation by Ameriprise in a recruiting dispute between the two companies.

3.    On or about April 8, 2025, Ameriprise sent a purported "Notice of a Data Breach" ("Notice") to thousands of (as-yet unidentified) LPL account holders informing them that, years ago, their advisors accessed their information without authorization in connection with their transition from Ameriprise to LPL.

4.    Ameriprise's Notice further asserts that these account holders are now, years later, at risk of, and should monitor for, unauthorized transactions in their account and identity theft.

5.    These statements are false and defamatory. ***Account holders are plainly not at risk of identity theft from their own LPL financial advisors.*** Nonetheless, upon receipt of the Notice, account holders are now calling their advisors, worried that their data has been hacked.

6.    LPL has no qualm with Ameriprise sending customers notifications regarding their personal information.

7.    Indeed, the parties had previously contemplated that Ameriprise might do so.

8.    But Ameriprise was obligated to send customers ***truthful*** notifications.

9.    If, for example, Ameriprise had sent a letter to customers informing them that its public Privacy Notice failed to disclose that their advisors may retain information upon departure (as is true), LPL would have taken no issue with that.

10.    Instead, Ameriprise lied to thousands of customers—including LPL account holders—in a brazen attempt to defame a market competitor and its associated persons and advantage itself in the parties' ongoing dispute.

11.    Ameriprise's unilateral, unjustified, and reckless decision to send the Notice is causing—and will likely continue to cause—mass customer confusion and anxiety (at a time when market movement is *already* creating significant anxiety among investors).

12.    In fact, advisors are already receiving calls from longtime customers who are worried that their personal information is at risk.

13.    Ameriprise has refused to disclose to LPL *who* it sent the Notice to, or even what specifically the Notice said about the data that was purportedly "compromised."

14.    LPL needs to immediately know *which* customers Ameriprise sent the Notice to and *what* Ameriprise told them about the safety and security of their data.

15.    LPL needs this information so that it can reach out to its affected account holders and assure them their data has *not* been accessed without authorization and that they are *not* at risk of fraud or identity theft.

16.    LPL repeatedly asked Ameriprise to provide the list of customers to whom it sent the Notice.  Ameriprise refuses to provide it.  As a result, LPL is compelled to urgently seek relief from the Court in the form of an Order directing Ameriprise to immediately provide the requested information.  LPL also asks the Court to enjoin Ameriprise from sending any additional false communications to LPL account holders.

## II.    THE PARTIES

17.    LPL is a limited liability company organized under the laws of California and headquartered in California.  LPL's sole member, LPL Holdings, Inc., is a corporation organized under the laws of Massachusetts with its principal place of business in California.

18.    Ameriprise is a limited liability company organized under the laws of Delaware and headquartered in Minnesota.  Ameriprise's sole member, AMPF Holding Corporation, is a corporation organized under the laws of Michigan with its principal place of business in Minnesota.

## III.    JURISDICTION AND VENUE

19.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different States and the amount in controversy is in excess of $75,000.

20.    While FINRA rules require arbitration of the underlying merits of LPL's Claim, FINRA Rule 13804(a)(1) provides that "In industry or clearing disputes required to be submitted to arbitration under the Code, parties may seek a temporary injunctive order from a court of competent jurisdiction. Parties to a pending arbitration may seek a temporary injunctive order from a court of competent jurisdiction even if another party has already filed a claim arising from the same dispute in arbitration pursuant to this paragraph, provided that an arbitration hearing on a request for permanent injunctive relief pursuant to paragraph (b) of this rule has not yet begun." FINRA Rule 13804(a)(1). No such "hearing on a request for permanent injunctive relief" has occurred in the currently pending arbitration.

21.    Venue is appropriate in this District under 28 U.S.C. § 1391(b)(2) and (3) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

22.    Additionally, LPL is designating this case as related to *Ameriprise Fin. Servs., LLC v. LPL Fin. LLC*, 3:24-cv-01333-JO-MSB.  Because that case is

administratively closed, and because—as detailed herein—the issues raised, and the relief sought, herein are separate from (albeit related to) the issues raised in that action, LPL is filing this case as a separate civil action.

## IV.    FACTUAL ALLEGATIONS

### A.    Ameriprise's Franchise Agreement with Its Advisors Permits Them to Retain Their Own Customers' Information upon Departure

23.    In the independent-broker dealer ("IBD") space in which both LPL and Ameriprise operate, financial advisors (known in the industry as "registered representatives") are independent contractors of the broker-dealer.[1]    The IBD provides back-office support and supervises for compliance with the securities regulations.

24.    Advisors associate with IBDs precisely because they value their independence.    The advisor is free to source and cultivate their *own* clients, often beginning with friends and family and then developing years-long relationships in the community to build their client base.

25.    These clients in turn, view their relationship as with their *advisor*, not the back-office IBD.    As a result, they usually "follow" their advisor when they choose to affiliate with a new IBD by transferring their assets into an account held at the new IBD.

26.    As a result, registered representatives in the IBD space are commonly understood—by the advisors, the broker-dealer, and the industry as a whole—to own

---

[1] Ameriprise, like LPL, has both an independent channel (where the advisors are independent contractors) and an employee channel (where the advisors are W-2 employees).  Only the independent channel is at issue here.

their own customer base.  The advisor, by dint of their own sweat equity, has built their own book of business and has full ownership over it.[2]

27.   IBDs thus usually permit advisors to retain their customers' information when they move between firms.  They do so both because the IBD does not have proprietary ownership over it (the information relates to customers the advisor herself developed), and because refusing to do so is pointless.  The majority of customers follow their advisors between firms, given that their relationship is with the advisor and not the back-office broker-dealer.  Accordingly, an advisor can just as easily call their customer following their transition and obtain the same information to open a new account.

28.   Advisors in Ameriprise's independent channel long understood that, consistent with industry norms and principles, they too could retain their customers' information upon departure.  This understanding was expressly confirmed by, and codified in, the Ameriprise Franchise Agreement that each advisor signed with Ameriprise.

29.   Certain Addenda to the Ameriprise Franchise Agreement set forth this arrangement.  First, Addendum 3-R provides that a departing advisor who gives two weeks' notice and meets certain other conditions[3] must return original client files and proprietary materials but may retain the customer information needed to continue to service their customers:

> To the extent consistent with privacy laws and policies, in order to allow Advisor to service portable products and to fulfill compliance duties, ***Advisor may retain copies of consolidated statements, financial plans,***

---

[2] This model stands in contrast to the "wirehouse" model, in which the advisor is an employee of the broker-dealer.  The wirehouse broker-dealer provides the advisor with training and support and assists her in sourcing and developing her customer base.  It thus usually maintains an ownership interest in the resulting book of business.

[3] Namely, the advisor must have had six consecutive years of service and not be subject to discipline or an ongoing investigation, client complaint, or litigation.

*tax returns, advisor notes, insurance policies, [Ameriprise] or [Ameriprise] approved product applications and trust or other legal documents for the clients Advisor serviced at [Ameriprise].*

*See* Exhibit A at 42 (emphasis added).

30.    Similarly, Addendum 3-V, subtitled "Veteran Advisor Recruits," provides for the same arrangement.  This Addendum applies to "advisors trained outside of [Ameriprise] and having their own client base not subject to another firm's non-compete agreement." Addendum 3-V, like Addendum 3-R (and other Addenda applicable in other scenarios), also states that Veteran Advisors, like other departing Independent Advisors, "***may retain***" all of the same client files upon provision of two-weeks' notice.  *See* Ex. A at 49 (emphasis added).

31.    Accordingly, for years, Ameriprise advisors reasonably understood, based on the express language in the Ameriprise Franchise Agreement, that if they met certain conditions upon departure they could retain their customers' information in excess of name, email address, telephone number, email address, and account type (so long as they did not take original client files).

32.    This reasonable understanding was informed not only by the language of the Ameriprise Franchise Agreement but by Ameriprise's representations to advisors. Ameriprise promises advisors in its independent channel "supported independence" with opportunity for "equity ownership" of their clients.[4]

33.    And this reasonable understanding was further informed by the fact that advisors understand themselves to be sourcing and developing their own client

---

[4] *See, e.g.*, "The Value of Supported Independence," *available at* https://www.ameriprise.com/binaries/content/assets/joinameriprise/news/srg-the-value-of-supported-independence.pdf (last accessed Apr. 14, 2025); "Ameriprise Independent Advisors", *available at* https://www.ameriprise.com/careers/experienced-financial-advisors/opportunity-value/aia (last visited Apr. 14, 2025).

relationships – often cultivating them over decades, with the client following the advisor as they transition between IBDs.

**B.    Between 2018 and 2021, Thirty Financial Advisors Leave Ameriprise for LPL While Retaining Their Customers' Information Pursuant to their Ameriprise Franchise Agreements**

34.    Between 2018 and 2021, thirty financial advisors (the "Advisors")[5] left Ameriprise for LPL.  When the Advisors informed Ameriprise of their departure, they invoked their rights under the Addenda to the Franchise Agreement.  Consistent with the rights granted in those Addenda, the Advisors retained their customers' information so as to continue to service them upon their registration with LPL.

35.    That they did so was no secret to Ameriprise. When an Independent Ameriprise Advisor gives notice, an Ameriprise Field Leader generally visits the advisor's location, inspects the advisor's office, reviews any information the advisor is planning to retain, and completes a "Verification of Compliance with Obligations upon Termination of Franchise Agreement" ("VOC"). The Field Leader confirms that the Independent Advisor has not taken any more customer information than permitted. During this time, many of the Advisors made notations on the VOC about the retention of their customers' files "as permitted by Franchise Agreement" or "under the Addendum to the Franchise Agreement." The Ameriprise Field Leader signed the VOC, thus affirming Ameriprise's knowledge that certain advisors were retaining their customers' files pursuant to an Addendum to the Franchise Agreement.[6]

---

[5] The Advisors' names are protected from public disclosure by Ameriprise or LPL pursuant to a prior confidentiality agreement entered into between the parties.

[6] Even setting the VOC aside, Ameriprise also would have known what customer information its advisors were retaining through its own supervisory processes. As part of its supervisory responsibilities, Ameriprise can and does review what information an advisor accesses, downloads, or prints from its systems. Ameriprise's Field Leaders also had the opportunity to (and did) visit the departing Independent Advisor's offices and could confirm whether files were taken or left behind.

36.    Moreover, on information and belief, certain of the Advisors spoke (and even negotiated) with Ameriprise management regarding the terms and circumstances of their departures, and disclosed directly to management their intent to retain their customers' information pursuant to the Ameriprise Franchise Agreement.

37.    The Advisors thus retained their customers' information pursuant to their contracts with Ameriprise, which expressly permitted them to do so, and with Ameriprise's knowledge and consent.

38.    In order to efficiently collate and transmit this information, the Advisors input it into an Excel spreadsheet provided by LPL.  The information input was the same information that could be derived from the "consolidated statements, financial plans, tax returns" and other materials the Advisors were permitted to keep pursuant to their Ameriprise Franchise Agreements – the spreadsheet simply provided for easy collation and access to the information in bulk.  For this reason, the Excel spreadsheet is known colloquially as the "Bulk Upload Tool."

**C.    Ameriprise Begins Serial Litigation Against Departing Advisors, Asserting that *Ameriprise* Owns *The Advisors'* Customers**

39.    For years, Ameriprise took no issue with departing advisors' retention of their customers' information pursuant to the Ameriprise Franchise Agreement.

40.    But Ameriprise apparently grew frustrated with the drain of talent departing it and joining LPL.  Rather than seek to improve its systems, its payout to advisors, or the way it treats its advisors, Ameriprise began a pattern of serial and vexatious litigation against departing advisors in an apparent attempt to chill further defections.

41.    Ameriprise began this legal assault in 2021.  At that time, in connection with litigation regarding a specific advisor, Ameriprise informed LPL—for the first time—of its position that advisors could *not* retain their customers' information, notwithstanding the express language in the Addenda to the Ameriprise Franchise Agreement.

42.    Ameriprise's Privacy Notice, posted on its website,[7] does not disclose to customers that their advisors may retain their information upon departure.[8]

43.    Ameriprise took the remarkable position that its *Privacy Notice* governed what advisors could retain rather than the express terms of the Ameriprise Franchise Agreement that it agreed to and signed with the Advisors.

44.    On information and belief, Ameriprise never disclosed to the Advisors its position that they could not retain their customers' information, notwithstanding the language of their contracts or Ameriprise's own knowledge of, and consent to, their retention of the information upon departure.

45.    When Ameriprise told LPL that departing Independent Ameriprise Advisors were in fact *not* permitted to retain their customers' information, LPL decided—in an attempt to avoid further dispute with Ameriprise—to inform all incoming Ameriprise advisors that it would accept *only* the limited information allowed for under the industry agreement known as the Protocol for Broker Recruiting.[9]  All other information must be obtained by the advisor directly from the client after the advisor registers with LPL.

---

[7]*Available at*: https://www.ameriprise.com/binaries/content/assets/ampcom/wcm/AMP_Privacy-NOTICE.pdf (last accessed Apr. 12, 2025).

[8]  Pursuant to Regulation S-P, covered institutions must accurately disclose to customers how their information is being used and provide them the opportunity to opt out of certain uses.  *See* 17 C.F.R. § 248.6(a) (explaining that privacy notices to customers must provide "the categories of affiliates and nonaffiliated third parties to whom you disclose nonpublic personal information").

[9] The Protocol is an industry agreement, signed by both Ameriprise and LPL (along with many other broker-dealers), in which the parties agree not to sue each other when a departing advisor takes only five discrete items of customer information (and follows certain other requirements), even if their retention of that information is not permitted by their contract. The Protocol is not at issue in this case, although it bears

46.    LPL thought that would be the end of it.  Unfortunately, its attempt to proactively *avoid* dispute with Ameriprise failed.  Ameriprise has continued its pattern of suing advisors who depart it for LPL, despite the fact that those advisors no longer utilize the Bulk Upload Tool or otherwise depart with *any* information beyond that permitted by the Protocol.

47.    In these actions, Ameriprise has taken an extraordinary stance: it boldly asserts that *Ameriprise*, not the advisor, owns the customer relationship and all of the customers' information.  This assertion flies in the face of the Ameriprise Franchise Agreement, the norms and practices of the IBD space, the extraordinary efforts expended by the advisors to source and develop relationships with their customers, and even Ameriprise's own representations to its recruits.

48.    Indeed, Ameriprise has gone so far as to assert, in court, *that it owns an advisor's customers (and the customers' information) because it pays them an industry-standard signing bonus when it recruits them:*

> "Ameriprise paid hundreds of thousands of dollars to them in money that it hasn't gotten back . . . . So it's not their information anymore. . . . [O]n day one, when they entered into the agreements, **the clients became Ameriprise clients**."

ECF No. 33-1 (TRO Hearing Tr.) at 30:05-11, 34:8-10, *Ameriprise Fin. Servs. v. Roskelley*, *et al.* No. 2:25-cv-00455-MSB (D. Ariz. Feb. 25, 2025) (emphasis added).[10]

_____

mentioning that Ameriprise has repeatedly breached it by suing LPL and advisors even when they followed the Protocol.

[10] Ameriprise's litigation tactics have also included attempting to enforce heavily redacted, unexecuted Franchise Agreements and strategically ignoring the choice-of-law clause in the Agreement to advance its position.  *See* Dkt. 1-2, *Ameriprise v. Kenoyer, et al.*, No. 2:24-cv-01675 (W.D. Wash.) (nearly completed redacted, unexecuted agreement); Dkt. 59 at 6 n.9, *Ameriprise v. Kenoyer, et al.*, No. 2:24-cv-

49.    In connection with its serial litigation, Ameriprise has also issued false and defamatory press releases and on-the-record quotes to industry reporters.[11] Unfortunately for Ameriprise, this tactic has backfired, as advisors have taken note of its extraordinary abandonment of the principles of independence and advisor-ownership.

**D.    The Prior Proceeding in this District**

50.    Ameriprise's serial litigation touched this District once before. On July 30, 2024, Ameriprise filed a complaint—followed two weeks later by a motion for preliminary injunction—against LPL. *See Ameriprise Fin. Servs., LLC v. LPL Fin. LLC*, No. 3:24-cv-01333-JO-MSB (S.D. Cal.).

51.    In that case, Ameriprise raised the (unsubstantiated) concern that the Advisors may have retained their customers' sensitive personal information on their personal devices when they left Ameriprise and joined LPL between 2018 and 2021. Ameriprise raised the (again unsubstantiated) concern that an Advisor may then leave

———————————

01675 (W.D. Wash.) (noting that unredacted Agreement showed a Minnesota choice-of-law clause but Ameriprise had argued Agreement was governed by Washington law, and noting other instance of same conduct).

Its tactics have also included the attempted enforcement of covenants that are void and prohibited under Minnesota law (the law specified in the Agreement) but have not been removed from the Agreement (as Minnesota law requires). *Compare* Ex. A § 19(e) (prohibiting advisors from attempting to "encourage, induce, or attempt to encourage or induce or otherwise solicit any person who is employed by Ameriprise Financial or associated or affiliated with Ameriprise Financial . . . to terminate their employment) *with* Minn. Stat. Ann.§ 181.991 ("No franchisor may restrict, restrain, or prohibit in any way a franchisee from soliciting or hiring an employee of the franchisor. . . . Notwithstanding any law to the contrary, no later than May 24, 2024, franchisors shall: amend existing franchise agreements to remove any restrictive employment provision that violates subdivision 2).

[11] LPL is separately pursuing claims against Ameriprise in FINRA arbitration related to its prior false and defamatory statements to the press and public.

their laptop in a coffee shop, the laptop could be stolen, and the customer information could fall into unauthorized hands.  TRO Hearing Tr. at 9:7–10.

52.    While Ameriprise provided no evidence suggesting that this concern was even remotely plausible—the Advisors left years ago, and no such incident has ever occurred—LPL nevertheless agreed in good faith to try to investigate whether that concern had any veracity and, if so, to address it.  This agreement was memorialized in a Stipulated Order signed by the Honorable Judge Ohta.  *See* ECF 53, Case No. 3:24-cv-01333-JO-MSB.

53.    Specifically, as set forth in the Stipulated Order, the parties agreed to jointly retain a forensic examiner. *Id.* ¶ 1.  They further agreed that "If an Advisor is identified as having retained Customer and/or Non-Customer Information upon their departure from Ameriprise, the Forensic Examiner will [r]easonably review locations in the Advisor's personal devices and/or repositories" where such information is located and, "taking reasonable steps . . . to protect any personal, confidential, or sensitive information of the Advisors," delete the information (while retaining a forensic copy). *Id.* ¶ 4.

54.    LPL's intent, in entering this agreement, was to alleviate any concern that the Advisors may have accidentally retained sensitive customer information on their personal devices when they moved to LPL by (i) first determining if that in fact occurred, and (ii) if it had, facilitating the deletion of that information.

55.    The Stipulated Order was entered on December 12, 2024.  Four days later, the Court denied Ameriprise's motion for a preliminary injunction as moot and administratively closed the case.  *See* ECF 55, Case No. 3-24-cv-01333-JO-MSB.

56.    Unfortunately, Ameriprise's actions after the parties reached their agreement demonstrated that it had not entered the agreement in good faith and was not actually animated by a purported concern that information lawfully retained years ago could suddenly be left at a coffee shop.

57. Specifically, on December 31, 2024, Ameriprise (without warning) **sued** all thirty Advisors in FINRA arbitration.

58. That suit has materially changed the relationship between the parties and the state of affairs from when they entered into the Stipulated Order. The Advisors contend (as detailed above) that they had a right to retain the information they did – which belongs, at base, to the *customer* - pursuant to their contractual rights under the Ameriprise Franchise Agreement. The issue will now be decided by a panel of FINRA arbitrators, who will decide what the language in Ameriprise's Franchise Agreements means.

59. Ameriprise's subsequent actions, even beyond its filing suit against the Advisors, have further demonstrated that it is not animated by a narrow concern of preventing incidental disclosure of customer information.

60. Ameriprise has insisted that LPL (and by extension the Advisors, who are not a party to the Stipulated Order) must go far further than what is contemplated in the Stipulated Order. The Order, by its own terms, provides that **if** an Advisor is identified as having retained customer information on their personal device, a forensic examiner would **reasonably review** the device and delete the information, while taking **reasonable steps** to protect confidential, sensitive, and personal information of the Advisor. *See* ECF 53 ¶ 4, Case No. 3-24-cv-01333-JO-MSB.

61. While Ameriprise initially agreed to this language (and further represented as much in discussion with LPL), it quickly reversed course.

62. Now, Ameriprise insists that **all thirty Advisors must turn over every device they have used since they left Ameriprise years ago**, in addition to providing access to their personal emails and cloud storage. It has further insisted **every one of these devices must undergo full forensic imaging.**

63. This is far beyond what the Order contemplates or what LPL agreed to do, and represents a far-reaching and unnecessary intrusion of the Advisors' privacy.

64.    For instance, LPL understands that Ameriprise informed one of the Advisors' counsel that, *regardless* of what the Advisor says about whether they are in possession of customer information, Ameriprise would insist on obtaining a complete forensic image of the Advisor's phone (including all pictures, texts, and the like).

65.    Ameriprise's position invades on the privacy rights of the Advisors, departs from what Ameriprise agreed to in the Stipulated Order, and has stymied LPL's attempts to move the forensic review forward.

66.    Moreover, Ameriprise's actions after the parties entered into the Stipulated Order—suing the advisors, and then demanding complete forensic imaging of their devices—suggests that its true goal is to obtain unwarranted and intrusive discovery to advance its litigation position, *not* to work together to reasonably accomplish the goal of the Order.

67.    Notwithstanding the above, LPL has continued to try to work in good faith to accomplish what is actually agreed upon in the Stipulated Order: identification of whether any Advisor actually retained personal customer information on a personal device and, if so, reasonable review and deletion of that information.

**E.    Ameriprise Wrongly Weaponizes Data Breach Notification Procedures that Could Cause Mass Customer Anxiety and Confusion, in an Attempt to Gain a Strategic Advantage Over LPL**

68.    The Stipulated Order also provided that LPL would provide copies of the Bulk Upload Tools used by the Advisors "for the purpose of Ameriprise determining whether it must make notification to customers and what information to include in that notification to customers." *See* ECF 53 ¶ 6, Case No. 3-24-cv-01333-JO-MSB.

69.    LPL provided the Bulk Upload Tools on January 24, 2025.

70.    LPL thus knew and understood that Ameriprise could determine that it was required to notify certain customers.

14
**COMPLAINT**

71.    But, of course, LPL reasonably expected that any such notification would be *truthful*. LPL is aware of no obligation that would require Ameriprise to provide false statements to LPL account holders.

72.    In fact, as a FINRA member firm, any communications Ameriprise has with the public "**must** be based on principles of fair dealing and good faith, [and] **must** be fair and balanced." FINRA Rule 2210(d)(1)(A) (emphasis added). In communicating with the public, Ameriprise "**must** ensure that statements are clear and not misleading within the context in which they are made, and that they provide balanced treatment of risks and potential benefits," and "**must** consider the nature of the audience to which the communication will be directed and must provide details and explanations appropriate to the audience," FINRA Rule 2210(d)(1)(D) &(E) (emphasis added).[12]

73.    In issuing the Notice as it did, Ameriprise complied with none of these obligations.

74.    If Ameriprise actually had a good faith basis to conclude it needed to notify customers, it could have done so truthfully.  Ameriprise could have decided to inform customers that its Privacy Notice failed to disclose that their advisor may retain customer information pursuant to the Ameriprise Franchise Agreement.  LPL would have taken no issue with that.

75.    Instead, Ameriprise lied.

76.    With its litigation strategy backfiring and having apparently decided it no longer wishes to take reasonable steps to determine if customer information is on

---

[12] Rule 2210 also states that: "No member may make any false, exaggerated, unwarranted, promissory or misleading statement or claim in any communication. No member may publish, circulate or distribute any communication that the member knows or has reason to know contains any untrue statement of a material fact or is otherwise false or misleading." FINRA Rule 2210(d)(1)(B).

the Advisors' personal devices, Ameriprise decided to tarnish LPL and the Advisors to the Advisors' customers.

77.     The evening of April 8, 2025, counsel for Ameriprise sent LPL what it characterized as "a copy of the notification letter sent to customers today."  But it was not a copy, as it omitted key information, including the identities of the recipients and the specific information that was supposedly accessed without authorization.

78.     Ameriprise's counsel attached what appears to be a template document titled "NOTICE OF DATA BREACH" (the "Notice").  *See* Exhibit B.

79.     The Notice states:

**What Happened?**

I am writing to inform you of an incident involving your personal information.  Your former Ameriprise Financial advisor left Ameriprise for LPL Financial during the period 2018-2020.  In connection with that transition, your former advisor shared certain confidential personal information about you and your account(s) that exceeded the limited scope of information your former advisor was permitted to use for transition purposes.  As indicated in the Ameriprise privacy notice, this information should have been limited to your name, address, email address, phone number and account number.  Ameriprise recently became aware of this unauthorized disclosure and wanted to notify you of the incident.

*Id.*

80.     This statement is knowingly false and defamatory.  Advisors' retention of their customers' information was not a "data breach" or an "incident," nor was it "unauthorized."   It was expressly permitted under the Ameriprise Franchise Agreement and done with Ameriprise's knowledge and consent.  By the same token, the scope of information retained did not "exceed[] the limited scope of information" the Advisor was permitted to keep.  Ameriprise's own Franchise Agreement expressly states that an Advisor may keep copies of customer records and, thus, all of the information contained within them.

81. Moreover, individuals who moved their accounts to LPL with their Advisor necessarily consented to their Advisor's possession of this information. It is the very information contained within their accounts – which the Advisor has access to on a daily basis. Thus, LPL account holders clearly authorized their Advisors to possess their information.

82. Ameriprise did not "recently become aware of this unauthorized disclosure." It knew at the time, years ago, that the Advisors were retaining their customers' information. To the extent it had any doubt, that doubt was removed when LPL confirmed in 2021—in litigation commenced by Ameriprise—that Ameriprise recruits retained this information. That doubt was further removed three months ago, on January 24, 2025, when LPL provided Ameriprise with copies of the actual Bulk Upload spreadsheets provided by the Advisors upon their transitions during the 2018 to 2021 time period.

83. The Notice was also issued in bad faith.

84. This is evidenced by review of *past* data breach notices sent by Ameriprise.[13]

85. On information and belief, past data breach notices sent by Ameriprise contain *far* less detail than the Notice sent on or about April 8, 2025.

86. For example, notices issued by Ameriprise in April of 2022, September of 2022, February of 2023, and January of 2024 all state:

---

[13] The Massachusetts Office of Consumer Affairs and Business Regulation (and potentially other regulators) maintains a database of data breach notices sent to Massachusetts residents. *See* https://www.mass.gov/archive/data-breach-notification-letters (last accessed Apr. 12, 2025). Past data breach notices sent by Ameriprise are reviewable in the database. The past notices attached as Exhibits to this Complaint are true and correct copies downloaded from the database.

**What Happened?**

I am writing to inform you of an incident involving your personal information. Unfortunately, it has been determined that there has been unauthorized access to your information.

*See* Exhibit C (compilation of past Ameriprise Privacy Notices).

87.     The Notice at issue, of course, contains *far* more gratuitous (and inaccurate) detail, including a specific and unnecessary reference to LPL.

88.     That Ameriprise suddenly chose *now* to materially change the information it provides to customers in its data breach notices speaks volumes as to its *actual* intent in sending the Notice.

89.     The Notice also states that Ameriprise service representatives will be using "extra caution when verifying callers and to confirm the signature on written requests," falsely implying that the Advisors' retention of customer information *years ago* could now lead to an actual risk of identity theft.  That is plainly impossible.

90.     Similarly, the Notice directs that the recipient should "closely monitor all of your personal accounts . . . to make sure there is no unauthorized activity."  *See* Ex. B.

91.     Again, the assertion that the Advisors' possession of *their customers'* information could lead to "unauthorized activity" is false and misleading.

92.     The Notice also directs *LPL account holders* to contact *Ameriprise* regarding the data breach – leading to a high likelihood of additional customer confusion and misinformation.  *See id.*

93.     Ameriprise's decision to send a "data breach" notification letter to customers regarding their own advisors' retention of their information, which occurred *years ago* and was *authorized by Ameriprise*, is false and defamatory.

94.     Ameriprise has claimed it has some vague and unsupported regulatory obligation to send the letter.  This pretext is so flimsy as to be transparent.  If Ameriprise **truly believed** that it had a regulatory obligation to notify customers of an

alleged "data breach," it obviously should—and would—have done so when it became *aware* that advisors retained this information.

95.    Ameriprise knew *at the time the Advisors left*, between 2018 and 2021, that the Advisors were retaining their customers' information.  That is because the Advisors told them.

96.    And, *at bare minimum*, Ameriprise knew as of January 24, 2025, when LPL provided the Bulk Upload Tools, what information was at issue.

97.    Ameriprise's delay, and its decision to depart from its prior notices to provide gratuitous and false details, reveals its true goal: to attempt to gain a strategic advantage over LPL and the Advisors in light of pending disputes over the forensic review.

98.    Indeed, on information and belief, advisors have left Ameriprise for other broker-dealers besides LPL and retained their customers' information pursuant to the Ameriprise Franchise Agreement – but Ameriprise has not sent *those* customers the letter.  (To that end, it is no coincidence that the letter expressly, and gratuitously, references LPL in connection with the alleged "breach.")

99.    That is because the Notice is plainly not being sent out of any regulatory obligation to notify of a data breach, but as a weaponization of notification procedures in an attempt to scare LPL account holders about the safety and security of their information and gain a strategic advantage in the parties' ongoing dispute.[14]

_____

[14] Ameriprise has previously suggested it has a regulatory obligation to inform customers of the purported "data breach" under Regulation S-P.  Not so.  The amendment to Regulation S-P requiring that a customer be notified upon a data breach does not even take effect for Ameriprise until November 2025.  *See* "SEC Adopts Rule Amendments to Regulation S-P to Enhance Protection of Customer Information," *available at* https://www.sec.gov/newsroom/press-releases/2024-58 (last accessed Apr. 10, 2025).  Nothing in the amendment suggests it requires retroactive notification for an (alleged) breach years ago. And when that provision *does* take effect, it will not require notification if a "reasonable investigation of the

100.   The Notice also states that **LPL account holders** should contact **Ameriprise** for more information: "Please do not hesitate to contact Ameriprise Financial Customer Service at (800) 862-7919, and ask for the Privacy and Security queue."

101.   The Notice contains a section describing the data allegedly "breached," but the template Notice that Ameriprise provided LPL does not contain this information:

**What Information Was Involved?**

In addition to your name, address, email address and phone number, the following data elements were provided to the other financial firm:

<<DATA_COMPROMISED>>.

*See* Exhibit B.

102.   Thus, while Ameriprise represented that it had sent the Notice to "customers," LPL was not informed *which* accountholders at *LPL* may have received the Notice, or *what* data Ameriprise told those account holders was purportedly "compromised."

103.   LPL needs actual copies—not an incomplete template—of the Notice sent to the Advisors' customers, so that it can identify who actually received the notice and address those individuals' concerns.

_____

facts and circumstances of the incident" determines the information "has not been, and is not reasonably likely to be, used in a manner that would result in substantial harm or inconvenience[.]" 17 C.F.R. § 248.30(a)(4)(i).  Moreover, it will require firms to "provide the notice as soon as practicable, *but not later than 30 days,* after becoming aware that unauthorized access to or use of customer information has occurred or is reasonably likely to have occurred[.]" 17 C.F.R. § 248.30(a)(4)(iii) (emphasis added).  In any event, nothing in Regulation S-P, as in effect today or after the amendment goes into effect, authorize or compel a covered institution to make materially false statements to the public.

**COMPLAINT**

104.    Indeed, the Stipulated Order provided that "Ameriprise agrees to provide a copy of such notice to individuals who became customers of LPL, to LPL"—*not* an incomplete template.  ECF 53 ¶ 6, No. 24-cv-01333.

105.    At minimum, LPL needs a list of the account holders to whom the Notice was sent and a description of how the "DATA_COMPROMISED" field was filled out

106.    Upon receipt of Ameriprise's counsel's email, LPL's counsel responded, stating, "Please send me the actual copies of letters sent to LPL clients today."

107.    Counsel for Ameriprise did not respond.

108.    The next day, on April 9, 2025, LPL's counsel sent a second email to Ameriprise's counsel requesting confirmation as to whether the Notice was actually sent, and "if the letter has been sent, we need to know the complete list of customers to whom it was sent immediately[.]"

109.    Counsel for LPL also called and left messages for two separate lawyers for Ameriprise in an attempt to obtain this information.

110.    Finally, the afternoon of April 9, Ameriprise's counsel responded. However, he refused to identify to whom the Notice was actually sent. Instead, he said only: "Ameriprise sent the notification letter to those customers whom it deemed were subjects of a data breach."

111.    LPL's counsel responded:

> Michael,
> We need copies of the <u>actual</u> letters sent by Ameriprise.  In light of Ameriprise's decision to send these notification letters—which were certainly not required by Regulation S-P, or by any other state or federal law or regulation, and would be extremely untimely even *if* required—LPL now needs to contact its customers that are in receipt of the letter.  We need the letters in order to identify LPL customers that they were sent to.  Moreover, the document you sent us is a template document that does not identify what data was supposedly "compromised."  LPL needs to know what the <u>actual</u> letter to customers said so that it can determine the appropriate next steps, including appropriate messaging to its customers.

112.   Counsel for Ameriprise did not respond until the next day, April 10, at which time he again refused to provide the requested information, instead stating that "Ameriprise sent a breach notification letter to its current and former customers[.]"

113.   Counsel for LPL again explained the need to know *which* customers the letter was sent to, and *what* data Ameriprise identified as compromised. Ameriprise's counsel continued to refuse to provide this information, necessitating the filing of this action to obtain that information.[15]

114.   Finally, at 4:54 pm, on Friday, April 11, 2025, Ameriprise's counsel responded, making clear that Ameriprise would refuse to provide any further information regarding *who* the Notice was sent to, or *what* data Ameriprise is asserting was compromised.  He also represented that Ameriprise refused to send a corrective retraction.

**F.     LPL Urgently Needs to Know Which of Its Account Holders Received the Notice and What It Said About Their Data**

115.   Ameriprise's refusal to even provide information regarding to *whom* it sent the Notice and *what* the Notice actually said is putting LPL at imminent risk of irreparable harm.

116.   At this very moment, unidentified customers are receiving false and misleading letters claiming their "data" has been "breached."  The letter expressly names LPL as involved in this alleged "breach."

117.   Without information regarding *who* received this letter, LPL cannot feasibly reach out to the affected account holders to assure them that their information

---

[15] Ameriprise's position may be that LPL could "reverse-engineer" this information by reviewing the Bulk Upload Tools to determine which names listed are LPL customers and what information is listed for each name.  That position is wrong.  LPL does not know—despite expressly asking—whether Ameriprise sent the Notice to every name listed on the Bulk Upload Tools, or whether it identified every item of information on the Tools as "compromised data."  LPL should not be forced to *guess* as to who Ameriprise sent the Notice to, or what it said.

is—and has always been—safe and secure. LPL understands that Advisors are fielding calls from their customers—some of them elderly—fearing that their accounts have been hacked.

118. Indeed, subsequent developments after Ameriprise sent the Notice have demonstrated that LPL cannot predict to whom Ameriprise sent its Notice.

119. Specifically, on or about April 11, 2025, an Advisor informed LPL that an individual who is *not* an account-holder had also received the Notice. This individual is the mother of an account-holder and is listed as the beneficiary of the account-holder.

120. Ameriprise's representation that it sent the letter to "customers" thus appears to be inaccurate or, at best, fatally ambiguous.

121. LPL is being forced into an impossible Catch-22: blindly reach out to any individual it thinks *may* have received the Notice (potentially creating unnecessary alarm amongst customers who never even received it), or simply wait for account holders to inform it they are in receipt of the Notice (inevitably leading to substantial frustration and anger, and depriving LPL of contacting account holders who received the notice but did *not* inform LPL). Further compounding this is Ameriprise asking LPL account holders to call it, not LPL, for further information.

122. Ameriprise's refusal to "provide a copy of such notice to individuals who became customers of LPL, to LPL," – not an incomplete template – or at least identify *who* received the Notice, and *what* it actually said, is putting LPL at imminent risk of irreparable harm in the form of lost customer goodwill, and, potentially, lost business relationships.

123. LPL urgently needs either the actual Notices sent to customers or, at minimum, a list of the customers to whom the Notice was sent and a description of what data the Notice identifies as "compromised" in order to prevent this imminent irreparable harm.

124. Ameriprise has no basis for withholding this information.

23
**COMPLAINT**

125.   Ameriprise has claimed it is under no obligation to provide this information, and that disclosing to whom it sent the Notice would require it to also disclose the names of individuals who are not customers of LPL who received it.

126.   But this is information that LPL could, and would, ordinarily seek in discovery and be fully entitled to there.

127.   Unfortunately, LPL cannot wait for the normal discovery process (or even an expedited one) to play out.  It needs this information—which Ameriprise could provide within minutes—immediately.

128.   LPL has asked Ameriprise to retract the Notice given that it is false, defamatory, and unwarranted.

129.   Thus far, Ameriprise has refused.

130.   Upon receipt of information regarding which customers received the Notice, and what the Notice actually said, LPL can appropriately remediate Ameriprise's false and defamatory statements.

131.   On information and belief, the Notice was sent to thousands of (as-yet unidentified) LPL account holders.

132.   On information and belief, to remedy Ameriprise's actions, LPL may need to prepare letters to those account holders explaining the context of what has occurred and why their data is, and has always been, safe and secure.

133.   LPL and its advisors will also need to spend substantial time speaking with these individuals to alleviate their concerns.

134.   On information and belief, the expenditure necessary to return to the status quo (before Ameriprise sent the Notice)—including hiring a vendor to prepare mailings and conducting individualized reach-outs—will be well in excess of $75,000.

135.    After LPL obtains the narrow injunctive relief sought and returns the state of affairs to the status quo, it will then pursue its substantive claims against Ameriprise related to this misconduct in FINRA arbitration, as required under FINRA

24
**COMPLAINT**

1    rules.  LPL also intends to seek a referral of this matter to FINRA's regulatory arm to

2    investigate Ameriprise for its violations of FINRA rules.

3                           **V.      CAUSES OF ACTION**

4          136.    LPL intends to pursue the following causes of action for damages, and

5    such other relief as is necessary and proper, in the underlying and ongoing FINRA

6    arbitration between LPL and Ameriprise.[16]  LPL also intends to seek a regulatory

7    referral to FINRA Enforcement in light of Ameriprise's violations of FINRA rules.

8                           **COUNT I: DEFAMATION**

9          137.    LPL incorporates each of the preceding paragraphs as if set forth in full

10    herein.

11          138.    "The elements of a defamation claim are (1) a publication that is; (2)

12    false; (3) defamatory; (4) unprivileged; and (5) has a natural tendency to injure or

13    causes special damage." *Wong v. Jing*, 189 Cal. App. 4th 1354, 1369 (2010) (citations

14    omitted); *see also* Cal. Civ. Code § 44.

15          139.    By mailing the Notice to thousands of LPL account holders, Ameriprise

16    has published it.  *See Fields v. Twitter, Inc.*, 200 F. Supp. 3d 964, 975 (N.D. Cal. 2016)

17    ("[T]he term 'publication' means communication of the defamatory matter

18    intentionally or by a negligent act to one other than the person defamed.").

19          140.    The Notice is false.  It states that the customer's information was retained

20    and shared without authorization or permission.  In truth, the information was retained

21    pursuant to the express language of Ameriprise's Franchise Agreement and with

22    Ameriprise's knowledge and consent.

23          141.    Moreover, the Notice falsely asserts that Ameriprise only "recently

24    became aware" of the alleged "unauthorized access."  Ameriprise has known *for years*

25    of the Advisors' retention of this information.

26    _____

27    [16] LPL will be filing this pleading, and seeking to assert these claims, with FINRA in

28    the underlying arbitration.

142.   The Notice is also defamatory.  The above assertions are provably false.

143.   The statements made in the Notice are not privileged. None of the statutory bases for privilege apply to the Notice.  *See* Civ. Code, §§ 43.7 (mental health communications), 43.8 (medical communication), 43.91 (realtor communications), 47 (various), 48.9 (witness anonymity programs).

144.   The statements made in the Notice have the natural tendency to injure – indeed, they were sent with the intent to tortiously interfere with LPL's relationship with these account holders.  The Notice directly impugns the Advisors' actions in transitioning to LPL and asserts that customer information is at risk when that is not the case.  These statements have a natural tendency to lessen profits and cause a loss of customer goodwill.

145.   As a direct and proximate result of Ameriprise's defamatory statements, LPL sustained and will continue to sustain irreparable injury and monetary damages.

## COUNT II: TORTIOUS INTERFERENCE

146.   "Under California law, a claim for tortious interference requires: '(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm proximately caused by the acts of the defendant.'" *Song fi Inc. v. Google, Inc.*, 108 F. Supp. 3d 876, 887 (N.D. Cal. 2015) (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 131 Cal.Rptr.2d 29, 63 P.3d 937, 950 (2003)).

147.   LPL has an economic relationship with the accountholders who received (or will receive) the Notice.  The accountholders pay fees to LPL in connection with the maintenance and management of their accounts.

148.   Ameriprise knows that it has sent the Notice to LPL account holders (and refuses to tell LPL *who* amongst its account holders it sent the Notice to).

149.  By mailing the Notice, Ameriprise has intentionally acted to disrupt LPL's relationship with these account holders.

150.  LPL's relationship with its account holders has, in fact, been disrupted. Account holders are receiving the Notice and expressing fear and anxiety about potential unauthorized access to their data.

151.  As a direct and proximate result of Ameriprise's tortious interference, LPL is suffering, and will continue to suffer, economic harm (in addition to irreparable injury).  LPL must expend significant resources to correct Ameriprise's false statements.  Moreover, account holders may leave LPL as a result of the false and defamatory statements in the Notice.

## VI.    RELIEF REQUESTED

152.  WHEREFORE, LPL respectfully requests that a judgment be entered ordering:

i.    Ameriprise to immediately provide LPL with (i) copies of the actual Notices sent to LPL account holders; or (ii) a list of the account holders to whom the Notice was sent, as well as a description of what information was included in the "<<DATA_COMPROMISED>>" field in the template Notice;

ii.    Ameriprise to cease and desist from sending any other false, misleading, or defamatory statements to LPL account holders and from making any other false, misleading, or defamatory statements about LPL; and

iii.    Such other and further relief as the Court deems just and proper.

DATED:  April 14, 2025                    Respectfully submitted,

_/s/ Molly M. White_

Molly M. White, Bar No. 171448
Cheryl L. Haas (_pro hac vice_ forthcoming)
Alex Madrid (_pro hac vice_ forthcoming)
Brittney M. Angelich, Bar No. 313011
MCGUIREWOODS LLP
1800 Century Park East
Los Angeles, California 90067
Tel.:  (310) 315-8200

27
**COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Jeffrey K. Compton, Bar No. 142969
MARKUN ZUSMAN & COMPTON LLP
16255 Ventura Blvd.
Suite 910
Encino, California 91436
Tel.: (310) 454-5900

Attorneys for Plaintiff
LPL FINANCIAL LLC

# EXHIBIT A

# AMERICAN EXPRESS FINANCIAL ADVISORS INC.
## INDEPENDENT ADVISOR BUSINESS
## FRANCHISE AGREEMENT

American Express Financial Advisors Inc.
Franchise Agreement - 10/25/99

EXHIBIT "A"

# TABLE OF CONTENTS

<u>Section</u>                                                                                    <u>Page</u>

RECITALS.....................................…………....................... ..........1

1.    GRANT...........................................................................................1
2.    TERM AND RENEWAL ................................................................3
3.    DUTIES OF AEFA ..........................................................................4
4.    FEES AND COMPENSATION .......................................................5
5.    ONGOING DUTIES OF INDEPENDENT ADVISOR .....................6
6.    OPENING OF FRANCHISED BUSINESS ................................... 9
7.    ORIENTATION AND TRAINING................................................10
8.    PROPRIETARY MARKS ..............................................................10
9.    MANUALS.....................................................................................12
10.   CONFIDENTIAL INFORMATION ..............................................13
11.   ACCOUNTING AND RECORDS .................................................14
12.   ADVERTISING AND PROMOTION ...........................................14
13.   ERRORS AND OMISSIONS COVERAGE/INSURANCE ............17
14.   TRANSFER OF INTEREST ..........................................................18
15.   COMPLIANCE AND INSPECTIONS ...........................................21
16.   SPECIAL REGULATORY SUPERVISION ..................................22
17.   DEFAULT AND TERMINATION .................................................23
18.   OBLIGATIONS UPON TERMINATION OR EXPIRATION.........26
19.   COVENANTS ................................................................................28
20.   TAXES, PERMITS, AND INDEBTEDNESS .................................30
21.   INDEPENDENT CONTRACTOR AND INDEMNIFICATION ......31
22.   APPROVALS AND WAIVERS ......................................................32
23.   NOTICES.......................................................................................32
24.   ENTIRE AGREEMENT .................................................................33
25.   SEVERABILITY AND CONSTRUCTION .....................................33
26.   APPLICABLE LAW .......................................................................33
27.   ACKNOWLEDGMENTS ...............................................................34

## AGREEMENT

THIS IS AN AGREEMENT, made and entered into on _____, 20___, by and between American Express Financial Advisors Inc. ("**AEFA**") at its principal place of business at IDS Tower 10, Minneapolis,           Minnesota           55440,           and           you, _____ ("**Independent Advisor**").

RECITALS:

A.     Through its time, skill, effort, and money, AEFA has developed a distinctive system that offers, through financial advisors, a variety of financial services to individuals and/or business owners (the "**System**"). The financial services include financial planning, investment advice and consulting services, securities products, insurance products, brokerage services, , including individual securities, tax services, lending services, and other related products & services provided or procured through AEFA and/or its affiliates or third parties (collectively, "**Products & Services**").

B.     The distinguishing characteristics of the System include a well recognized brand; distinctive products & services; high level of securities and regulatory compliance; the highest standards of customer service and quality advice, including financial planning; administrative procedures providing superior customer service, including consolidated statements; orientation programs; advertising and promotional programs; and direct marketing services, telemarketing and on-line services directed to clients; all of which may be changed, improved, and further developed by AEFA from time to time.

C.     The System is identified by trade names, service marks, trademarks, logos, emblems, and indicia of origin, including, the mark "American Express," (the "**Proprietary Marks**");

D.     Independent Advisor desires to contract with AEFA to operate a business offering Products & Services under the System and using the Proprietary Marks (the "**Independent Financial Advisor Business**"), and to receive the services provided by AEFA in consideration for the covenants contained herein; and

E.     Independent Advisor understands and acknowledges the importance of all the Independent Financial Advisors operating their Independent Financial Advisor Businesses in a manner which meets AEFA's high standards of quality of advice and customer service, to protect the value and integrity of the System and all the Independent Financial Advisor Businesses.

THEREFORE, Independent Advisor and AEFA agree as follows:

1.     GRANT

A. Independent Financial Advisor Business.
- AEFA and Independent Advisor agree upon the terms and conditions in this Agreement, for Independent Advisors to establish and operate the Independent Financial Advisor Business.

---

American Express Financial Advisors Inc.
Franchise Agreement - 10/25/99

- Independent Advisor agrees to operate the Independent Financial Advisor Business only at the location specified in Schedule A (the "**Location**") in the market group (as described in the Uniform Franchise Offering Circular) (the "**Market Group**").  Independent Advisor agrees to not relocate the Independent Financial Advisor Business outside the Market Group without prior written approval by AEFA, which approval will not be unreasonably withheld.

- AEFA will only compensate an appropriately licensed individual.  Accordingly, Independent Advisor agrees to operate the Independent Financial Advisor Business, as described in this Agreement, as an individual business and shall not conduct such business as a corporation, partnership, limited liability company, sub-chapter S company or any other similar organizational structure.   This shall not prevent Independent Advisor from operating other related businesses as described in Section 5, under the heading Use of Premises, and in the Manuals.

- Independent Advisor agrees to have the right during the term of this Agreement to solicit Clients for Products & Services as more fully described in Section 5 and in the Manuals.  For purposes of this Agreement, "**Client**" shall mean a person or entity that acquires any Products & Services from or through Independent Advisor, AEFA, AEFA's affiliates, or an advisor operating under the System.

- Independent Advisor acknowledges that the System may be supplemented, improved, and otherwise modified from time to time by AEFA; and Independent Advisor agrees to comply with all reasonable requirements of AEFA in that regard.

B. <u>Non-Exclusive Agreement</u>.

- **INDEPENDENT ADVISOR EXPRESSLY ACKNOWLEDGES AND AGREES THAT THIS INDEPENDENT ADVISOR FINANCIAL ADVISOR BUSINESS IS NON-EXCLUSIVE, AND THAT THIS AGREEMENT DOES NOT GRANT OR IMPLY ANY PROTECTED AREA, TERRITORY, OR CLIENTS FOR THE INDEPENDENT FINANCIAL ADVISOR BUSINESS.    BY WAY OF EXAMPLE, OTHER INDEPENDENT ADVISORS, AEFA, AND ITS AFFILIATES MAY OR WILL CONTINUE TO MARKET, AT INDEPENDENT ADVISOR'S LOCATION, THROUGH EMPLOYEES, AGENTS, DEALERS, DIRECT MARKETING, TELEMARKETING, AND ON-LINE SERVICES.**

- AEFA and its affiliates reserve the following rights:

  a.  To offer financial products and services, including Products & Services, directly or indirectly to any client or business (including the Clients), or license others to offer Products & Services under any proprietary marks (including the Proprietary Marks) at any location, through other Independent Advisors, employees, direct marketing, telemarketing, on-line services, third-party marketers and any other distribution method;

  b.  To own and/or operate, and license others to operate, businesses that offer Products & Services using the System and Proprietary Marks, at any location; and

---

American Express Financial Advisors Inc.
Franchise Agreement - 10/25/99

    c.   To own and/or operate, and license others to operate, businesses that offer other investment opportunities and financial services and products, using proprietary marks other than the Proprietary Marks or other systems, whether such businesses are similar to or different from the Independent Financial Advisor Business, at any location.

- Independent Advisor acknowledges and agrees that AEFA and certain of AEFA's affiliates and designees (including other Independent Advisors of AEFA, AEFA employees, third-party dealers, persons associated with such persons, and mail orders services) now sell, and shall continue to have the right to sell, Products & Services, to clients located in the same or close proximity to Independent Advisor's Location; and that AEFA and such affiliates and designees shall be direct competitors of Independent Advisor.

- AEFA expressly reserves any and all rights not explicitly granted to Independent Advisor by the terms and conditions of this Agreement.

2.    <u>TERM AND RENEWAL</u>

- <u>Three-Year Term</u>.  This Agreement shall be in effect upon its execution by AEFA and, except as otherwise provided herein, the term of this Agreement shall be three (3) years from the date of execution by AEFA.

- <u>Renewal</u>.  This Agreement will automatically renew for additional terms of three (3) years, subject to satisfaction of the following conditions:

    a.   The premises of the Independent Financial Advisor Business under Independent Advisor's control and supervision (the **"Premises"**) shall meet reasonable professional standards and the requirements set forth in the Manuals regarding signage and the use of Proprietary Marks;

    b.   Independent Advisor agrees to not be in default of any provision of this Agreement, any other agreement between Independent Advisor and AEFA or its affiliates, or any standards applicable to Independent Advisor as set forth in the Manuals; and Independent Advisor agrees to have substantially complied with all the terms and conditions of such agreements and standards;

    c.   Except as otherwise allowed by AEFA, Independent Advisor agrees to have satisfied all monetary obligations owed by Independent Advisor to AEFA and its affiliates, and shall have timely met those obligations throughout the term of this Agreement.

- <u>Terminating the System</u>.  In the event of changes in regulatory, market or industry conditions, AEFA may make a policy decision to terminate or dissolve the System upon ninety (90) days' written notice to Independent Advisors.  In the event AEFA terminates or dissolves the System, AEFA shall make available to Independent Advisor a new form of agreement, which will be substantially similar to the terms of this Agreement.

3.     <u>DUTIES OF AEFA</u>

- <u>Compensation</u>.  Within thirteen (13) business days of the end of each Accounting Period (defined below), AEFA agrees to prepare a statement (i) containing a summary of Independent Advisor's financial activity for Products & Services during such Accounting Period  (the "**Commission Statement**"), (ii) detailing the Compensation as defined in Section 4 below, and (iii) containing certain confidential Client information.  With each Commission Statement, AEFA agrees to remit Independent Advisor's share of the Compensation.  AEFA may provide the Commission Statement by providing Independent Advisor with limited access to AEFA's computer system for the purpose of downloading the Commission Statement.  "**Accounting Period**" means each of the two week accounting periods in a calendar year, as determined by AEFA.

- <u>Offering and Servicing Products and Services</u>.  AEFA, except as otherwise provided herein, shall provide those Products & Services distributed or offered by AEFA and/or its affiliates consistent with the standards set forth in the Manuals.   AEFA agrees to perform such bookkeeping, processing, and related functions as described in the Manuals.  AEFA agrees to process all applications from Clients for Products & Services.  AEFA retains the right to reject any application for Products & Services that does not meet the qualifications, specifications, or standards set forth in the Manuals. AEFA agrees to provide Clients with consolidated statements as provided in the Manuals.  AEFA agrees to provide Independent Advisor with certain forms, brochures, prospectuses, and sales literature required to process the Independent Financial Advisor Business as part of the Association Fee.   AEFA will provide to Independent Advisor certain other forms, brochures, and sales literature related to Products & Services for a fee.

- <u>Advertising and Promotions</u>.  AEFA agrees to provide national advertising, as provided in Section 12 below, as part of the Association fee. AEFA may make available for a fee American Express Cardmember leads to Independent Advisors who meet criteria described in the Manuals.  AEFA may develop promotional programs and sales campaigns for Products & Services, the nature, duration, and geographic scope of which shall be determined by AEFA.

- <u>Compliance</u>.   AEFA agrees to provide regulatory compliance training and corporate compliance oversight as part of the Association Fee.  AEFA agrees to conduct, as it deems advisable and consistent with its regulatory and supervisory obligations, inspections of Independent Advisor's operation of the Independent Financial Advisor Business for the purpose of establishing Independent Advisor's compliance with this Agreement and with all federal, state, local and NASD (and other self-regulatory organizations) laws, rules, and regulations requirements, including licensing requirements, and all of AEFA's policies and practices in the Client Relations Manuals (hereinafter referred to as "**Compliance Rules**").

- <u>Orientation and Training</u>.  As provided in Section 7 below, AEFA agrees to (i) provide an initial orientation program as part of the Initial Franchise Fee to Independent Advisor, and (ii) offer continuing education programs as it deems necessary for a fee.

---

Case 3:25-cv-00880-JO-MSB    Document 1    Filed 04/14/25    PageID.37    Page 37 of
Case 1:21-cv-00347-DKW-RT    Document 130    Filed 08/16/21    Page 7 of 69    PageID.33
130

- Premises.  AEFA agrees to make available signage specifications to Independent Advisor as part of the Association Fee.  AEFA may provide for a fee on-site pre-opening and opening assistance to ensure the orderly opening of an office as Independent Advisor requests.

- Manuals.  AEFA agrees to provide Independent Advisor, on loan, one copy of AEFA's Confidential Manuals (the "**Manuals**"), as more fully described in Section 9 hereof. The Manuals shall also include AEFA's Quality of Advice Standards, Client Satisfaction Standards and Client Relations Manuals.

- Other Optional Services.  AEFA agrees to offer optional services to Independent Advisor for a fee, as described in the Manuals.

- Independent Advisor acknowledges and agrees that any duty or obligation imposed on AEFA by this Agreement may be performed by a Branch Manager (as defined below), any independent contractor, designee, employee, or agent of AEFA, as AEFA may direct.

4.    FEES AND COMPENSATION
- Initial Franchise Fee.  In consideration of the franchise granted herein, Independent Advisor has paid to AEFA an initial franchise fee of One Thousand Five Hundred Dollars ($1,500), receipt of which is hereby acknowledged, and which is non-refundable.  Independent Advisor is paying this fee in consideration of administrative and other expenses incurred by AEFA in entering into this Agreement.

- Association Fee.  During each Accounting Period (but not in the third Accounting Period of any month that has three Accounting Periods), Independent Advisor authorizes AEFA to deduct the association fee of One Hundred Ninety-Five Dollars ($195) for national advertising, accounting, payroll, compliance and fidelity bond coverage and errors and omissions program participation as set forth in the Manuals (the "**Association Fee**") from the portion of the Compensation due to Independent Advisor.  During any Accounting Period in which Independent Advisor is not entitled to a portion of the Compensation or Independent Advisor's share of the Compensation is less than the Association Fee, Independent Advisor agrees to promptly pay to AEFA the Association Fee as provided in the Manuals.

- Compensation.  As long as this Agreement is in effect and Independent Advisor is not in default hereunder or under Special Regulatory Supervision (as defined below), AEFA agrees to (i) retain a percentage of the Compensation for each Accounting Period as set forth in the compensation schedule which is in the Manuals; (the "**Compensation Schedule**") (ii) pay to Independent Advisor's branch manager (the "**Branch Manager**") in accordance with the branch agreement (the "**Branch Agreement**") the specified amount of the Compensation for each Accounting Period, (iii) pay to Independent Advisor after deducting the Association Fee, any other fees, interest, or other monies due to AEFA for Services authorized by Independent Advisor and/or other deductions provided for in this Agreement, the balance of the Compensation for each Accounting Period in accordance with Section 3.

  As used in this Agreement, "Compensation" which is further defined in the Manuals, is the compensation from a product sale as specified in the Compensation Schedule, based on what Products & Services the Advisor sells.

Case 3:25-cv-00880-JO-MSB    Document 1    Filed 04/14/25    PageID.38    Page 38 of
Case 1:21-cv-00347-DKW-RT    Document 130    Filed 08/16/21    Page 8 of 69  PageID.34
                                              130

- <u>Method of Payment</u>.  AEFA agrees to have the right to make the payments to Independent Advisor due under Section 4 by telegraphic transfer, auto-draft arrangement, electronic funds transfer, or by other means AEFA may specify from time to time, to a bank account designated by Independent Advisor, in accordance with procedures in the Manuals; provided, however, that if Independent Advisor requests payment under Section 4 in the form of a check, AEFA may charge a reasonable fee to Independent Advisor for providing payment via check.

- <u>Uncollected Payments</u>.  If there are any uncollected payments (i) for Products & Services that Independent Advisor failed to remit to AEFA, (ii) an error occurs and Independent Advisor receives an overpayment, (iii) a payment has been made to Independent Advisor for any canceled or returned Products & Services, (iv) there is a loss, refund or payment due to a settlement or claim related to Products & Services purchased by a Client that Independent Advisor serviced, and/or (v) Independent Advisor owes AEFA pursuant to Section 21 below, AEFA may deduct such amount from the percentage of Compensation due to Independent Advisor in any Accounting Period following the event.

- <u>Incentive Programs</u>.  AEFA may offer incentive programs, such as awards and conferences as described in the Manuals.

- <u>Disclaimer of Benefits.</u>  Independent Advisor acknowledges that the Manuals, including the Compensation Schedule contained therein, constitute the complete list of the compensation and benefits owed Independent Advisor resulting from this Agreement or Independent Advisor's relationship with AEFA.  Independent Advisor acknowledges that Independent Advisor has no claim to any other compensation or benefit plan, program or policy of or sponsored by AEFA unless such plan, policy or benefit plan specifically references Independent Advisors in their role as Independent Advisors as an eligible group under such plan, program or policy and Independent Advisor meets all conditions for eligibility set forth in such program.

5.    <u>ONGOING DUTIES OF INDEPENDENT ADVISOR</u>

- Independent Advisor shares AEFA's and the other Independent Advisors' commitment to high standards of financial planning, quality advice and customer service to increase the demand for Products & Services offered by all Independent Advisors operating under the System, and to protect the reputation and goodwill of AEFA and the  Proprietary Marks through regulatory compliance and related policies.   Consistent with this commitment, Independent Advisor agrees:

    a.    <u>Compliance</u>.  To maintain all required licenses and regulatory compliance standards consistent with the standards set forth in Section 15 and the Manuals, including Client Relations Manuals and Compliance Rules as defined in this Agreement.

    b.    <u>Financial Planning</u>. To produce a minimum of five (5) financial plans or Three Thousand Dollars ($3,000) in fees during the year 2000.  AEFA reserves the right to increase this minimum on an annual basis and will provide written notice of any such increase 60 days prior to the beginning of each year.  During the first three year term, the maximum requirement AEFA may impose is seven (7) plans or Four Thousand

Case 3:25-cv-00880-JO-MSB    Document 1    Filed 04/14/25    PageID.39    Page 39 of
Case 1:21-cv-00347-DKW-RT    Document 1-10    Filed 08/16/21    Page 9 of 69    PageID.35
130

Two Hundred Dollars ($4,200) in fees per year.  AEFA may make exceptions to these requirements on an individual Independent Advisor basis, provided that the branch office where the Independent Advisor is located has an average on a per advisor basis of the current minimum number of plans or the current minimum dollar amount.  The definition of "financial plan" and the definition of "fee" shall be as described in the appropriate AEFA financial planning ADV brochure, and specifically excludes services or fees described in the wrap fee program ADV brochures.

c.  <u>Quality of Advice</u>.  To maintain a Quality of Advice standard of at least level three (3), as more fully described in the Manuals.

d.  <u>Client Satisfaction</u>.  To maintain Client Satisfaction Standards of at least seventy percent (70%), as more fully described in the Manuals.

e.  <u>Premises and Signage</u>.  To  maintain, at Independent Advisor's expense, an office with the fixtures, furnishings, and equipment necessary to maintain professional standards for the operation of the Independent Financial Advisor Business. Independent Advisor agrees to purchase and install signs as provided in the Manuals.

f.  <u>Products and Services</u>.  To offer, provide, and market the Products & Services to Clients.

- <u>Use of Premises</u>.  Independent Advisor agrees to use the Premises to operate the Independent Financial Advisor Business and any other activities for which Independent Advisor has obtained written consent from AEFA or provided notice to AEFA as specified in the Manuals, or for other uses which do not require consent or notice as explained in the Manuals; and shall refrain from using or permitting the use of the Premises for any other purpose at any time without first obtaining written consent from AEFA or providing notice to AEFA as specified in the Manuals, or unless the use is permitted without obtaining consent or providing notice as specified in the Manuals.

- <u>Client Service</u>.  As provided in the Manuals, Independent Advisor agrees to:  (a) promptly submit complete and accurate applications for Products & Services and other financial information required by AEFA to comply with legal, regulatory, underwriting or AEFA's internal processing requirements; (b) promptly forward all payments received from Clients for Products & Services to AEFA; and (c) preserve good customer relations; render competent, prompt, courteous, and knowledgeable service; and meet such minimum standards as AEFA may establish from time to time in the Manuals.

- <u>Territory</u>. Independent Advisor will operate the Independent Financial Advisor Business at the Location and in the Market Group.  Independent Advisor will not relocate the office of the Independent Financial Advisor Business outside the Market Group without prior written approval from AEFA. AEFA recognizes that Independent Advisor may desire to actively seek prospects outside the Market Group, and in order to do this, Independent Advisor agrees to obtain the approval of AEFA, which approval shall not be unreasonably withheld, and provided Independent Advisor and the person who performs regulatory supervision for the Independent Advisor have the appropriate licenses. Independent Advisor may also service

unsolicited clients outside the Market Group, provided Independent Advisor and the person who performs regulatory supervision for the Independent Advisor have the appropriate licenses. Independent Advisor may continue to accept referrals from outside the Market Group. AEFA may change Market Group boundaries. Independent Financial Advisor Business will not be adversely impacted by these changes and Independent Advisor will have the benefits of the new Market Group boundaries.

- <u>Computer Hardware and Software</u>. Independent Advisor agrees to purchase or lease a computer system that meets the specifications of AEFA, including such peripheral devices and equipment as AEFA may specify in the Manuals, or otherwise in writing, as reasonably necessary for the efficient management and operation of the Independent Financial Advisor Business and the transmission of data to and from AEFA. AEFA may specify in the Manuals or otherwise in writing the information that Independent Advisor agrees to collect and maintain on the computer system installed at the Independent Financial Advisor Business to satisfy regulatory and processing requirements, and Independent Advisor agrees to provide to AEFA such information as AEFA may reasonably request from the data so collected and maintained. While AEFA does not intend to have access to personal or other non-Independent Financial Advisor Business activities, Independent Advisor agrees to permit AEFA, upon AEFA's request, to access the computer system installed at the Independent Financial Advisor Business for the purpose of obtaining AEFA-related information from Independent Advisor's computer system to satisfy regulatory and business processing requirements. Independent Advisor agrees to acquire from AEFA or, if any, an approved vendor, a license to use software designated by AEFA for the computer system. In order to send messages electronically, AEFA may require Independent Advisor to establish and maintain an e-mail address with an Internet provider. At the request of AEFA, Independent Advisor agrees to obtain such upgrades, or other modifications to the computer system and software to conform to the specifications of AEFA.

- <u>Approved Products & Services</u>. Independent Advisor agrees to obtain all AEFA Products & Services solely from AEFA, or from suppliers approved by AEFA. If Independent Advisor desires to offer products or services, other than those already approved in the Manuals, Independent Advisor agrees to submit to AEFA a written request to approve the proposed products or services and its supplier, together with such evidence of conformity with AEFA's specifications as AEFA may reasonably require. AEFA agrees to have the right to require that its representatives be permitted to evaluate the proposed products or services. AEFA agrees to, within thirty (30) days after its receipt of such request, notify Independent Advisor in writing of its approval or disapproval of the proposed products or services and/or supplier. AEFA reserves the right to (i) deny approval of any proposed products or services and/or supplier, (ii) limit the number of approved products and services and approved suppliers, and/or (iii) condition approval of unapproved products and services on AEFA being the supplier of such products and services. Independent Advisor agrees to not offer for sale or sell any products or services until written approval by AEFA of the proposed product or service or supplier is received. AEFA may from time to time revoke its approval of particular Products & Services or suppliers if AEFA determines, in its sole discretion, that the Products & Services or suppliers no longer meet the standards of AEFA. Upon receipt of written notice of such revocation, Independent Advisor agrees to cease to offer and sell any disapproved Products & Services and/or cease to purchase from any disapproved supplier, although Independent Advisor may continue to service such Products and Services.

Case 3:25-cv-00880-JO-MSB    Document 1    Filed 04/14/25    PageID.41    Page 41 of
Case 1:21-cv-00347-DKW-RT    Document 1-30    Filed 08/16/21    Page 11 of 69  PageID.37
130

- <u>Use of Proprietary Marks</u>.  Independent Advisor agrees to ensure that all advertising and promotional materials, signs, decorations, stationery, business forms, and other items bear the Proprietary Marks in the form, color, location, and manner prescribed by AEFA. Independent Advisor will use best efforts to uphold the reputation and goodwill of AEFA, and its affiliates.

- <u>Employees of Independent Advisor</u>.  Independent Advisor agrees to be solely responsible for all employment decisions and all state, federal, and local laws and functions of the Independent Financial Advisor Business, including, without limitation, those related to hiring, firing, training, wage and hour requirements, compensation, promotion, record-keeping, supervision, and discipline of employees. Independent Advisor's employees must be competent, conscientious, and properly trained and licensed.  Any licensed employee of Independent Advisor must be approved by and licensed with AEFA.

- <u>No Changes Without Consent</u>.  Independent Advisor agrees to not implement any material change to the System without the express prior written consent of AEFA.  Independent Advisor agrees to notify AEFA in writing of any material change to the System which Independent Advisor proposes to make, and shall provide to AEFA such information as AEFA requests regarding the proposed change.   AEFA may, but is not obligated to, compensate Independent Advisor for consulting services regarding a material change to the System proposed by Independent Advisor.  Independent Advisor acknowledges and agrees that AEFA shall have the right to incorporate the proposed material change into the System and shall thereupon obtain all right, title, and interest therein without the obligation to compensate Independent Advisor.

6.    <u>OPENING OF FRANCHISED BUSINESS</u>

- Independent Advisor agrees to furnish and equip the Independent Financial Advisor Business at Independent Advisor's own expense.

- Independent Advisor may use the Premises only for the operation of the Independent Financial Advisor Business and such other authorized activities for which Independent Advisor has obtained written consent or notice from AEFA or has provided notice to AEFA as specified in the Manuals.

- Independent Advisor agrees to be responsible for obtaining, at Independent Advisor's expense, all appropriate permits, certificates, licenses, and training, which may be required by NASD, AEFA, and other governmental and regulatory agencies.

- Independent Advisor agrees to obtain AEFA's written approval prior to opening the Independent Financial Advisor Business, which approval shall not be unreasonably withheld, and shall open the Independent Financial Advisor Business within sixty (60) days after the date of this Agreement.

Case 3:25-cv-00880-JO-MSB    Document 1    Filed 04/14/25    PageID.42    Page 42 of
Case 1:21-cv-00347-DKW-RT    Document 1-10    Filed 08/16/21    Page 12 of 69   PageID.38
130

7.    ORIENTATION AND TRAINING

- Independent Advisor represents that he or she has the requisite experience, skills and training to operate the Independent Financial Advisor Business in a manner consistent with the high standards of quality of advice and customer service of other Independent Financial Advisor Business operating under the System.  Prior to the opening of the Independent Financial Advisor Business, Independent Advisor agrees to attend and complete to AEFA's satisfaction the initial orientation program for Independent Advisors offered by AEFA.    Independent Advisor agrees to attend regulatory compliance seminars as set forth in the Manuals.  For a fee, Independent Advisor and Independent Advisor's employees may attend optional courses, seminars, and other training programs offered by AEFA.

- AEFA agrees to offer, as AEFA deems appropriate, advanced education programs ("**Advanced Programs**") that may (i) relate to certain Products & Services, (ii) enable Independent Advisor to offer additional Products & Services, (iii) enable Independent Advisor to obtain permits, certificates, and licenses to offer additional Products & Services, (iv) satisfy regulatory requirements,  and (v) cover customer service, marketing to Clients, promotion, and other topics related to operation of the Independent Financial Advisor Business.  Independent Advisor shall not be required to attend such Advanced Programs, except as necessary to satisfy regulatory requirements.  Independent Advisor agrees to pay a fee, if any, specified by AEFA to participate in all Advanced Programs.

- Orientation programs, regulatory compliance programs and Advanced Programs shall be at such times and places or through other methods, such as computer software or websites, as may be designated by AEFA.  For the initial orientation program, AEFA agrees to provide, at no additional charge to Independent Advisor, instructors and program materials; and Independent Advisor agrees to be responsible for any and all other expenses incurred by Independent Advisor or its employees in connection with any such program, including, without limitation, the costs of transportation, lodging, meals, and wages.

8.    PROPRIETARY MARKS

- AEFA represents with respect to the Proprietary Marks that AEFA has the right to use, and to license others to use, the Proprietary Marks.

- With respect to Independent Advisor's use of the Proprietary Marks:

    a.    Independent Advisor agrees to use only the Proprietary Marks designated by AEFA, and shall use them only in the manner authorized and permitted by AEFA.  If AEFA is no longer authorized to use the Proprietary Marks, Independent Advisor will not be able to continue to use the Proprietary Marks;

    b.    Independent Advisor agrees to use the Proprietary Marks only (i) for the operation of the Independent Financial Advisor Business, (ii) in connections with Products & Services approved in the Manuals for use in connection with the Proprietary Marks, or (iii) in advertising approved by AEFA for the Independent Financial Advisor Business;

Case 3:25-cv-00880-JO-MSB    Document 1    Filed 04/14/25    PageID.43    Page 43 of
Case 1:21-cv-00347-DKW-RT    Document 1-30    Filed 08/16/21    Page 13 of 69    PageID.39
130

    c.   Unless otherwise authorized or required by AEFA, Independent Advisor agrees to operate and advertise the Independent Financial Advisor Business only under the Proprietary Marks, and shall use all Proprietary Marks without prefix or suffix in the manner required by AEFA;

    d.   Independent Advisor agrees to identify himself or herself as the owner of the Independent Financial Advisor Business in conjunction with any use of the Proprietary Marks in the manner required by AEFA;

    e.   Independent Advisor's right to use the Proprietary Marks is limited to such uses as are authorized under this Agreement, and any unauthorized use thereof shall constitute an infringement of rights of AEFA;

    f.   Independent Advisor agrees to not use the Proprietary Marks to incur any obligation or indebtedness on behalf of AEFA;

    g.   Independent Advisor agrees to execute any documents deemed necessary by AEFA to obtain protection for the Proprietary Marks or to maintain their continued validity and enforceability; and

    h.   Independent Advisor agrees to promptly notify AEFA of any suspected unauthorized use of the Proprietary Marks, any challenge to the validity of the Proprietary Marks, or any challenge to AEFA's ownership of, AEFA's right to use and to license others to use, or Independent Advisor's right to use, the Proprietary Marks. Independent Advisor acknowledges that AEFA has the sole right to direct and control any administrative proceeding or litigation involving the Proprietary Marks, including any settlement thereof. AEFA has the right, but not the obligation, to take action against uses by others that may constitute infringement of the Proprietary Marks. AEFA agrees to defend Independent Advisor against any third-party claim, suit, or demand arising out of Independent Advisor's use of the Proprietary Marks. Independent Advisor agrees to execute any and all documents and do such acts as may, in the opinion of AEFA, be necessary or advisable to protect and maintain the interests of AEFA and Independent Advisor in the Proprietary Marks. Except to the extent that such litigation is the result of Independent Advisor's use in a manner inconsistent with the terms of this Agreement, AEFA agrees to reimburse Independent Advisor for his or her out-of-pocket costs in doing such acts.

- Independent Advisor expressly understands and acknowledges that:

    a.   AEFA and/or its affiliates are the owners of all right, title, and interest in and to the Proprietary Marks and the goodwill associated with and symbolized by them, and AEFA has the right to use, and license others to use, the Proprietary Marks;

    b.   The Proprietary Marks are valid and serve to identify the System, the AEFA Distributed Products & Services, and those who are authorized to operate under the System;

c. During the term of this Agreement and after its expiration or termination, Independent Advisor agrees to not directly or indirectly contest the validity of, or AEFA's ownership of, or right to use and license others to use, the Proprietary Marks;

d. Independent Advisor's use of the Proprietary Marks does not give Independent Advisor any ownership interest or other interest in or to the Proprietary Marks;

e. Any and all goodwill arising from Independent Advisor's use of the Proprietary Marks shall inure solely and exclusively to the benefit of AEFA, and upon expiration or termination of this Agreement, no monetary amount shall be assigned as attributable to any goodwill associated with Independent Advisor's use of AEFA's System or the Proprietary Marks;

f. The license of the Proprietary Marks granted hereunder to Independent Advisor is nonexclusive, and AEFA thus has and retains the rights, among others:  (a) to use the Proprietary Marks itself in connection with selling products and services (including Products & Services that Independent Advisor will offer and sell); (b) to grant other licenses for the Proprietary Marks, including to licensees outside of the System; and (c) to develop and establish other systems using the Proprietary Marks, similar proprietary marks, or any other proprietary marks, and to grant licenses thereto without providing any rights therein to Independent Advisor; and

g. AEFA reserves the right to substitute different proprietary marks for use in identifying the System and the businesses operating thereunder at AEFA's sole discretion.

9.   MANUALS

- To promote the highest standards of operation under the System, AEFA has prepared Confidential Operations Manuals ("**Manual**" or "**Manuals**") which include manuals, bulletins, and other written policies and procedures setting forth the minimum standards regarding Quality of Advice, Client Satisfaction, Client Relations and the Code of Conduct. In addition, the Manuals set forth standards regarding the use of Proprietary Marks, signage, communications, privacy principles, processing procedures and the Compensation Schedule.

- To comply with all applicable laws and regulations and to protect the reputation and goodwill of AEFA and the System, Independent Advisor agrees to operate the Independent Financial Advisor Business in accordance with the professional standards specified in the Manuals, one copy of which Independent Advisor agrees to receive on loan from AEFA for the term of this Agreement upon completion by Independent Advisor of AEFA's initial orientation program to AEFA's satisfaction. In lieu of, or in addition to, providing Independent Advisor with a paper copy of the Manuals, AEFA may provide Independent Advisor with electronic access to the Manuals (or such updates to the Manuals as AEFA may determine).

- Independent Advisor agrees to treat the Manuals, any other materials created for or approved for use in the operation of the Independent Financial Advisor Business, and the information contained therein, as confidential, and shall use all reasonable efforts to maintain such information as secret and confidential.  Independent Advisor agrees to not copy, duplicate,

record, or otherwise reproduce the foregoing materials, in whole or in part, or otherwise make the same available to any unauthorized person.

- The Manuals shall remain the sole property of AEFA and shall be kept in a secure place on the Premises.

- To comply with regulatory requirements, AEFA may make reasonable interpretations and revise the contents of the Manuals from time to time. For business changes to the Manuals, AEFA will provide Independent Advisor with reasonable notice. AEFA further agrees to provide Independent Advisor with 90 days' written notice of any non-regulatory changes to the Manuals resulting in a reduction in the GDC (Gross Dealer Concession) Payout Rate as defined in such Manuals. Independent Advisor agrees to comply with the revised Manuals.

- Independent Advisor agrees to ensure that the Manuals are kept current at all times. In the event of any dispute as to the contents of the Manuals, the terms of the most recently communicated Manuals supercede all previous Manuals.

10.    <u>CONFIDENTIAL INFORMATION</u>

- Independent Advisor has had and/or may have access to AEFA trade secrets and confidential information that Independent Advisor agrees has great value to AEFA. Independent Advisor agrees that because of such access, Independent Advisor is in a position of trust and confidence with respect to this information. To protect client confidentiality, AEFA goodwill, trade secrets, and other proprietary and confidential business information, Independent Advisor agrees to not, during the term of this Agreement or thereafter, except as permitted under Section 14 regarding transfers of the Independent Financial Advisor Business, communicate, divulge, or use for himself or herself except pursuant to the System, or for the benefit of any other person, partnership, association, or corporation any confidential information, or trade secrets, including, without limitation, Client names, addresses and data and know-how concerning the methods of operation of the System and the business franchised hereunder which may be communicated to Independent Advisor or of which Independent Advisor may be apprised by virtue of Independent Advisor's operation under the terms of this Agreement. Independent Advisor also shall not reveal any information about potential clients to whom a presentation has been made by any Independent Advisor who might reasonably be expected to do business with AEFA. Independent Advisor agrees to divulge such confidential information only to such of his or her employees as must have access to it in order to operate the Independent Financial Advisor Business. Except as otherwise permitted in Section 19, Independent Advisor agrees that, without limitation, Client names, addresses, data and other personal and financial information recorded in Client records are confidential. Confidential information includes compilations and lists of such Client information even if of otherwise public information if such compilations or lists were the result of substantial effort, time and/or money expended pursuant to the System. Independent Advisor further agrees to use this confidential information only in furtherance of this Agreement or in accordance with the Manuals and for no other purpose. Confidential information does not include information which is generally known outside of AEFA other than as a result of a disclosure by Independent Advisor, Independent Advisor's agents or representatives, or any other person or entity in breach of

any contractual, legal or fiduciary obligation of confidentiality to AEFA or to any other person or entity with respect to such information.

- At AEFA's request, Independent Advisor agrees to require any personnel having access to any confidential information of AEFA or information about Clients or potential clients to execute covenants that they will maintain the confidentiality of information they receive in connection with their employment by or association with Independent Advisor in the Independent Financial Advisor Business.  Such covenants shall be in a form satisfactory to AEFA, including, without limitation, specific identification of AEFA as a third-party beneficiary of such covenants with the independent right to enforce them.

11.    ACCOUNTING AND RECORDS

- Independent Advisor agrees to record all sales on a computer system that meets the specifications of AEFA, or on any other equipment specified by AEFA in the Manuals or otherwise in writing.  Independent Advisor agrees to prepare, and shall preserve for at least seven (7) years from the dates of their preparation, complete and accurate books, records, and accounts in accordance with the Manuals and Compliance Rules as defined in this Agreement.

- Independent Advisor agrees to, at Independent Advisor's expense, submit to AEFA, in the form prescribed by AEFA, such reports, forms, records, information, and data as AEFA may require to comply with regulatory requirements or to respond to a Client complaint or lawsuit.

- All original books and records containing Client lists and/or information and transactions belong to AEFA and must be returned to AEFA upon termination or expiration of this Agreement, unless Independent Advisor transfers the Independent Financial Advisor Business as provided in Section 14.  In order to permit AEFA to fulfill its regulatory requirements, AEFA and its designated agents shall have the right at all reasonable times, with or without notice to Independent Advisor, to examine and copy any books and records, including computerized books and records related to the Independent Financial Advisor Business.

12.    ADVERTISING AND PROMOTION

A.    AEFA Advertising Fund

- Recognizing the value of advertising and promotion to AEFA and the Independent Financial Advisor Business, and the importance of coordinated advertising and promotion programs to the furtherance of the goodwill and public image of the System, the parties agree as follows:

  a.    AEFA has the right, but not the obligation, to establish the System's advertising fund (the **"Fund"**). Part of the Association Fee paid by Independent Advisors may be used for this Fund.

  b.    If established, the Fund shall be maintained and administered by AEFA as follows:

Case 3:25-cv-00880-JO-MSB   Document 1   Filed 04/14/25   PageID.47   Page 47 of
Case 1:21-cv-00347-DKW-RT   Document 1-30   Filed 08/16/21   Page 17 of 69   PageID.43
130

(i)    AEFA agrees to direct all advertising programs conducted through the Fund, with sole discretion over the concepts, materials, and media used in such programs and the placement and allocation thereof.   Independent Advisor agrees and acknowledges that the Fund is intended to maximize general public recognition, acceptance, and use of the System, Products & Services; and that AEFA is not obligated, in administering the Fund, to make expenditures for Independent Advisor which are equivalent or proportionate to Independent Advisor's contribution, or to ensure that any particular advisor benefits directly or pro rata from expenditures by the Fund.

(ii)   The Fund, all contributions thereto, and any earnings thereon, shall be used exclusively to meet the costs of preparing, directing, conducting, and administering advertising, marketing, public relations, and/or promotional programs and materials, and any other activities which AEFA believes will enhance the image of the System, including, the costs of preparing and conducting media advertising campaigns; direct mail advertising; marketing surveys; employing advertising and/or public relations agencies to assist therein; purchasing promotional items; conducting and administering in-office promotions; and providing promotional and other marketing materials and services to the businesses operating under the System.

B.    Regional/Local Advertising Campaigns

- AEFA may designate any geographical area for purposes of establishing a regional or local advertising and promotional campaign ("**Campaign**"), and to determine whether a Campaign is applicable to the Independent Financial Advisor Business.  If a Campaign has been established applicable to the Independent Financial Advisor, at Independent Advisor's option and expense, Independent Advisor may become a member of such Campaign.  The following provisions shall apply to each Campaign.

  a.   Each Campaign shall be coordinated by AEFA or AEFA's designees (such as AEFA's Group Vice Presidents), and shall commence operation on a date approved in advance by AEFA in writing.

  b.   Each Campaign shall be established and organized for the exclusive purpose of administering regional or local advertising programs and developing, subject to AEFA's approval, standardized advertising materials for use by the members in local advertising.

  c.   No promotional or advertising plans or materials may be used by a Campaign or furnished to its members without the prior approval of AEFA to conform to regulatory requirements and to protect the value of the Proprietary Marks.  All such plans and materials shall be submitted to AEFA in accordance with the procedure set forth in this Section.

    d.   Each Independent Advisor who is a member of the Campaign agrees to submit to the Campaign, his or her contribution together with such other statements or reports as may be required by AEFA or by the Campaign.

    e.   Only Independent Advisors who are members of the Campaign will receive the leads resulting from the Campaign.

C.  <u>Independent Advisor Advertising</u>

- All advertising and promotion by Independent Advisor shall be in such media and of such type and format as AEFA may approve, shall be conducted in a dignified manner, and shall conform to such standards and requirements as AEFA may specify to conform to regulatory requirements and to protect the value of the Proprietary Marks. Independent Advisor agrees to not use any advertising or promotional plans or materials unless and until Independent Advisor has received written approval from AEFA, pursuant to the procedures and terms set forth in this Section. Independent Advisor agrees to submit samples of all advertising and promotional plans and materials to AEFA, for AEFA's prior approval if such plans and materials have not been prepared or previously approved by AEFA within the prior one year period. Independent Advisor agrees to not use such plans or materials until they have been approved in writing by AEFA.

- AEFA may make available to Independent Advisor, at Independent Advisor's expense, pre-approved advertising plans and promotional materials, including newspaper mats, merchandising materials, sales aids, point-of-purchase materials, special promotions, direct mail materials, and similar advertising and promotional materials.

- If Independent Advisor has the appropriate licenses and satisfies all regulatory requirements, Independent Advisor may obtain listings for the Independent Financial Advisor Business in telephone directories. The content and appearance of any telephone listing shall conform to AEFA's pre-approved format, to conform to regulatory requirements and to protect the value of the Proprietary Marks.

- If AEFA believes that any advertising or promotional materials may cause a conflict with protecting the value of the Proprietary Marks, AEFA will initiate a process to review and/or coordinate the advertising or promotional materials and has final approval authority over the materials.

D.  <u>Websites</u>

- Independent Advisor specifically acknowledges and agrees that any Website (as defined below) shall be deemed "advertising" under this Agreement, and will be subject to (among other things) AEFA's approval under this Section. (As used in this Agreement, the term "Website" means an interactive electronic document, contained in a network of computers linked by communications software, that Independent Advisor operates or authorizes others to operate and that refers to the Independent Financial Advisor Business, Products & Services, Proprietary Marks, AEFA, and/or the System. The term Website includes, but is not limited to, Internet and World Wide Web home pages.) In connection with any Website, Independent Advisor agrees to the following:

a.  Any Website shall be in the format of AEFA's template for Websites.

b.  Before establishing the Website, Independent Advisor agrees to submit to AEFA a sample of the Website format and information in the form and manner AEFA may reasonably require.

c.  Independent Advisor agrees to not establish or use the Website without AEFA's prior written approval to conform to regulatory requirements and to protect the value of the Proprietary Marks.

d.  In addition to any other applicable requirements, Independent Advisor agrees to comply with AEFA's standards for Websites as prescribed by AEFA from time to time in the Manuals or otherwise in writing.  If required by AEFA, Independent Advisor agrees to establish its Website as part of AEFA's Website and/or establish electronic links to AEFA's Website.

e.  If Independent Advisor proposes any material revision to the Website or any of the information contained in the Website, Independent Advisor agrees to submit each such revision to AEFA for AEFA's prior written approval.

13.    <u>ERRORS AND OMISSIONS PROGRAM AND INSURANCE</u>

• As part of the Association Fee, AEFA agrees to provide, during the term of this Agreement, participation in AEFA's errors and omissions program protecting Independent Advisor, AEFA, AEFA's affiliates, and their respective officers, directors, partners, agents, and employees against demands or claims arising or occurring in connection with the Independent Financial Advisor Business as a result of errors or omissions as defined in the Manuals.  Such program may be provided by AEFA or written by a carrier or carriers approved by AEFA, shall name AEFA and AEFA's affiliates as additional insured parties as specified by AEFA, and shall provide at least the types and minimum amounts of coverages specified in the Manuals.

• AEFA recommends that Independent Advisor procure, prior to the commencement of any operations under this Agreement, and maintain in full force and effect at all times during the term of this Agreement, at Independent Advisor's expense, an insurance policy or policies protecting Independent Advisor against any demand or claim with respect to personal injury, death, or property damage, or any loss, liability, or expense whatsoever arising or occurring upon or in connection with the Independent Financial Advisor Business, including, but not limited to, comprehensive general liability insurance.  For good risk management purposes, AEFA recommends that any insurance policy or policies procured by Independent Advisor with respect to the Independent Financial Advisor Business, also protect AEFA, and AEFA's affiliates, and their respective officers, directors, partners, agents and employees. Independent Advisor acknowledges and agrees that Independent Advisor indemnify AEFA as provided in Section 21.

14.    <u>TRANSFER OF INTEREST</u>

- AEFA shall have the right to transfer or assign this Agreement and all or any part of its rights or obligations herein to any person or legal entity, and any designated assignee of AEFA agrees to become solely responsible for all obligations of AEFA under this Agreement from the date of assignment.  Independent Advisor agrees to execute such documents of acknowledgment or otherwise as AEFA shall request.

- Independent Advisor understands and acknowledges that the rights and duties set forth in this Agreement are personal to Independent Advisor, and that AEFA has granted this franchise in reliance on Independent Advisor's business skill, financial capacity, and personal character. Accordingly, neither Independent Advisor nor any immediate or remote successor to any part of Independent Advisor's interest in this Agreement or in the Independent Financial Advisor Business shall sell, assign, transfer, convey, pledge, encumber, merge, or give away (collectively, **"transfer"**) any direct or indirect interest in this Agreement or in all or substantially all of the assets of the Independent Financial Advisor Business without the prior written consent of AEFA.  Any purported assignment or transfer not having the written consent of AEFA required by this Section 14 shall be null and void and shall constitute a material breach of this Agreement, for which AEFA may immediately terminate without opportunity to cure pursuant to Section 17 of this Agreement.

- Independent Advisor agrees to notify AEFA in writing of any proposed transfer of any direct or indirect interest in this Agreement or in all or substantially all of the assets of the Independent Financial Advisor Business at least thirty (30) days before such transfer is proposed to take place.  AEFA agrees to not unreasonably withhold its consent to any transfer, provided, however, that (i) the transferee is eligible to enter into and actually executes a franchise agreement, and (ii) AEFA will not consent to a transfer to a corporation, partnership, or limited liability company.  Upon a transfer, AEFA may, in its sole discretion, require any or all of the following as conditions of its approval:

    a.  That all of Independent Advisor's accrued monetary obligations and all other outstanding obligations to AEFA and its affiliates related to the Independent Financial Advisor Business have been satisfied;

    b.  That Independent Advisor is not in default of any provision of this Agreement, any amendment hereof or successor hereto, or any other agreement between Independent Advisor and AEFA or its affiliates;

    c.  That Independent Advisor agrees to have executed a general release, in a form satisfactory to AEFA, of any and all claims against AEFA and its affiliates, and their respective officers, directors, shareholders, and employees;

    d.  That (i) if the transferee is not an Independent Advisor under the System, the transferee execute, for a term ending on the expiration date of this Agreement and with such renewal term(s) as may be provided by this Agreement, the then-current form of franchise agreement and other ancillary agreements, including the applicable Addendum No. 3, as AEFA may require for the

Independent Financial Advisor Business, which agreements shall supersede this Agreement in all respects or (ii), if the transferee is an Independent Advisor under the System, the transferee enter into a written assignment, in a form satisfactory to AEFA, assuming and agreeing to discharge all of Independent Advisor's obligations under the terms of the transferee's existing franchise agreement with AEFA;

e.  That the transferee demonstrate to AEFA's satisfaction that it meets AEFA's educational, managerial, and business standards; possesses a good moral character and business reputation; has the aptitude and ability to operate the Independent Financial Advisor Business (as may be evidenced by prior related business experience or otherwise); has all appropriate permits, certificates, licenses, and training which may be required by AEFA, NASD, and governmental and regulatory agencies; be in compliance with the minimum requirements to be in good standing with this Agreement as set forth in Section 5 and has adequate financial resources and capital to operate the Independent Financial Advisor Business;

f.  That Independent Advisor remain liable for all of the obligations to AEFA in connection with the Independent Financial Advisor Business which arose prior to the effective date of the transfer and execute any and all instruments reasonably requested by AEFA to evidence such liability;

g.  That the transferee, as part of the Association Fee, complete any orientation programs then in effect for Independent Advisors upon such terms and conditions as AEFA may reasonably require; and

h.  That Independent Advisor pay a transfer fee of One Thousand Dollars ($1,000) to reimburse AEFA for its costs and expenses associated with reviewing the application to transfer and administration of the transfer.

•  Independent Advisor agrees to not grant a security interest in the Independent Financial Advisor Business or in any of the assets of the Independent Financial Advisor Business, without the prior written consent of AEFA, which consent will not be unreasonably withheld.

•  If Independent Advisor desires to accept any *bona fide* offer from a transferee to purchase the Independent Financial Advisor Business, Independent Advisor agrees to notify AEFA as provided in this Section, and shall provide such information and documentation relating to the offer as AEFA may require.  If, prior to the actual date of a proposed transfer, Independent Advisor has entered into a continuity of practice agreement with the transferee, AEFA has the right to approve the transferee under the conditions of Section 14, paragraph 3, subsection (e) of this Agreement both at the time the continuity of practice agreement was entered into and at the time of the proposed transfer. If Independent Advisor has entered into a continuity of practice agreement with a transferee, AEFA shall have the right and option, exercisable within thirty (30) days of Independent Advisor entering into a continuity of practice, agreement to purchase the Independent Financial Advisor Business on the same terms and conditions as described below and consistent with the continuity of practice agreement.  If upon AEFA's offer to purchase the Independent Financial Advisor Business on

similar terms and conditions, Independent Advisor chooses not to sell to AEFA, Independent Advisor has the right to withdraw the offer to enter into a continuity of practice agreement and continue operating his or her Independent Financial Advisor Business.  If ninety (90) days prior to the proposed transfer, Independent Advisor has entered into a continuity of practice agreement and AEFA has not exercised the opportunity to buy or right of first refusal, described below, AEFA agrees to not have a right or option to purchase the Independent Financial Advisor Business at the time of the proposed transfer.  In addition, if Independent Advisor has not entered into a continuity of practice agreement at least ninety (90) days prior to the proposed transfer, AEFA also shall have the right and option to purchase the Independent Financial Advisor Business on the same terms and conditions as described below. If AEFA elects to purchase the Independent Financial Advisor Business, closing on such purchase shall occur within thirty (30) days from the date of notice to the seller of the election to purchase by AEFA.  If AEFA elects not to purchase the Independent Financial Advisor Business, any material change thereafter in the terms of the offer from a transferee shall constitute a new offer subject to the same rights of first refusal by AEFA as in the case of the transferee's initial offer.  Failure of AEFA to exercise the option afforded by this Section shall not constitute a waiver of any other provision of this Agreement, including all of the requirements of this Section, with respect to a proposed transfer. In the event the consideration, terms, and/or conditions offered by a transferee are such that AEFA may not reasonably be required to furnish the same consideration, terms, and/or conditions, then AEFA may purchase the interest proposed to be sold for the reasonable equivalent in cash.  If the parties cannot agree within thirty (30) days on the reasonable equivalent in cash of the consideration, terms, and/or conditions offered by the transferee, an independent appraiser shall be designated and mutually agreed upon by AEFA and Independent Advisor, at AEFA's expense, and the appraiser's determination shall be binding.

- AEFA encourages Independent Advisor, for a variety of business reasons, including anticipation of death or mental or physical incapacity, to execute an agreement with another Independent Advisor, consistent with the transfer of interest policies in this Section 14.  The Independent Financial Advisor Business will immediately transfer to that Independent Advisor, upon the death or mental or physical incapacity of Independent Advisor.  Such transfers, including, without limitation, transfers by devise or inheritance, shall be subject to the same conditions as any inter vivos transfer.  In the event an agreement does not exist, AEFA, for a management fee, will manage the Independent Financial Advisor Business for up to ninety (90) days from the death or mental incapacity of Independent Advisor, until the executor can find a buyer for AEFA to approve.  The management fee (further described in the Compensation Manual) is the compensation on the Independent Financial Advisor Business while a buyer is being located and approved.  The estate is responsible for all expenses relating to the Independent Financial Advisor Business during this time. If the Independent Financial Advisor Business is not disposed of within ninety (90) days after such death or mental incapacity, AEFA may terminate this Agreement, pursuant to Section 17 hereof.

- AEFA's consent to a transfer of any interest in this Agreement or in all or substantially all of the assets of the Independent Financial Advisor Business shall not constitute a waiver of any claims it may have against the transferring party, nor shall it be deemed a waiver of AEFA's right to demand exact compliance with any of the terms of this Agreement by the transferor or transferee.

---

American Express Financial Advisors Inc.
Franchise Agreement - 10/25/99

15.    <u>COMPLIANCE AND INSPECTIONS</u>

- Independent Advisor agrees to comply with the Compliance Rules as defined herein and the Individual Treatment Policy.  Compliance with such laws, regulations, policies and procedures is required to ensure that AEFA and Independent Advisor are in good standing with the regulators.  Independent Advisor agrees to timely obtain and maintain all licenses with AEFA necessary for the full and proper conduct of the Independent Financial Advisor Business and the offering of Products & Services, including any required NASD, state securities and/or insurance licenses, licenses to do business, state investment advisor registrations, sales tax permits, and/or clearances.  Independent Advisor is an associated person of AEFA and agrees to be supervised for regulatory compliance purposes by the OSJ Branch Manager, Field Compliance Director or Field Compliance Supervisor, as described in the Client Relations Manual, and this compliance supervisor must be located in Independent Advisor's Market Group.  To ensure a high level of securities and regulatory compliance, Independent Advisor agrees to promptly respond to requests for information and records from OSJ Branch Managers and AEFA employees and agents, and Field Compliance Directors.

- Independent Advisor agrees to, within 24 hours of the occurrence of any of the following events, notify AEFA of any:  (i) inspection, investigation, or citation of Independent Advisor or the Independent Financial Advisor Business by NASD, state securities regulators, state insurance commissioners or any other governmental or regulatory agencies; (ii) suspension of any license related to the Independent Financial Advisor Business or the sale of any Products or Services;  (iii) alleged violation of any  federal, state, local, or NASD laws or regulations related to Products or Services, or to the Independent Financial Advisor Business; (iv) action, suit, disciplinary proceeding or other proceeding, and/or the issuance of any fine, sanction, order, writ, injunction, award, or decree of NASD or any court, regulator, agency, or other governmental instrumentality, against Independent Advisor or which may adversely affect Independent Advisor or the operation or financial condition of the Independent Financial Advisor Business; or (v) Client complaints.

- Independent Advisor agrees to permit AEFA, the OSJ Branch Managers, AEFA's agents, and governmental and regulatory agencies required to have access by law (collectively, the **"Inspectors"**) to enter upon the Premises at any time, with or without notice to Independent Advisor, during normal business hours for the purpose of conducting inspections to confirm compliance with the terms of this Agreement, the Manuals and Compliance Rules; shall cooperate with Inspectors in such inspections by rendering such assistance as they may reasonably request, including access to all books and records, including computerized books and records; and, upon notice from Inspectors, and without limiting AEFA's other rights under this Agreement, shall take such steps as may be necessary to correct immediately any deficiencies detected during any such inspection within a reasonable time as determined by AEFA.

- In accordance with NASD requirements, AEFA agrees to investigate and resolve complaints and compliance issues involving Independent Advisor.  AEFA agrees to provide Independent Advisor with an opportunity to respond to complaints and supply documentation, but AEFA maintains the right to settle these issues.  Independent Advisor will have access to an internal appeals process should a dispute on the resolution of a case occur.  AEFA may assess

Case 3:25-cv-00880-JO-MSB    Document 1    Filed 04/14/25    PageID.54    Page 54 of
Case 1:21-cv-00347-DKW-RT    Document 1-10    Filed 08/16/21    Page 24 of 69  PageID.50
1-10

applicable settlement costs, subject to whatever offsets, if any, are afforded Independent Advisor by the AEFA errors and omissions program, and fines against Independent Advisor for failure to comply with regulatory requirements and company policies as set forth in the Client Relations Manual. These costs and fines may be deducted directly from Independent Advisor's Compensation or any amounts otherwise due to Independent Advisor by AEFA; however, AEFA agrees to allow either or both to be paid directly to AEFA should the Independent Advisor so choose.

16.    SPECIAL REGULATORY SUPERVISION

- Upon the occurrence of any of the following events, AEFA may place Independent Advisor on special regulatory supervision for a period of time determined by AEFA ("**Special Regulatory Supervision**") and place certain restrictions on Independent Advisor and the Independent Financial Advisor Business (the "**Terms of Special Regulatory Supervision**") which may, at AEFA's option, include: (i) terminating some of Independent Advisor's rights to offer Products & Services; (ii) suspending or placing restrictions on Independent Advisor's rights to operate the Independent Financial Advisor Business and/or offer Products & Services; (iii) requiring Independent Advisor to obtain additional training; (iv) imposing heightened supervision of Independent Advisor and the Independent Financial Advisor Business; (v) reducing the payout to which Independent Advisor would otherwise be entitled; and (vi) such other requirements that AEFA may require, effective immediately upon the provision of notice to Independent Advisor (in the manner provided under Section 23 hereof):

    a.    If Independent Advisor shall become insolvent or make a general assignment for the benefit of creditors; if a petition in bankruptcy, or such a petition is filed against and not successfully opposed by Independent Advisor; if Independent Advisor is adjudicated a bankrupt or insolvent; if a final judgment remains unsatisfied or of record for thirty (30) days or longer (unless supersedeas bond is filed); or if Independent Advisor makes a compromise with creditors;

    b.    If Independent Advisor is under investigation by NASD or other self-regulatory organizations, state securities regulators, or any other governmental or regulatory agencies;

    c.    If there is an allegation (including any allegation by a Client) that Independent Advisor violated any Compliance Rules related to the Independent Financial Advisor Business; or

    d.    If Independent Advisor fails to substantially comply with any of the requirements imposed by this Agreement (including, without limitation, those identified in Section 17 below) or failure to carry out the terms of this Agreement in good faith.

- Upon notice from AEFA that Independent Advisor has been placed on Special Regulatory Supervision and the Terms of Special Regulatory Supervision, Independent Advisor agrees to immediately comply with the Terms of Special Regulatory Supervision. Independent Advisor's failure to comply with the Terms of Special Regulatory Supervision shall be a default under the "Immediate Termination" provision of Section 17, below.

17.   <u>DEFAULT AND  TERMINATION</u>

- <u>Termination by Independent Advisor</u>.  Independent Advisor may terminate this Agreement upon fourteen (14) days written notice to AEFA in the manner provided in Section 23 hereof and, if applicable, Addendum No. 3 hereto.  The termination shall take effect on the date specified in the notice or as directed by AEFA.

- <u>Immediate Termination with Cause</u>.  Upon the occurrence of any of the following events of default, AEFA may, at its option, terminate this Agreement and all rights granted hereunder, which events shall constitute good cause to the extent permitted by law, without affording Independent Advisor any opportunity to cure the default, effective immediately upon the provision of notice to Independent Advisor (in the manner provided under Section 23 hereof).  In the event AEFA believes any law may prohibit the immediate termination of this Agreement, AEFA may immediately suspend Independent Advisor, who shall remain suspended until such time as AEFA either terminates this Agreement or ends the suspension.  Any Independent Advisor who is suspended must temporarily cease operations, although such Independent Advisor will receive all Compensation that Independent Advisor is entitled pursuant to the Manuals to receive at the time the suspension is lifted.

  a.  If Independent Advisor fails to locate an approved site or to open the Independent Financial Advisor Business within the time limits provided in Section 6 of this Agreement;

  b.  If Independent Advisor fails to complete the initial orientation program described in Section 7 hereof to AEFA's satisfaction;

  c.  If Independent Advisor at any time ceases to operate or otherwise abandons the Independent Financial Advisor Business, enters into an unauthorized agency agreement with a competitor or imminently plans to do so, or otherwise forfeits the right to do or transact business in the jurisdiction where the Independent Financial Advisor Business is located.  However, if, through no fault of Independent Advisor, the Premises are damaged or destroyed by an event such that repairs or reconstruction cannot be completed within sixty (60) days thereafter or Independent Advisor loses the right to possession of the Premises, then Independent Advisor agrees to have sixty (60) days after such event in which to apply for AEFA's approval to relocate the Independent Financial Advisor Business, which approval shall not be unreasonably withheld;

  d.  If Independent Advisor is charged with, pleads nolo contendere to, or is convicted of a felony, a crime involving moral turpitude or dishonesty, or any other crime or offense that AEFA believes is reasonably likely to have an adverse effect on the System, the Proprietary Marks, the goodwill associated therewith, or AEFA's interest therein;

  e.  If Independent Advisor fails to obtain or loses any appropriate licenses which may be required by AEFA, NASD, and governmental and regulatory agencies to

operate the Independent Financial Advisor Business or offer Products & Services;

f.  If any purported assignment or transfer of any direct or indirect interest in this Agreement or in all or substantially all of the assets of the Independent Financial Advisor Business is made to any transferee without AEFA's prior written consent, contrary to the terms of Section 14 hereof;

g.  If an approved transfer is not effected within the time provided following death or mental incapacity, as required by Section 14 hereof;

h.  If Independent Advisor fails to comply with the covenants in Section 19 hereof or fails to obtain execution of the covenants required under Sections 10 or 19 hereof;

i   If, contrary to the terms of Sections 9 or 10 hereof, Independent Advisor discloses or divulges the contents of the Manuals or other confidential information provided to Independent Advisor by AEFA;

j.  If Independent Advisor knowingly maintains false books or records, or submits any false reports to AEFA;

k.  If Independent Advisor is involved in misappropriating monies, fails to timely transmit Client funds or securities to AEFA, or engages in unauthorized activities or violates the Compliance Rules and/or the Individual Treatment Policy.

l.  If Independent Advisor misuses or makes any unauthorized use of the Proprietary Marks or any other identifying characteristics of the System, or otherwise materially impairs the goodwill associated therewith or AEFA's rights therein;

m.  If Independent Advisor refuses to permit an Inspector to inspect the Premises, or the books, records, or accounts of Independent Advisor upon demand;

n.  If Independent Advisor, upon receiving a notice of default under Section 17 hereof entitled "Termination with an Opportunity to Cure Within Thirty (30) Days," fails to initiate immediately a remedy to cure such default;

o.  If Independent Advisor, after curing a default pursuant to Section 17 hereof entitled "Termination with an Opportunity to Cure Within Thirty (30) Days," commits the same default again, whether or not cured after notice;

p.  If Independent Advisor fails to comply with the Terms of Special Regulatory Supervision; or

q.  If Independent Advisor is alleged to have violated Federal or state civil or common law that AEFA believes is reasonable likely to have an adverse effect on the System, the Proprietary Marks, the goodwill associated therewith, or AEFA's interest therein.

- <u>Termination with an Opportunity to Cure Within Thirty (30) Days</u>. Except as otherwise provided in Section 17 entitled "Immediate Termination" and Section 17 entitled "Termination with an Opportunity to Cure within One (1) Year," upon any other default by Independent Advisor, AEFA may terminate this Agreement by giving written notice of termination (in the manner set forth under Section 23 hereof) stating the nature of the default to Independent Advisor at least thirty (30) days prior to the effective date of termination; provided, however, that Independent Advisor may avoid termination by immediately initiating a remedy to cure such default, curing it to AEFA's satisfaction, and by promptly providing proof thereof to AEFA within the thirty (30) day period. If any such default is not cured within the specified time, or such longer period as applicable law may require, this Agreement shall terminate without further notice to Independent Advisor, effective immediately upon the expiration of the thirty (30) day period or such longer period as applicable law may require and AEFA may re-assign any Clients assigned to the Independent Advisor. Defaults which are susceptible of cure hereunder include the following illustrative events:

  a. If Independent Advisor fails to substantially comply with any of the requirements imposed by this Agreement.

  b. If Independent Advisor fails, refuses, or neglects promptly to pay any monies owing to AEFA or its affiliates when due, or to submit the financial or other information required by AEFA under this Agreement;

  c. Except as provided in Section 17 entitled "Immediate Termination," if Independent Advisor fails, refuses, or neglects to obtain AEFA's prior written approval or consent as required by this Agreement; or

  d. If Independent Advisor engages in any business or markets any service or product under a name or mark which, in AEFA's opinion, is confusingly similar to the Proprietary Marks.

- <u>Termination with an Opportunity to Cure within One (1) Year</u>. Upon the occurrence of any of the following events of default, determined as of the first anniversary of this Agreement and annually thereafter, AEFA may, at its option, terminate this Agreement and all rights granted hereunder, by giving written notice of termination (in the manner set forth under Section 23 hereof) stating the nature of the default to Independent Advisor one (1) year prior to the effective date of termination; provided, however, that Independent Advisor may avoid termination by immediately initiating a remedy to cure such default, curing it to AEFA's satisfaction, and by providing proof thereof to AEFA within such one (1) year period. If any such default is not cured within the one (1) year period, this Agreement shall terminate without further notice to Independent Advisor, effective immediately upon the expiration of such one (1) year period.

  a. If Independent Advisor fails to maintain Quality of Advice Standards of at least level three (3).

    b.   If Independent Advisor fails to maintain Client Satisfaction Standards of at least seventy percent (70%), as more fully described in the Manuals.

    c.   If Independent Advisor fails to maintain an office with the fixtures, furnishings and equipment necessary to maintain professional standards for the operation of the Independent Financial Advisor Business or if Independent Advisor fails to install signs as provided in the Manuals.

    d.   If Independent Advisor fails to meet the financial planning standards set forth in Section 5.

- Subject to AEFA and affiliated broker-dealer policies, AEFA agrees to allow the Independent Advisor to terminate this Agreement and move to an affiliated broker-dealer, (e.g. Securities America).

18.    <u>OBLIGATIONS UPON TERMINATION OR EXPIRATION</u>

Upon termination or expiration of this Agreement, all rights granted hereunder to Independent Advisor shall forthwith terminate although Independent Advisor's duties under this Agreement shall continue as specified in this Section 18, and:

- Independent Advisor agrees to immediately cease to operate the Independent Financial Advisor Business, and Independent Advisor agrees to not thereafter, directly or indirectly, represent to the public or hold himself or herself out as a present or former franchisee of AEFA.

- If this Agreement is terminated for reasons outlined in Section 17, AEFA will honor any agreement with another Independent Advisor, consistent with the transfer of interest policies in Section 14, or, Independent Advisor can attempt to locate a buyer for AEFA to approve. AEFA, for a management fee, will manage the Independent Financial Advisor Business for up to ninety (90) days until a buyer can be found and approved. The management fee (further defined in the Compensation Manual) is the compensation on the Independent Financial Advisor Business while a buyer is being located and approved. If a buyer is not found and approved within the ninety (90) days after such termination, the Independent Financial Advisor Business terminates the right to the equity. In the interests of good client relationships, AEFA will assume continuous service to all Clients.

- Independent Advisor agrees to immediately and permanently cease to use, in any manner whatsoever, any confidential methods, procedures, and techniques associated with the System; the Proprietary Marks; and distinctive forms, slogans, signs, symbols, and devices associated with the System. In particular, Independent Advisor agrees to cease to use, without limitation, all signs, advertising materials, displays, stationery, forms, products, and any other articles which display the Proprietary Marks.

- Independent Advisor agrees to make such modifications or alterations to the Premises immediately upon termination or expiration of this Agreement as may be necessary to distinguish the Premises from that of the Independent Financial Advisor Business under the System, and shall make such specific additional changes thereto as AEFA may reasonably

Case 3:25-cv-00880-JO-MSB    Document 1    Filed 04/14/25    PageID.59    Page 59 of
Case 1:21-cv-00347-DKW-RT    Document 1-10    Filed 08/16/21    Page 29 of 69    PageID.55
130

request for that purpose. In the event Independent Advisor fails or refuses to comply with the requirements of this Section 18, AEFA agrees to have the right to enter upon the Premises, without being guilty of trespass or any other tort, for the purpose of making or causing to be made such changes as may be required, at the expense of Independent Advisor, which expense Independent Advisor agrees to pay upon demand.

• Independent Advisor agrees to immediately cease using any telephone number used by Independent Advisor in the Independent Financial Advisor Business. AEFA agrees to immediately cease using the telephone number unless the telephone number is for an Area Office or other AEFA-leased space. At AEFA's expense, AEFA reserves the right to add a forwarding message to any such telephone number, indicating the telephone number for AEFA and for the departing Independent Advisor.

• Independent Advisor agrees, in the event it continues to operate or subsequently begins to operate any other business, not to use any reproduction, counterfeit, copy, or colorable imitation of the Proprietary Marks, either in connection with such other business or the promotion thereof, which, in AEFA's sole discretion, is likely to cause confusion, mistake, or deception, or which, in AEFA's sole discretion, is likely to dilute AEFA's rights in and to the Proprietary Marks. Independent Advisor further agrees not to utilize any designation of origin, description, or representation (including but not limited to reference to AEFA, the System, or the Proprietary Marks) which, in AEFA's sole discretion, suggests or represents a present or former association or connection with AEFA, the System, or the Proprietary Marks.

• Independent Advisor agrees to promptly pay all sums owing to AEFA and its affiliates. In the event of termination for any default of Independent Advisor, such sums shall include all damages, costs, and expenses, including reasonable attorneys' fees, incurred by AEFA as a result of the default.

• Independent Advisor agrees to immediately deliver to AEFA the Manuals and all other original records, including most recent financial plans and recommendations, computer databases and files, correspondence, and instructions containing confidential information relating to the System (and any copies thereof, including electronic or computer generated copies, even if such copies were made in violation of this Agreement), all of which are acknowledged to be the property of AEFA. To satisfy regulatory requirements, Independent Advisor agrees to immediately deliver to AEFA the originals of all Client records, including records containing Client lists and/or information and transactions belonging to AEFA, unless Independent Advisor transfers the Independent Financial Advisor Business as provided in Section 14.

• Independent Advisor agrees to immediately (i) discontinue use of any computer software developed for the System or AEFA, (ii) deliver to AEFA all such computer software in Independent Advisor's possession or control and any copies made of such computer software, (iii) erase or destroy any of such computer software contained in the computers or data storage devices under the control of Independent Advisor, and (iv) remove such computer software from any other computer programs or software in Independent Advisor's possession or control that incorporates or used such computer software in whole or in part.

Case 3:25-cv-00880-JO-MSB    Document 1    Filed 04/14/25    PageID.60    Page 60 of
Case 1:21-cv-00347-DKW-RT    Document 1-30    Filed 08/16/21    Page 30 of 69  PageID.56
130

- Independent Advisor agrees to comply with the covenants contained in Section 19 of this Agreement.

19.    <u>COVENANTS</u>

- Independent Advisor covenants that, during the term of this Agreement, Independent Advisor agrees to (i) devote best efforts to the management and operation of the Independent Financial Advisor Business, and (ii) except as otherwise approved in writing by AEFA or after providing notice to AEFA as specified in the Manuals, not be employed or engage in other business activities outside the Independent Financial Advisor Business.

- Independent Advisor specifically acknowledges that, pursuant to this Agreement, Independent Advisor will receive additional substantive rights as a franchisee of AEFA. Independent Advisor also recognizes he or she will receive valuable and confidential information, including, without limitation, information regarding the operational, sales, promotional, and marketing methods and techniques of AEFA and the System.  In recognition of and in consideration for these and other benefits, to protect the confidentiality of AEFA's Client information and to protect AEFA's goodwill,   Independent Advisor covenants that (a) during the term of this Agreement and (b) for one year after the expiration or termination of this Agreement in the geographic area within which Independent Advisor operates or operated,  Independent Advisor agrees to not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person or entity:

    a.   (1)    Encourage, assist, participate, induce, or attempt to induce any Client or prospective business or customer to terminate an agreement with AEFA, AEFA's affiliates, Issuers, or any financial advisor business under the System;

         (2)   Encourage, assist, participate, induce, or attempt to induce any Client or prospective business or customer to terminate, surrender, redeem, or cancel any action related to Products & Services acquired or ordered from or through AEFA, AEFA's affiliates, Issuers, or any financial advisor business under the System, except as provided in the Manuals or with AEFA's written approval and consent;

         (3)   Solicit any Clients that Independent Advisor contacted, serviced or learned about while operating under this Agreement to open an account other than an AEFA account or to sell any investment, financial or insurance products or services other than through AEFA with AEFA's written approval and consent; or

         (4)   Open an account for, or provide or offer to provide any investment, financial, or insurance products or services to any Clients that Independent Advisor contacted, serviced or learned about while operating under this Agreement.

    b.   (1)   Employ, or retain as an independent contractor, any person who is at that time employed by AEFA or associated with AEFA as an independent

contractor or agent or by any other Independent Advisor of AEFA, or otherwise directly or indirectly induce such person to leave his or her employment, association or independent contractor relationship with AEFA; or

(2)    Disparage AEFA, its affiliates, employees, advisors, and Products & Services.

For purposes of this Section, an **"Issuer"** is a company or entity that issues Products & Services distributed or offered by AEFA, AEFA's affiliates, or AEFA as the agent of another company.

- Independent Advisor understands and acknowledges that if Independent Advisor terminates this Agreement, AEFA shall have the right to continue to actively offer all Products and Services to Clients the Independent Advisor serviced at AEFA.

- Upon expiration of this Agreement, Independent Advisor may have a right to revenue based on past Products & Services that have been purchased by Clients through the Independent Financial Advisor Business, as provided for in the Manuals, or with AEFA's approval and consent.

- Independent Advisor understands and acknowledges that AEFA shall have the right, in its sole discretion, to reduce the scope or restrictiveness of any covenant set forth above, or any portion thereof, without Independent Advisor's consent, effective immediately upon receipt by Independent Advisor of written notice thereof; and Independent Advisor agrees that it shall comply forthwith with any covenant as so modified, which shall be fully enforceable notwithstanding the provisions of Section 24 hereof. Independent Advisor agrees and understands that AEFA's exercise of such discretion, as to the Independent Advisor who is the subject of this Agreement, or of any other Independent Advisor, shall not constitute a waiver of any of AEFA's right to enforce this or any other agreements.

- Independent Advisor expressly agrees that the existence of any claims it may have against AEFA, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by AEFA of the covenants in this Section 19.

- At AEFA's request, Independent Advisor agrees to obtain and furnish to AEFA executed covenants similar in substance to those set forth in this Section 19 and, at the Independent Advisor's discretion, Addendum No. 3 (including covenants applicable upon the termination of a person's relationship with Independent Advisor and the provisions of Section 10 of this Agreement) from personnel (identified in the Manuals) employed or retained as an independent contractor by Independent Advisor or his/her agent. Every covenant required by this Section shall be in a form approved by AEFA, including, without limitation, specific identification of AEFA as a third-party beneficiary of such covenants with the independent right to enforce them.

- Independent Advisor agrees that to the fullest extent permitted by applicable law, AEFA will be entitled to injunctive relief from a court or NASD arbitration should Independent Advisor violate any of the covenants in this Section 19 and in Sections 10 and 18 (the "Sections") of

this Agreement. Independent Advisor recognizes that AEFA's remedies solely at law will be inadequate, that AEFA will be irreparably harmed by violations of the provisions in the Sections, and thus that AEFA will be entitled to injunctive relief to prevent future violations of the provisions in the Sections until a full and final resolution of any dispute may be had on the merits. If Independent Advisor has signed Addendum No. 3 but fails to comply with it, AEFA shall be entitled to immediate injunctive relief to enforce at AEFA's option, the covenants in Section 19, including 19(a) (1), (2), (3), and (4) and/or of Addendum 3. AEFA has the right to seek such injunctive relief in a court of competent jurisdiction, which relief shall extend until, and if, a decision on the merits of the same issue is rendered by an NASD arbitration panel. Such election by AEFA to seek judicial relief shall not waive any rights AEFA may have to arbitrate disputes arising under this Agreement, including rights to obtain damages from Independent Advisor in arbitration for violations of this Agreement.

- Nothing in this Agreement will prevent Independent Advisor from engaging in a competitive business consistent with the covenants in this Section 19, including serving as a financial advisor or consultant affiliated with another firm, after this Agreement expires or is terminated. Nothing in this Agreement will prohibit Independent Advisor from soliciting and servicing any Clients that Independent Advisor contacted, serviced or learned about while operating under an agreement with AEFA more than one year after this Agreement terminates or expires, provided that Independent Advisor makes no use directly or indirectly of any confidential or trade secret information, including but not limited to client files and lists obtained from AEFA.

- Upon Independent Advisor's request, AEFA may in its complete discretion release Independent Advisor from any provisions in this Section 19, in whole or in part, for example to exclude specified family members from the provisions in this Section 19. Such requests by Independent Advisor must be in writing and any release to Independent Advisor must be in writing and signed by an officer of AEFA. Any such release shall not act as a waiver of any other of AEFA's rights under this Agreement as such rights apply to any other Independent Advisor.

- AEFA agrees that clients who Independent Advisor purchased a direct or indirect interest in or obtained outside of the AEFA System and transferred to AEFA are not subject to Section 19 (a) (1), (2), (3) and (4).

## 20. TAXES, PERMITS, AND INDEBTEDNESS

- Independent Advisor agrees to promptly pay when due all taxes levied or assessed, including, without limitation, unemployment and sales taxes, and all accounts and other indebtedness of every kind incurred by Independent Advisor in the operation of the Independent Financial Advisor Business. Independent Advisor agrees to pay to AEFA an amount equal to any sales tax, gross receipts tax, or similar tax (other than income tax) imposed on AEFA with respect to any payments to AEFA required under this Agreement, unless the tax is credited against income tax otherwise payable by AEFA.

- In the event of any bona fide dispute as to Independent Advisor's liability for taxes assessed or other indebtedness, Independent Advisor may contest the validity or the amount of the tax or indebtedness in accordance with procedures of the taxing authority or applicable law, but

in no event shall Independent Advisor permit a tax sale or seizure by levy or execution or similar writ or warrant, or attachment by a creditor, to occur against the Premises of the Independent Financial Advisor Business, or any improvements thereon.

21.    <u>INDEPENDENT CONTRACTOR AND INDEMNIFICATION</u>

- This Agreement does not create a fiduciary duty on behalf of AEFA to the Independent Advisor.  Independent Advisor agrees to be an independent contractor, and nothing in this Agreement is intended to constitute AEFA as an agent, legal representative, subsidiary, joint venturer, partner, employee, or servant of the Independent Advisor for any purpose whatsoever.

- During the term of this Agreement, Independent Advisor agrees to hold himself or herself out to the public as an independent contractor operating the Independent Financial Advisor Business.  Independent Advisor agrees to take such action as may be necessary to do so, including, without limitation, exhibiting a notice of that fact in a conspicuous place at the Premises, the content of which AEFA reserves the right to specify.   Nothing in this Agreement authorizes Independent Advisor to make any contract, agreement, warranty, or representation on AEFA's behalf, or to incur any debt or other obligation in AEFA's name; and AEFA agrees to in no event assume liability for, or be deemed liable hereunder as a result of, any such action; nor shall AEFA be liable by reason of any act or omission of Independent Advisor in his or her operation of the Independent Financial Advisor Business or for any claim or judgment arising therefrom against Independent Advisor or AEFA.

- To the extent permitted by law and not covered by the errors and omission program pursuant to Section 13, Independent Advisor agrees to indemnify and hold harmless AEFA and its affiliates, and their respective officers, directors, agents, employees, successors and assigns (the "**Indemnitees**"), against any and all causes of action, claims, demands, liabilities, losses, damages, actions, litigation or other expenses (including, but not limited to, interest, costs of investigation, settlement costs, and attorneys' fees) arising out of or relating to Independent Advisor's establishment or operation of the Independent Financial Advisor Business, except for any claim based solely on the willful misconduct or gross negligence of AEFA or its officers, agents and employees, or based solely on nonperformance by AEFA of its obligations hereunder.  Independent Advisor agrees that with respect to any threatened or actual litigation, proceeding or dispute which could directly or indirectly affect any of the Indemnitees, the Indemnitees shall have the right, but not the obligation, to: (i) choose counsel, (ii) direct, manage and/or control the handling of the matter; and (iii) settle on behalf of the Indemnitees, and/or Independent Advisor, any claim against the Indemnitees in their sole discretion.   All vouchers, canceled checks, receipts, receipted bills or other evidence of payments for any such losses, liabilities, costs, damages, charges or expenses of whatsoever nature incurred by any Indemnitee shall be taken as prima facie evidence of Independent Advisor's obligation hereunder.  AEFA may require Independent Advisor to reimburse AEFA for all expenses (including attorneys' fees) reasonably incurred by AEFA to enforce the terms of this Agreement or any obligation owed by Independent Advisor to AEFA under this Agreement or otherwise, including, without limitation, Independent Advisor's indemnification obligations.

22.    **APPROVALS AND WAIVERS**

- Whenever this Agreement requires the prior approval or consent of AEFA, Independent Advisor agrees to make a timely written request to AEFA therefor, and such approval or consent must be obtained in writing from an officer of AEFA.  AEFA will respond to such requests within a timeframe reasonable under the circumstances.

- AEFA makes no warranties or guarantees upon which Independent Advisor may rely, and assumes no liability or obligation to Independent Advisor, by providing any waiver, approval, consent, or suggestion to Independent Advisor in connection with this Agreement, or by reason of any neglect, delay, or denial of any request therefor.

- No failure of AEFA to exercise any power reserved to it by this Agreement, or to insist upon strict compliance by Independent Advisor with any obligation or condition hereunder, and no custom or practice of the parties at variance with the terms hereof, shall constitute a waiver of AEFA's right to demand exact compliance with any of the terms hereof.  Waiver by AEFA of any particular default of Independent Advisor shall not affect or impair AEFA's rights with respect to any subsequent default of the same, similar, or different nature; nor shall any delay, forbearance, or omission of AEFA to exercise any power or right arising out of any breach of default by Independent Advisor of any of the terms, provisions, or covenants hereof, affect or impair AEFA's right to exercise the same, nor shall such constitute a waiver by AEFA of any right hereunder, or the right to declare any subsequent breach or default and to terminate this Agreement prior to the expiration of its term.  Subsequent acceptance by AEFA of any payments due to it hereunder shall not be deemed to be a waiver by AEFA of any preceding breach by Independent Advisor of any terms, covenants, or conditions of this Agreement.

23.    **NOTICES**

Any and all notices required or permitted under this Agreement shall be in writing and shall be:  personally delivered; sent by facsimile/telecopier (if confirmed by mail); mailed by certified mail, return receipt requested; or dispatched by overnight delivery envelope, to the respective parties at the following addresses, unless and until a different address has been designated by written notice to the other party:

> Notices to AEFA:
> American Express Financial Advisors Inc.
> IDS Tower 10
> 733 Marquette Avenue
> Minneapolis, Minnesota 55440
> Attn:  Unit 1523

> Notices to Independent Advisor will be made to the Independent Advisor's preferred business address on record at AEFA.

Any notice by a means which affords the sender evidence of delivery or rejected delivery shall be deemed to have been given and received at the date and time of receipt or rejected delivery.

24.    **ENTIRE AGREEMENT**

This Agreement, the attachments hereto, and the documents referred to herein constitute the entire Agreement between AEFA and Independent Advisor concerning the subject matter hereof, and supersede all prior and contemporaneous agreements, negotiations and representations (written and oral), no other representations having induced Independent Advisor to execute this Agreement.  No party is relying on any agreement or representation, or bound by any other agreement or obligation concerning the subject matter of this Agreement that is not expressly set forth herein.  Except for those permitted to be made unilaterally by AEFA hereunder, no amendment, change, or variance from this Agreement shall be binding on either party unless mutually agreed to by the parties and executed by their authorized officers or agents in writing.

25.   <u>SEVERABILITY AND CONSTRUCTION</u>

- If, for any reason, any section, part, term, provision, and/or covenant herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction, such shall not impair the operation of, or have any other effect upon, such other portions, sections, parts, terms, provisions, and/or covenants of this Agreement as may remain otherwise intelligible; and the latter shall continue to be given full force and effect and bind the parties hereto; and said invalid portions, sections, parts, terms, provisions, and/or covenants shall be deemed not to be a part of this Agreement.

- Any provision or covenant in this Agreement which expressly or by its nature imposes obligations beyond the expiration, termination, or assignment of this Agreement (regardless of cause for termination) shall survive such expiration, termination, or assignment, including but not limited to Sections 10, 19, 21, and 26.

- Independent Advisor expressly agrees to be bound by any promise or covenant imposing the maximum duty permitted by law which is subsumed within the terms of any provision hereof, as though it were separately articulated in and made a part of this Agreement, that may result from striking from any of the provisions hereof any portion or portions which a court, regulator, or agency having valid jurisdiction may hold to be unreasonable and unenforceable in an unappealed final decision to which AEFA is a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court, regulator, or agency order.

26.   <u>APPLICABLE LAW</u>

- This Agreement shall be interpreted and construed exclusively under the laws of the State of Minnesota.  In the event of any conflict of law, the laws of Minnesota shall prevail, without regard to the application of Minnesota conflict-of-law rules; except that all issues relating to arbitrability or the enforcement of this Agreement to arbitrate herein contained shall be governed by the terms set forth in this Agreement, and to the extent not inconsistent with this Agreement, by the Rules of Arbitration of the NASD.  Nothing in this Section is intended by the parties to subject this Agreement to any franchise or similar statute, rule, or regulation of the State of Minnesota to which it would not otherwise be subject.

- Except as provided in Section 19, any claim or controversy arising out of, or related to, this

Agreement, or the offer, making, performance, or interpretation thereof, shall be finally settled by arbitration unless otherwise agreed to by the parties.  Except as provided in Section 19, arbitration shall be conducted pursuant to the NASD Code of Arbitration Procedure and other applicable rules of the NASD.  By agreement of the parties, disputes may be resolved in arbitration conducted by a mutually agreed upon organization.

- No right or remedy conferred upon or reserved to AEFA or Independent Advisor by this Agreement is intended to be, nor shall be deemed, exclusive of any other right or remedy herein or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy.

- AEFA and Independent Advisor irrevocably waive trial by jury in any action, proceeding, or counterclaim, whether at law or in equity, brought by either of them against the other, whether or not there are other parties in such action or proceeding.

- AEFA and Independent Advisor hereby waive to the fullest extent permitted by law any right to, or claim of, any punitive or exemplary damages against the other and agree that in the event of a dispute between them each shall be limited to the recovery of any actual damages sustained by it.

- Nothing herein contained shall bar AEFA's right to obtain injunctive relief against conduct or threatened conduct that (i) will cause it loss or damage or (ii) violates the Terms of Special Regulatory Supervision or (iii) is in violation of AEFA's obligation to comply fully with government agency laws or regulations under the usual equity rules, including the applicable rules for obtaining specific performance, restraining orders, and preliminary injunctions.

## 27.  ACKNOWLEDGMENTS

- Independent Advisor acknowledges that it has conducted an independent investigation of the Independent Financial Advisor Business, and recognizes that the business venture contemplated by this Agreement involves significant business risks and that its success will be largely dependent upon the ability of Independent Advisor as an independent businessperson.  AEFA expressly disclaims the making of, and Independent Advisor acknowledges that it has not received, any warranty or guarantee, express or implied, as to the potential volume, profits, or success of the business venture contemplated by this Agreement.

- Independent Advisor acknowledges that it received a complete copy of this Agreement, the attachments hereto, and agreements relating thereto, if any, at least five (5) business days prior to the date on which this Agreement was executed.  Independent Advisor further acknowledges that it received the disclosure document required by the Trade Regulation Rule

Case 3:25-cv-00880-JO-MSB    Document 1    Filed 04/14/25    PageID.67    Page 67 of
Case 1:21-cv-00347-DKW-RT    Document 1-30    Filed 08/16/21    Page 37 of 69    PageID.63
130

of the Federal Trade Commission entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures" at least ten (10) business days prior to the date on which this Agreement was executed.

- Independent Advisor acknowledges that it has read and understood this Agreement, the attachments hereto, and agreements relating thereto, if any, and that AEFA has accorded Independent Advisor ample time and opportunity to consult with advisors of Independent Advisor's own choosing about the potential benefits and risks of entering into this Agreement.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement in duplicate on the date first above written.

_____          _____
Independent Advisor                                                    American Express Financial Advisors Inc.

By: _____          By: _____
Name: _____          Name: _____
Title: _____          Title: _____
Date: _____          Date: _____
Social Security No.: _____
Advisor No.: _____

**SCHEDULE A**

**Independent Financial Advisor office location:** _____

_____

_____

Name: _____

Title: _____

Date: _____

Social Security No.: _____

Advisor No.: _____

Addendum 1

### ADDENDUM TO THE
### AMERICAN EXPRESS FINANCIAL ADVISORS INC.
### INDEPENDENT ADVISOR BUSINESS FRANCHISE AGREEMENT

AEFA and Independent Advisor are parties to the attached American Express Financial Advisors Inc. Independent Advisors Business Franchise Agreement (the "Agreement") and agree as follows:

1.  This Addendum to the Agreement shall supplement the terms of the Agreement.  In the event of any inconsistency between this Addendum and the Agreement, this Addendum shall control.

2.  Section 4 of the Agreement, under the heading "FEES AND COMPENSATION" the paragraph entitled "Initial Franchise Fee", shall be replaced with the following:

    - Initial Franchise Fee.  In consideration of Independent Advisor's previous financial planning agreements with AEFA, AEFA agrees to waive Independent Advisor's initial franchise fee of One Thousand Five Hundred Dollars ($1,500).

1.  Section 5 of the Agreement, under the heading "Ongoing Duties of the Independent Advisor", the paragraph entitled "Premises and Signage", shall be modified by adding the following:

    - Alternatively, Independent Advisor may meet Clients at the Area Office or other location of Client's choice.

4.  Independent Advisor acknowledges that it has read and understood this Addendum.


IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement in duplicate on the date first above written.


_____          _____
Independent Advisor                       American Express Financial Advisors Inc.

By: _____           By: _____
Name: _____           Name: _____
Title: _____         Title: _____
Date: _____           Date: _____
Social Security No.: _____
Advisor No.: _____

Addendum 2

# ADDENDUM TO THE
## AMERICAN EXPRESS FINANCIAL ADVISORS INC.
## INDEPENDENT ADVISOR BUSINESS FRANCHISE AGREEMENT
## OFFICE OF SUPERVISORY JURISDICTION AGREEMENT

AEFA and Independent Advisor are parties to the attached American Express Financial Advisors Inc. Independent Advisors Business Franchise Agreement (the "**Agreement**") and agree as follows:

1.  This Addendum to the Agreement shall supplement the terms of the Agreement.  In the event of any inconsistency between this Addendum and the Agreement, this Addendum shall control.

2.  This Addendum defines Independent Advisor's relationship with AEFA as an Office of Supervisory Jurisdiction Branch Manager and, in setting forth such relationship in this Addendum, Independent Financial Advisor shall be referred to as the OSJ Branch Manager (the "**OSJ Branch Manager**") in this Addendum.

3.  <u>Undertakings by OSJ Branch Manager</u>.  OSJ Branch Manager will serve as a Registered Principal and maintain an Office Of Supervisory Jurisdiction and perform these functions according to the rules and regulations of the NASD, the Securities and Exchange Commission and the AEFA Manuals.

    A. The regulatory activities as described in the Manuals include, but are not limited to, the compliance with the specific regulatory requirements for:

        (i)     advertising and correspondence
        (ii)    annual compliance review
        (iii)   annual compliance meeting
        (iv)    branch office inspections
        (v)     complaint handling
        (vi)    continuing education
        (vii)   mail handling
        (viii)  outside activities disclosure
        (ix)    record keeping requirements
        (x)     supervision

    B.  As provided in the Manuals, OSJ Branch Manager will provide, at his or her own expense, adequate support personnel and systems sufficient to perform the functions described above in Section 3.A. necessary to supervise Independent Advisors assigned to the Branch Office in _____ (the "**Branch Office**").

    C.  OSJ Branch Manager may also provide services to Independent Advisors that are not related to compliance supervision, as described in the Manuals.

4.  Section 4 of the Agreement, under the heading "<u>FEES AND COMPENSATION</u>", shall be supplemented with the following:

- As provided in the Manuals, (i) OSJ Branch Manager shall negotiate with each Independent Advisor the amount of compensation such Independent Advisor agrees to pay OSJ Branch Manager for Compliance supervision and prevision of additional services; (ii)  OSJ Branch Manager and each Independent Advisor agrees to formalize their agreement with respect to the Compliance supervision and additional services in a branch agreement that complies with the Manuals (the "**Branch Agreement**"); (iii) OSJ Branch Manager's compensation for Compliance supervision may be a percentage of an Independent Advisor's sales of securities or a fixed dollar amount; and (iv) OSJ Branch Manager shall receive each Accounting Period the compensation provided for in each  Branch Agreement for an Independent Advisor that OSJ Branch Manager has a Branch Agreement with.

5.  <u>Termination</u>.

A.  This Addendum terminates in the event of:

(i)    OSJ Branch Manager's death or retirement;
(ii)   OSJ Branch Manager's total and permanent disability;
(iii)  Cancellation or non renewal of any license, registration or bond you are required to have by the states, the NASD, SEC or the Agreement;
(iv)   OSJ Branch Manager's violation of any provision of this Addendum or the Agreement; or
(vi)   Any transfer by OSJ Branch Manager under Section 14 of the Agreement.

B.  This Addendum may be terminated by either party with or without cause at any time and for any reason.

6.  <u>Termination Claims</u>.  Upon termination or expiration of this Addendum, OSJ Branch Manager shall have no claim against AEFA for profits, anticipated profits or earnings.  OSJ Branch Manager also shall have no claim for a refund or reimbursement of any funds OSJ Branch Manager has advanced or expenses OSJ Branch Manager has paid or incurred in connection with OSJ Branch Manager's responsibilities under this Addendum or for any other reason.

7.  <u>Miscellaneous</u>.

A.  This Addendum may be amended only by a written amendment signed by the parties and executed by their authorized officers or agents.

B.  If AEFA waives any provision of this Addendum, the waiver applies only to that provision, not to any other part of the Addendum.  A waiver is effective only when it is in writing and signed by an authorized officer of AEFA.

C.  If the laws of any state prohibit any provision of this Addendum, the laws apply only to that provision.  They do not invalidate the remaining portion of the Addendum.

D.  OSJ Branch Manager and AEFA both acknowledge that no oral or written representations were made about this Addendum or about the relationship between OSJ Branch Manager and AEFA that are not set forth in this Addendum.

---

E.   All capitalized terms not otherwise defined in this Addendum shall have the same meaning as in the Agreement.

8.   <u>Effective Date</u>.  In witness of the provisions of this Addendum as described above, OSJ Branch Manager and AEFA have entered into this Addendum with the understanding that it becomes effective on _____, _____.

IN WITNESS WHEREOF, the parties hereto have duly executed this Addendum in duplicate on the date first above written.

_____          _____
Independent Advisor                                                    American Express Financial Advisors Inc.

By: _____          By: _____
Name: _____          Name: _____
Title: _____          Title: _____
Date: _____          Date: _____
Social Security No.: _____
Advisor No.: _____

**ADDENDUM 3-R**
**(Rollout)**


**(RESTRICTIVE COVENANT ADDENDUM)**


This Contract Addendum is entered into by and between _____ ("Advisor") and American Express Financial Advisors Inc. ("AEFA"), IDS Life Insurance Company, and, if applicable, IDS Life Insurance Company of New York on this _____ day of _____, _____. AEFA and the Advisor agree as follows:

A.        The terms of this Addendum become effective no earlier than June 30, 2001, and are hereby incorporated into the following Agreements: 1) the Franchise Agreement(s) between AEFA and Advisor; and 2) the Independent Advisor Agreement(s) between Advisor and IDS Life Insurance Company and, if applicable, IDS Life Insurance Company of New York ("IDS Life") (hereinafter, collectively referred to as "AEFA").

B.        AEFA will suffer irreparable harm should Advisor violate Section 19(a)(1)(2)(3) and/or (4) of the Franchise Agreement, or Section IV 1(a)(1)(i)(ii)(iii) and/or 2(ii) of the IDS Life Independent Advisor Agreements (hereinafter, collectively "Restrictive Covenant") without fully and timely satisfying the terms of this Addendum.

C.        <u>Terms of Forbearance Agreement</u>.  As a mitigation of this irreparable harm, AEFA agrees to forbear from enforcement of its rights against Advisor under the Restrictive Covenant if Advisor timely and fully complies with the following conditions:

1.        <u>Two Weeks' Notice</u>. Advisor must provide AEFA with at least two-weeks' written notice of the termination of the Franchise Agreement ("Termination Notice"), with a copy to be delivered personally to the Advisor's Group Vice President ("GVP") designate, or if no designate is timely provided, to the Advisor's immediate AEFA leader, and, in either event, a copy, by facsimile or overnight mail, to AEFA Corporate Office, Licensing Unit.


2.        As of the date of the Termination Notice, the Advisor must:

(a)        <u>Length of Service</u>.  Have served at least six consecutive years as an advisor for AEFA.

(b)        <u>Compliance Obligations</u>.  Not be subject to discipline as a result of a violation of the Compliance Rules as defined in Section 3, of the Franchise Agreement ("Compliance Rules").  This discipline may include, but not be limited to, suspension, strict supervision, involuntary termination or otherwise "permitted to resign".

---

American Express Financial Advisors Inc.                                                        Addendum 3-R
Franchise Agreement - 10/25/99

Case 3:25-cv-00880-JO-MSB    Document 1    Filed 04/14/25    PageID.74    Page 74 of
Case 1:21-cv-00347-DKW-RT    Document 1-30    Filed 08/16/21    Page 44 of 69  PageID.70
130

(c)     <u>Regulatory Obligations</u>.   Not be the subject of an ongoing Compliance Rule related (i) investigation by AEFA, the Securities and Exchange Commission, the National Association of Securities Dealers, Regulation, Inc., any of the other self-regulatory organizations, a state securities or insurance commissioner or regulatory authority; (ii) AEFA client complaint; or (iii) adversary proceeding involving an AEFA client or AEFA.  (Upon Advisor's reasonable request, AEFA may waive conditions 2(c)(ii) and (iii)).

3.      <u>Return of Complete Files and Proprietary Materials</u>.  Within five (5) business days after the date of the Termination Notice (including the date of such Notice), Advisor must return all original client files and AEFA proprietary materials, as defined in the Franchise Agreement, to the Advisor's GVP designate or, if no designation is provided by AEFA within five (5) business days, to the Advisor's immediate AEFA leader.

To the extent consistent with privacy laws and policies, in order to allow Advisor to service portable products and to fulfill compliance duties, Advisor may retain copies of consolidated statements, financial plans, tax returns, advisor notes, insurance policies, AEFA or AEFA approved product applications and trust or other legal documents for the clients Advisor serviced at AEFA, but may not retain copies of any AEFA/American Express Company proprietary materials, or AEFA/American Express Company trademarked, or copyrighted materials, software or property, as defined in the Franchise Agreement.

4.      <u>Franchise Agreement Compliance</u>.  On and before the effective date of the termination of the Franchise Agreement between AEFA and Advisor, Advisor shall comply fully with Section 18 (Obligations upon Termination or Expiration) of the Franchise Agreement.

5.      <u>No Disparagement or Recruiting.</u>   Both before and after the effective date of the termination of the Franchise Agreement between AEFA and Advisor, the Advisor:

(a)     must not make disparaging or defamatory comments to anyone about AEFA, its affiliated companies, their products, services or personnel; and

(b)     must not recruit or solicit any other AEFA independent contractor, employee or franchisee to terminate their respective relationship with AEFA; and

(c)     continue to comply with Section 18 of the Franchise Agreement, to the extent such section requires Advisor to meet obligations subsequent to the termination of the Franchise Agreement.

6.      <u>No Pre-Termination Solicitation of Clients.</u>   Departing Advisor agrees not to send notification of termination to clients prior to the effective date of termination.  Further, any notice Advisor does send to clients, announcing Advisor's termination from AEFA, must not be on AEFA (or affiliated company) stationery or use AEFA's proprietary marks, and may not be mailed in any envelope marked with any AEFA proprietary marks.  Advisor also must not, prior to the effective date of termination, solicit or otherwise assist any AEFA client to transfer AEFA client assets from AEFA to another broker/dealer, insurance company or investment advisor.

Case 3:25-cv-00880-JO-MSB    Document 1    Filed 04/14/25    PageID.75    Page 75 of
Case 1:21-cv-00347-DKW-RT    Document 1-30    Filed 08/16/21    Page 45 of 69  PageID.71
130

D.    <u>Preliminary Agreement as to Addendum Compliance.</u>  If AEFA has a reasonable basis to believe that Advisor has satisfied, and Advisor certifies in writing that Advisor has satisfied, subparagraphs C.1. through C.6. above, AEFA, prior to the effective date of termination, or, in the event of extenuating circumstances, within a reasonable time period subsequent to termination not to exceed five (5) business days, will notify Advisor, in writing, that AEFA believes, based on the information available to it at that time, that Advisor appears to have satisfied those provisions.

E.    <u>Exception for Continuity of Practice Agreements.</u>  As to any clients or financial planning practices which Advisor acquires from AEFA or another AEFA Advisor, for value paid, a direct or indirect interest, as defined in the Franchise Agreement or in a Continuity of Practice, or similar agreement, this Addendum will not be effective for a period of three (3) years after Advisor becomes an AEFA Advisor, as well as for one (1) year after any such acquisition.

F.    <u>Compliance with Addendum Mitigates AEFA's Damage.</u>  Through Advisor's timely and complete compliance with this Addendum, Advisor will have mitigated, to the extent deemed reasonable by the parties hereto, the irreparable harm AEFA would otherwise suffer through the Advisor's violation of the Restrictive Covenant without compliance with this Addendum or the Restrictive Covenant.

G.    <u>Remedies.</u>  Should AEFA, before or after the effective date of Advisor's termination of the Franchise Agreement, discover that the Advisor:

      1.    has, in fact, not fully or timely complied with the provisions of paragraph C; and, if applicable, paragraph E; or

      2.    has defamed or disparaged AEFA in any manner; or

      3.    has recruited or solicited any other AEFA employee or franchisee to terminate their respective relationship with AEFA; or

      4.    has otherwise breached the terms of the Franchise Agreement or this Addendum;

then AEFA shall be entitled to all remedies at law and equity including but not limited to injunctive relief, actual, compensatory and punitive damages, and its reasonable attorneys' fees and costs.

H.    <u>No Waiver.</u>  This Addendum does not modify, amend or otherwise alter any provision of the Franchise Agreement except the Restrictive Covenant set forth at Sections 19(a)(1)(2)(3) and (4) of the Franchise Agreement(s) and Section IV(1)(a)(1)(i)(ii)(iii) and 2(ii) of the IDS Life Independent Advisor Agreement(s).  Should any court, arbitration panel or quasi-judicial body of competent jurisdiction determine that any provision of the Franchise Agreement or this Addendum is unenforceable or invalid, such a determination shall not render the Franchise Agreement or this Addendum, or any provision thereof, otherwise unenforceable or invalid.

I.    <u>Injunctive Relief.</u>  If AEFA has a reasonable basis for concluding that the Advisor has not timely or fully complied with one or more of the requirements of this Addendum, notwithstanding an Advisor's alleged compliance, Advisor agrees that AEFA shall immediately be entitled to a forty-five (45) day injunction which enforces fully the terms of the Franchise Agreement including the Restrictive Covenant.  AEFA shall be entitled to a Temporary Restraining Order or Preliminary Injunction from a

court of competent jurisdiction, for fifteen (15) days, pending a decision on the merits by an NASD arbitration panel, further emergency injunctive relief of at least thirty (30) days from an NASD expedited arbitration panel, and, thereafter, or contemporaneously, as part of any injunctive award, enforcement of the full Restrictive Covenant, from an NASD panel of arbitrators. The filing by Advisor of an NASD arbitration claim, seeking to declare any part of this Addendum or the Franchise Agreement invalid or unenforceable, shall be conclusive proof of a violation of and intent to violate such Agreements and a basis for immediate court ordered injunctive relief in favor of AEFA, upholding the Franchise Agreement, pending a decision on the merits by an NASD arbitration panel.

       J.    <u>Primary Purpose of This Addendum</u>.  AEFA and the Advisor agree and acknowledge that (1) AEFA has invested substantial sums and resources in the training, marketing and development of Advisor, which has been to the benefit of Advisor's business; and (2) in agreeing to this Addendum, the parties are intending to:

      1.    protect the welfare and interests of AEFA clients;

      2.    protect both parties against disparagement and unfair competition;

      3.    protect AEFA's interests in its proprietary and confidential information and trademarks; and

      4.    give AEFA reasonable parity with the departing Advisor in competing for the continued business of the clients.

    **IN WITNESS** of the provisions of this Contract Addendum as described above, you and AEFA have entered into this Addendum with the understanding that it becomes effective on the date(s) previously specified herein.

_____
Independent Advisor

By: _____
Name: _____
Title: _____
Date: _____
Social Security No.: _____
Advisor No.: _____

 

 

_____
American Express Financial Advisors Inc.

By: _____
Name: _____
Title: _____
Date: _____

 

_____
IDS Life Insurance Company

By: _____
Name: _____
Title: _____
Date: _____

 

_____
IDS Life Insurance Company of New York

By: _____
Name: _____
Title: _____
Date: _____

 

(To be executed in duplicate – one copy to be returned to Advisor.)

## ADDENDUM 3-V
### (Veteran Advisor Recruits)

### (FOR ADVISORS TRAINED OUTSIDE OF AMERICAN EXPRESS
### AND HAVING THEIR OWN CLIENT BASE NOT SUBJECT TO
### ANOTHER FIRM'S NON-COMPETE AGREEMENT)

_____ ("Independent Advisor), American Express Financial Advisors Inc., ("AEFA"), IDS Life Insurance Company, and, if applicable, IDS Life Insurance Company of New York ("IDS Life") (Independent Advisor) agree as of this _____ day of _____, _____, that the restrictive covenant set forth at Section 19(a)(1)(2)(3) and (4) of the Franchise Agreement and at Section IV(1)(a)(i)(ii)(iii) and 2(ii) of the Independent Advisor Agreements(s) (hereinafter, collectively "Restrictive Covenant") with IDS Life Insurance Company and, if applicable, IDS Life of New York ("IDS Life") (hereinafter, collectively "AEFA"), will not apply to (a) any client listed on the client list attached hereto as Exhibit 1; and (b) shall not apply to clients not listed on Exhibit 1, if Advisor meets the following conditions:

7.   <u>Two Weeks' Notice</u>.  Advisor must provide AEFA with at least two-weeks' written notice of the termination of the Franchise Agreement ("Termination Notice"), with a copy to be delivered personally to the Advisor's Group Vice President ("GVP") designate, or if no designate is timely provided, to the Advisor's immediate AEFA leader, and, in either event, a copy, by facsimile or overnight mail, to AEFA Corporate Office, Licensing Unit.

8.   As of the date of the Termination Notice, Advisor must:

(a)   <u>Compliance Obligations</u>.  Not be subject to discipline as a result of a violation of the Compliance Rules as defined in Section 3 of the Franchise Agreement ("Compliance Rules").   This discipline may include, but not be limited to, suspension, strict supervision, involuntary termination or otherwise "permitted to resign".

(b)   <u>Regulatory Obligations</u>.   Not be the subject of an ongoing Compliance Rule related (i) investigation by AEFA, the Securities and Exchange Commission, the National Association of Securities Dealers, Regulation, Inc., any of the other self-regulatory organizations, a state securities or insurance commissioner or regulatory authority; (ii) AEFA client complaint; or (iii) adversary proceeding involving an AEFA client or AEFA.  (Upon Advisor's reasonable request, AEFA may waive conditions 2(c)(ii) and (iii)).

3.   <u>Return of Complete Files and Proprietary Materials</u>.  Within five (5) business days after the date of the Termination Notice (including the date of such Notice), Advisor must return all original client files and AEFA proprietary materials, as defined in the Franchise Agreement, to the Advisor's GVP designate or, if no designation is provided by AEFA within five (5) business days, to the Advisor's immediate AEFA leader.

To the extent consistent with privacy laws and policies, in order to allow Advisor to service portable products and to fulfill compliance duties, Advisor may retain copies of consolidated statements, financial plans, tax returns, advisor notes, insurance policies, AEFA or AEFA approved product applications and trust or other legal documents for the clients the Advisor serviced at AEFA, but may not retain copies of any AEFA/American Express Company proprietary materials, or AEFA/American Express Company trademarked, or copyrighted materials, software or property, as defined in the Franchise Agreement.

4.    <u>Franchise Agreement Compliance</u>.  On and before the effective date of the termination of the Franchise Agreement between AEFA and Advisor, Advisor shall comply fully with Section 18 (Obligations upon Termination or Expiration) of the Franchise Agreement.

5.    <u>No Disparagement or Recruiting.</u>    Both before and after the effective date of the termination of the Franchise Agreement between AEFA and Advisor, the Advisor:

      (d)    Must not make disparaging or defamatory comments to anyone about AEFA, its affiliated companies, products, services or personnel; and

      (e)    Must not recruit or solicit any other AEFA independent contractor, employee or franchisee to terminate their respective relationship with AEFA; and

      (f)    Continue to comply with Section 18 of the Franchise Agreement, to the extent such section requires the Advisor to meet obligations subsequent to the termination of the Franchise Agreement.

6.    <u>No Pre-Termination Solicitation of Clients.</u>    Departing Advisor agrees not to send notification of termination to clients prior to the effective date of termination.  Further, any notice Advisor does send to clients, announcing Advisor's termination from AEFA, must not be on AEFA (or affiliated company) stationery or use AEFA's proprietary marks, and may not be mailed in any envelope marked with any AEFA proprietary marks.  Advisor also must not, prior to the effective date of termination, solicit or otherwise assist any AEFA client to transfer AEFA client assets from AEFA to another broker/dealer, insurance company or investment advisor.

7.    <u>Preliminary Agreement as to Addendum Compliance.</u>  If AEFA has a reasonable basis to believe that Advisor has satisfied, and Advisor certifies in writing that Advisor has satisfied, paragraphs 1. through 6. above, AEFA, prior to the effective date of termination, or, in the event of extenuating circumstances, within a reasonable time period subsequent to termination not to exceed five (5) business days, will notify Advisor, in writing, that AEFA believes, based on the information available to it at that time, that the Advisor appears to have satisfied those provisions.

8.    <u>Exception for Continuity of Practice Agreements</u>.  As to any clients or financial planning practices which Advisor acquires from AEFA or another AEFA Advisor, for value paid, a direct or indirect interest, as defined in the Franchise Agreement or in a Continuity of Practice, or similar agreement, this Addendum will not be effective for a period of three (3) years after Advisor becomes an AEFA Advisor, as well as for one (1) year after any such acquisition.

9.    <u>Compliance with Addendum Mitigates AEFA's Damage</u>.  Through Advisor's timely and complete compliance with this Addendum, Advisor will have mitigated, to the extent deemed reasonable by the parties hereto, the irreparable harm AEFA would otherwise suffer through the Advisor's violation of the Restrictive Covenant without compliance with this Addendum or the Restrictive Covenant.

10.    <u>Remedies</u>.  Should AEFA, before or after the effective date of Advisor's termination of the Franchise Agreement, discover that the Advisor:

      (a)    has, in fact, not fully or timely complied with the provisions of paragraphs 1-6 and, if applicable, paragraph 8; or

      (b)    has defamed or disparaged AEFA in any manner; or

      (c)    has recruited or solicited any other AEFA employee or franchisee to terminate their respective relationship with AEFA; or

      (d)    has otherwise breached the terms of the Franchise Agreement or this Addendum;

then AEFA shall be entitled to all remedies at law and equity including but not limited to injunctive relief, actual, compensatory and punitive damages; and its reasonable attorneys' fees and costs.

11.    <u>No Waiver</u>.  This Addendum does not modify, amend or otherwise alter any provision of the Franchise Agreement except the Restrictive Covenant set forth at Sections 19(a)(1)(2)(3) and (4) of the Franchise Agreement(s) and Section IV(1)(a)(1)(i)(ii)(iii) and 2(ii) of the IDS Life Independent Advisor Agreement(s).    Should any court, arbitration panel or quasi-judicial body of competent jurisdiction determine that any provision of the Franchise Agreement or this Addendum is unenforceable or invalid, such a determination shall not render the Franchise Agreement or this Addendum, or any provision thereof, otherwise unenforceable or invalid.

12.    <u>Injunctive Relief</u>.  If AEFA has a reasonable basis for concluding that the Advisor has not timely or fully complied with one or more of the requirements of this Addendum, notwithstanding an Advisor's alleged compliance, Advisor agrees that AEFA shall immediately be entitled to a forty-five (45) day injunction which enforces fully the terms of the Franchise Agreement including the Restrictive Covenant.  AEFA shall be entitled to a Temporary Restraining Order or Preliminary Injunction from a court of competent jurisdiction, for fifteen (15) days, pending a decision on the merits by an NASD arbitration panel, further emergency injunctive relief of at least thirty (30) days from an NASD expedited arbitration panel, and, thereafter, or contemporaneously, as part of any injunctive award, enforcement of the full Restrictive Covenant, from an NASD panel of arbitrators**.**  The filing by Advisor of an NASD arbitration claim, seeking to declare any part of this Addendum or the Franchise Agreement invalid or unenforceable, shall be conclusive proof of a violation of and intent to violate such Agreements and a basis for immediate court ordered injunctive relief in favor of AEFA, upholding the Franchise Agreement, pending a decision on the merits by an NASD arbitration panel.

**IN WITNESS** of the provisions of this Contract Addendum as described above, Advisor and AEFA have entered into this Addendum with the understanding that it becomes effective on the date(s) previously specified herein.

| | |
|---|---|
| _____ | _____ |
| Independent Advisor | American Express Financial Advisors Inc. |

| | | | |
|---|---|---|---|
| By: _____ | | By: _____ |
| Name: _____ | | Name: _____ |
| Title: _____ | | Title: _____ |
| Date: _____ | | Date: _____ |
| Social Security No.: _____ | | |
| Advisor No.: _____ | | |

_____
IDS Life Insurance Company

By: _____
Name: _____
Title: _____
Date: _____

_____
IDS Life Insurance Company of New York

By: _____
Name: _____
Title: _____
Date: _____

(To be executed in duplicate – one copy to be returned to Advisor.)

**EXHIBIT 1 TO ADDENDUM 3-V**
**(Veteran Advisor Recruits)**


        This is Exhibit 1 to Addendum 3-V to the Franchise Agreement between
_____ ("Independent Advisor") and American Express Financial Advisors Inc.
("AEFA"), IDS Life Insurance Company, and, if applicable IDS Life Insurance Company of New York.

        This Exhibit 1 to Addendum 3-V shall have no impact on any contract or restrictive covenant
which Advisor may have with another company, Advisor understanding that such obligations, if any, are
Advisor's obligation to consider without input or assistance from AEFA.

        Advisor certifies that each of the individuals/entities listed on the attached client list is a client of
Advisor as of the date Advisor signs Addendum 3-V.  This Exhibit consists of this cover document and
the attached list of clients (to be signed and dated by AEFA and Advisor).

Dated:  this _____ day of _____, _____,


_____          _____
Independent Advisor                                 American Express Financial Advisors Inc.

By: _____                 By: _____
Name: _____                 Name: _____
Title: _____               Title: _____
Date: _____                Date: _____
Social Security No.: _____
Advisor No.: _____

 

                                                    _____
                                                    IDS Life Insurance Company

                                                    By: _____
                                                    Name: _____
                                                    Title: _____
                                                    Date: _____


                                                    _____
                                                    IDS Life Insurance Company of New York

                                                    By: _____
                                                    Name: _____
                                                    Title: _____
                                                    Date: _____

        (To be executed in duplicate – one copy to be returned to Advisor.)

Case 3:25-cv-00880-JO-MSB   Document 1   Filed 04/14/25   PageID.83   Page 83 of
Case 1:21-cv-00347-DKW-RT   Document 1-10   Filed 08/16/21   Page 53 of 69   PageID.79
1-30

**ADDENDUM 3-T**
**(Employee to Franchise Transitions)**

This Contract Addendum is entered into by and between _____ ("Advisor") and American Express Financial Advisors Inc. ("AEFA"), IDS Life Insurance Company, and, if applicable, IDS Life Insurance Company of New York ("IDS Life") on this _____ day of _____, _____. AEFA and the Advisor agree as follows:

A.    The terms of this Addendum become effective no earlier than June 30, 2001, and are hereby incorporated into the following Agreements: 1) the Franchise Agreement(s) between AEFA and Advisor; and 2) the Independent Advisor Agreement(s) between Advisor and IDS Life Insurance Company, if applicable, and IDS Life Insurance Company of New York ("IDS Life") (hereinafter, collectively referred to as "AEFA").

B.    AEFA will suffer irreparable harm should Advisor violate Section 19(a)(1)(2)(3) and/or (4) of the Franchise Agreement, or Section IV 1(a)(1)(i)(ii)(iii) and/or 2(ii) of the IDS Life Independent Advisor Agreements (hereinafter, collectively "Restrictive Covenant") without fully and timely satisfying the terms of this Addendum.

C.    <u>Terms of Forbearance Agreement</u>.  As a mitigation of this irreparable harm, AEFA agrees to forbear from enforcement of its rights against Advisor under the Restrictive Covenant if Advisor timely and fully complies with the following conditions:

1.    <u>Two Weeks' Notice</u>.  Advisor must provide AEFA with at least two-weeks' written notice of the termination of the Franchise Agreement ("Termination Notice"), with a copy to be delivered personally to the Advisor's Group Vice President ("GVP") designate, or if no designate is timely provided, to the Advisor's immediate AEFA leader, and, in either event, a copy, by facsimile or overnight mail, to AEFA Corporate Office, Licensing Unit.

2.    As of the date of the Termination Notice, the Advisor must:

(a)    <u>Length of Service</u>.  Have served at least six consecutive years as an advisor for AEFA **and** have completed at least three full years under the Independent Financial Advisor Franchise Agreement ("Independent Advisor").  For example, an AEFA Advisor may be an employee advisor for three years and an Independent Financial Advisor for three years and qualify for this forbearance agreement.

(b)    <u>Compliance Obligations</u>.  Not be subject to discipline as a result of a violation of the Compliance Rules as defined in Section 3, of the Franchise Agreement ("Compliance Rules").  This discipline may include, but not be limited to, suspension, strict supervision, involuntary termination or otherwise "permitted to resign".

(c)    <u>Regulatory Obligations</u>.  Not be the subject of an ongoing Compliance Rule related (i) investigation by AEFA, the Securities and Exchange Commission, the

---

American Express Financial Advisors Inc.                                                            Addendum 3-T
Franchise Agreement - 10/25/99

Case 3:25-cv-00880-JO-MSB    Document 1    Filed 04/14/25    PageID.84    Page 84 of
Case 1:21-cv-00347-DKW-RT    Document 1-30    Filed 08/16/21    Page 54 of 69    PageID.80
130

National Association of Securities Dealers, Regulation, Inc., any of the other self-regulatory organizations, a state securities or insurance commissioner or regulatory authority; (ii) AEFA client complaint; or (iii) adversary proceeding involving an AEFA client or AEFA.  (Upon Advisor's reasonable request, AEFA may waive conditions 2(c)(ii) and (iii)).

9.    <u>Return of Complete Files and Proprietary Materials</u>.  Within five (5) business days after the date of the Termination Notice (including the date of such Notice), Advisor must return all original client files and AEFA proprietary materials, as defined in the Franchise Agreement, to the Advisor's GVP designate or, if no designation is provided by AEFA within five (5) business days, to Advisor's immediate AEFA leader.

To the extent consistent with privacy laws and policies, in order to allow Advisor to service portable products and to fulfill compliance duties, Advisor may retain copies of consolidated statements, financial plans, tax returns, advisor notes, insurance policies, AEFA or AEFA approved product applications and trust or other legal documents for the clients Advisor serviced at AEFA, but may not retain copies of any AEFA/American Express Company proprietary materials, or AEFA/American Express Company trademarked, or copyrighted materials, software or property, as defined in the Franchise Agreement.

10.    <u>Franchise Agreement Compliance</u>.  On and before the effective date of the termination of the Franchise Agreement between AEFA and Advisor, Advisor shall comply fully with Section 18 (Obligations upon Termination or Expiration) of the Franchise Agreement.

11.    <u>No Disparagement or Recruiting.</u>    Both before and after the effective date of the termination of the Franchise Agreement between AEFA and Advisor, the Advisor:

    (a)    must not make disparaging or defamatory comments to anyone about AEFA, its affiliated companies, their products, services or personnel; and

    (b)    must not recruit or solicit any other AEFA independent contractor, employee or franchisee to terminate their respective relationship with AEFA; and

    (c)    continue to comply with Section 18 of the Franchise Agreement, to the extent such section requires Advisor to meet obligations subsequent to the termination of the Franchise Agreement.

12.    <u>No Pre-Termination Solicitation of Clients.</u>    Departing Advisor agrees not to send notification of termination to clients prior to the effective date of termination.  Further, any notice Advisor does send to clients, announcing Advisor's termination from AEFA, must not be on AEFA (or affiliated company) stationery or use AEFA's proprietary marks, and may not be mailed in any envelope marked with any AEFA proprietary marks.  Advisor also must not, prior to the effective date of termination, solicit or otherwise assist any AEFA client to transfer AEFA client assets from AEFA to another broker/dealer, insurance company or investment advisor.

Case 3:25-cv-00880-JO-MSB    Document 1    Filed 04/14/25    PageID.85    Page 85 of
1-30
Case 1:21-cv-00347-DKW-RT    Document 1-30    Filed 08/16/21    Page 55 of 69    PageID.81

H.    Preliminary Agreement as to Addendum Compliance.  If AEFA has a reasonable basis to believe that Advisor has satisfied, and Advisor certifies in writing that Advisor has satisfied, subparagraphs C.1. through C.6. above, AEFA, prior to the effective date of termination, or, in the event of extenuating circumstances, within a reasonable time period subsequent to termination not to exceed five (5) business days, will notify Advisor, in writing, that AEFA believes, based on the information available to it at that time, that Advisor appears to have satisfied those provisions.

I.    Exception for Continuity of Practice Agreements.  As to any clients or financial planning practices which Advisor acquires from AEFA or another AEFA Advisor, for value paid, a direct or indirect interest, as defined in the Franchise Agreement or in a Continuity of Practice, or similar agreement, this Addendum will not be effective for a period of three (3) years after Advisor becomes an AEFA Advisor, as well as for one (1) year after any such acquisition.

F.    Compliance with Addendum Mitigates AEFA's Damage.  Through Advisor's timely and complete compliance with this Addendum, Advisor will have mitigated, to the extent deemed reasonable by the parties hereto, the irreparable harm AEFA would otherwise suffer through the Advisor's violation of the Restrictive Covenant without compliance with this Addendum or the Restrictive Covenant.

G.    Remedies.  Should AEFA, before or after the effective date of Advisor's termination of the Franchise Agreement, discover that the Advisor:

1.    has, in fact, not fully or timely complied with the provisions of paragraph C; and, if applicable, paragraph E; or

2.    has defamed or disparaged AEFA in any manner; or

3.    has recruited or solicited any other AEFA employee or franchisee to terminate their respective relationship with AEFA; or

4.    has otherwise breached the terms of the Franchise Agreement or this Addendum;

then AEFA shall be entitled to all remedies at law and equity including but not limited to injunctive relief, actual, compensatory and punitive damages, and its reasonable attorneys' fees and costs.

H.    No Waiver.  This Addendum does not modify, amend or otherwise alter any provision of the Franchise Agreement except the Restrictive Covenant set forth at Sections 19(a)(1)(2)(3) and (4) of the Franchise Agreement(s) and Section IV(1)(a)(1)(i)(ii)(iii) and 2(ii) of the IDS Life Independent Advisor Agreement(s).  Should any court, arbitration panel or quasi-judicial body of competent jurisdiction determine that any provision of the Franchise Agreement or this Addendum is unenforceable or invalid, such a determination shall not render the Franchise Agreement or this Addendum, or any provision thereof, otherwise unenforceable or invalid.

II.    Injunctive Relief.  If AEFA has a reasonable basis for concluding that the Advisor has not timely or fully complied with one or more of the requirements of this Addendum, notwithstanding an Advisor's alleged compliance, Advisor agrees that AEFA shall immediately be entitled to a forty-five (45) day injunction which enforces fully the terms of the Franchise Agreement including the Restrictive Covenant.  AEFA shall be entitled to a Temporary Restraining Order or Preliminary Injunction from a court of competent jurisdiction, for fifteen (15) days, pending a decision on the merits by an NASD

arbitration panel, further emergency injunctive relief of at least thirty (30) days from an NASD expedited arbitration panel, and, thereafter, or contemporaneously, as part of any injunctive award, enforcement of the full Restrictive Covenant, from an NASD panel of arbitrators.  The filing by Advisor of an NASD arbitration claim, seeking to declare any part of this Addendum or the Franchise Agreement invalid or unenforceable, shall be conclusive proof of a violation of and intent to violate such Agreements and a basis for immediate court ordered injunctive relief in favor of AEFA, upholding the Franchise Agreement, pending a decision on the merits by an NASD arbitration panel.

J.    <u>Primary Purpose of This Addendum</u>.  AEFA and the Advisor agree and acknowledge that (1) AEFA has invested substantial sums and resources in the training, marketing and development of Advisor, which has been to the benefit of Advisor's business; and (2) in agreeing to this Addendum, the parties are intending to:

5.    protect the welfare and interests of AEFA clients;

6.    protect both parties against disparagement and unfair competition;

7.    protect AEFA's interests in its proprietary and confidential information and trademarks; and

8.    give AEFA reasonable parity with the departing Advisor in competing for the continued business of the clients.

 

 

 

 

       **IN WITNESS** of the provisions of this Contract Addendum as described above, you and AEFA have entered into this Addendum with the understanding that it becomes effective on the date(s) previously specified herein.

 

 

| | |
|---|---|
| _____ | _____ |
| Independent Advisor | American Express Financial Advisors Inc. |
| | |
| By: _____ | By: _____ |
| Name: _____ | Name: _____ |
| Title: _____ | Title: _____ |
| Date: _____ | Date: _____ |
| Social Security No.: _____ | |
| Advisor No.: _____ | |
| | |
| | _____ |
| | IDS Life Insurance Company |
| | |
| | By: _____ |
| | Name: _____ |
| | Title: _____ |
| | Date: _____ |
| | |
| | _____ |
| | IDS Life Insurance Company of New York |
| | |
| | By: _____ |
| | Name: _____ |
| | Title: _____ |
| | Date: _____ |

 

 

(To be executed in duplicate – one copy to be returned to Advisor.)

 

## AGREEMENT

THIS IS AN AGREEMENT, made and entered into on _____, 20___, by and between American Express Financial Advisors Inc. ("AEFA") at its principal place of business at IDS Tower 10, Minneapolis, Minnesota 55440, and you, ALAN H. KODAMA _____
_____ ("Independent Advisor").

### RECITALS:

A.     Through its time, skill, effort, and money, AEFA has developed a distinctive system that offers, through financial advisors, a variety of financial services to individuals and/or business owners (the "System").  The financial services include financial planning, investment advice and consulting services, securities products, insurance products, brokerage services, , including individual securities, tax services, lending services, and other related products & services provided or procured through AEFA and/or its affiliates or third parties (collectively, "Products & Services").

B.     The distinguishing characteristics of the System include a well recognized brand; distinctive products & services; high level of securities and regulatory compliance; the highest standards of customer service and quality advice, including financial planning; administrative procedures providing superior customer service, including consolidated statements; orientation programs; advertising and promotional programs; and direct marketing services, telemarketing and on-line services directed to clients; all of which may be changed, improved, and further developed by AEFA from time to time.

C.     The System is identified by trade names, service marks, trademarks, logos, emblems, and indicia of origin, including, the mark "American Express," (the "Proprietary Marks");

D.     Independent Advisor desires to contract with AEFA to operate a business offering Products & Services under the System and using the Proprietary Marks (the "Independent Financial Advisor Business"), and to receive the services provided by AEFA in consideration for the covenants contained herein; and

E.     Independent Advisor understands and acknowledges the importance of all the Independent Financial Advisors operating their Independent Financial Advisor Businesses in a manner which meets AEFA's high standards of quality of advice and customer service, to protect the value and integrity of the System and all the Independent Financial Advisor Businesses.

THEREFORE, Independent Advisor and AEFA agree as follows:

1.     GRANT

A.  Independent Financial Advisor Business.
- AEFA and Independent Advisor agree upon the terms and conditions in this Agreement for Independent Advisors to establish and operate the Independent Financial Advisor Business.



- Except as provided in Section 19, any claim or controversy arising out of, or related to, this Agreement, or the offer, making, performance, or interpretation thereof, shall be finally settled by arbitration unless otherwise agreed to by the parties. Except as provided in Section 19, arbitration shall be conducted pursuant to the NASD Code of Arbitration Procedure and other applicable rules of the NASD. By agreement of the parties, disputes may be resolved in arbitration conducted by a mutually agreed upon organization.

- No right or remedy conferred upon or reserved to AEFA or Independent Advisor by this Agreement is intended to be, nor shall be deemed, exclusive of any other right or remedy herein or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy.

- AEFA and Independent Advisor irrevocably waive trial by jury in any action, proceeding, or counterclaim, whether at law or in equity, brought by either of them against the other, whether or not there are other parties in such action or proceeding.

- AEFA and Independent Advisor hereby waive to the fullest extent permitted by law any right to, or claim of, any punitive or exemplary damages against the other and agree that in the event of a dispute between them each shall be limited to the recovery of any actual damages sustained by it.

- Nothing herein contained shall bar AEFA's right to obtain injunctive relief against conduct or threatened conduct that (i) will cause it loss or damage or (ii) violates the Terms of Special Regulatory Supervision or (iii) is in violation of AEFA's obligation to comply fully with government agency laws or regulations under the usual equity rules, including the applicable rules for obtaining specific performance, restraining orders, and preliminary injunctions.

## 27. ACKNOWLEDGMENTS

- Independent Advisor acknowledges that it has conducted an independent investigation of the Independent Financial Advisor Business, and recognizes that the business venture contemplated by this Agreement involves significant business risks and that its success will be largely dependent upon the ability of Independent Advisor as an independent businessperson. AEFA expressly disclaims the making of, and Independent Advisor acknowledges that it has not received, any warranty or guarantee, express or implied, as to the potential volume, profits, or success of the business venture contemplated by this Agreement.

- Independent Advisor acknowledges that it received a complete copy of this Agreement, the attachments hereto, and agreements relating thereto, if any, at least five (5) business days prior to the date on which this Agreement was executed. Independent Advisor further acknowledges that it received the disclosure document required by the Trade Regulation Rule

of the Federal Trade Commission entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures" at least ten (10) business days prior to the date on which this Agreement was executed.

- Independent Advisor acknowledges that it has read and understood this Agreement, the attachments hereto, and agreements relating thereto, if any, and that AEFA has accorded Independent Advisor ample time and opportunity to consult with advisors of Independent Advisor's own choosing about the potential benefits and risks of entering into this Agreement.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement in duplicate on the date first above written.

| Independent Advisor | American Express Financial Advisors Inc. |
|---|---|
| By: | By: |
| Name: | Name: |
| Title: ADVISOR | Title: Assistant Secretary |
| Date: 01/07/2000 | Date: MAR 2 9 2000 |
| Social Security No.: | |
| Advisor No.: A 72242 | |

## SCHEDULE A

**Independent Financial Advisor office location:** 1655 KAPIOLANI BLVD. STE. 1726

HONOLULU HI 96814

Name: ████████████████

Title: ADVISOR

Date: 01/07/2000

Social Security No.: ████████████

Advisor No.: 72242

Case 3:25-cv-00880-JO-MSB   Document 1   Filed 04/14/25   PageID.92   Page 92 of
Case 1:21-cv-00347-DKW-RT   Document 1-10   Filed 08/16/21   Page 62 of 69   PageID.88

Addendum 1

## ADDENDUM TO THE
## AMERICAN EXPRESS FINANCIAL ADVISORS INC.
## INDEPENDENT ADVISOR BUSINESS FRANCHISE AGREEMENT

AEFA and Independent Advisor are parties to the attached American Express Financial Advisors Inc. Independent Advisors Business Franchise Agreement (the "Agreement") and agree as follows:

1. This Addendum to the Agreement shall supplement the terms of the Agreement. In the event of any inconsistency between this Addendum and the Agreement, this Addendum shall control.

2. Section 4 of the Agreement, under the heading "FEES AND COMPENSATION" the paragraph entitled "Initial Franchise Fee", shall be replaced with the following:

   • Initial Franchise Fee. In consideration of Independent Advisor's previous financial planning agreements with AEFA, AEFA agrees to waive Independent Advisor's initial franchise fee of One Thousand Five Hundred Dollars ($1,500).

1. Section 5 of the Agreement, under the heading "Ongoing Duties of the Independent Advisor", the paragraph entitled "Premises and Signage", shall be modified by adding the following:

   • Alternatively, Independent Advisor may meet Clients at the Area Office or other location of Client's choice.

4. Independent Advisor acknowledges that it has read and understood this Addendum.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement in duplicate on the date first above written.

| Independent Advisor | American Express Financial Advisors Inc. |
|---|---|
| By: | By: |
| Name: | Name: |
| Title: ADVISOR | Title: Assistant Secretary |
| Date: 01/07/2000 | Date: MAR 2 9 2000 |
| Social Security No.: | |
| Advisor No.: 72242 | |

Addendum 2

### ADDENDUM TO THE
### AMERICAN EXPRESS FINANCIAL ADVISORS INC.
### INDEPENDENT ADVISOR BUSINESS FRANCHISE AGREEMENT
### OFFICE OF SUPERVISORY JURISDICTION AGREEMENT

AEFA and Independent Advisor are parties to the attached American Express Financial Advisors Inc. Independent Advisors Business Franchise Agreement (the **"Agreement"**) and agree as follows:

1.  This Addendum to the Agreement shall supplement the terms of the Agreement. In the event of any inconsistency between this Addendum and the Agreement, this Addendum shall control.

2.  This Addendum defines Independent Advisor's relationship with AEFA as an Office of Supervisory Jurisdiction Branch Manager and, in setting forth such relationship in this Addendum, Independent Financial Advisor shall be referred to as the OSJ Branch Manager (the **"OSJ Branch Manager"**) in this Addendum.

3.  <u>Undertakings by OSJ Branch Manager</u>. OSJ Branch Manager will serve as a Registered Principal and maintain an Office Of Supervisory Jurisdiction and perform these functions according to the rules and regulations of the NASD, the Securities and Exchange Commission and the AEFA Manuals.

    A.  The regulatory activities as described in the Manuals include, but are not limited to, the compliance with the specific regulatory requirements for:

        (i)     advertising and correspondence
        (ii)    annual compliance review
        (iii)   annual compliance meeting
        (iv)    branch office inspections
        (v)     complaint handling
        (vi)    continuing education
        (vii)   mail handling
        (viii)  outside activities disclosure
        (ix)    record keeping requirements
        (x)     supervision

    B.  As provided in the Manuals, OSJ Branch Manager will provide, at his or her own expense, adequate support personnel and systems sufficient to perform the functions described above in Section 3.A. necessary to supervise Independent Advisors assigned to the Branch Office in <u>1585 KAPIOLANI BLVD. STE. 1736</u> (the **"Branch Office"**).

    C.  OSJ Branch Manager may also provide services to Independent Advisors that are not related to compliance supervision, as described in the Manuals.

American Express Financial Advisors Inc.                                    Addendum 2
Franchise Agreement - 10/25/99

E.  All capitalized terms not otherwise defined in this Addendum shall have the same meaning as in the Agreement.

8.  <u>Effective Date</u>.  In witness of the provisions of this Addendum as described above, OSJ Branch Manager and AEFA have entered into this Addendum with the understanding that it becomes effective on _____, _____.

IN WITNESS WHEREOF, the parties hereto have duly executed this Addendum in duplicate on the date first above written.


Independent Advisor                          American Express Financial Advisors Inc.

By: _____                  By: _____
Name: ████████████████                        Name: _____
Title: ____ADVISOR____                        Title: _____
Date: ____01|07|2000____                      Date: _____
Social Security No.: ██████████
Advisor No.: ___72242___

## ADDENDUM 3-R
### (Rollout)

## (RESTRICTIVE COVENANT ADDENDUM)

This Contract Addendum is entered into by and between ████████████ ("Advisor") and American Express Financial Advisors Inc. ("AEFA"), IDS Life Insurance Company, and, if applicable, IDS Life Insurance Company of New York on this _____ day of _____. AEFA and the Advisor agree as follows:

A.     The terms of this Addendum become effective no earlier than June 30, 2001, and are hereby incorporated into the following Agreements: 1) the Franchise Agreement(s) between AEFA and Advisor; and 2) the Independent Advisor Agreement(s) between Advisor and IDS Life Insurance Company and, if applicable, IDS Life Insurance Company of New York ("IDS Life") (hereinafter, collectively referred to as "AEFA").

B.     AEFA will suffer irreparable harm should Advisor violate Section 19(a)(1)(2)(3) and/or (4) of the Franchise Agreement, or Section IV 1(a)(1)(i)(ii)(iii) and/or 2(ii) of the IDS Life Independent Advisor Agreements (hereinafter, collectively "Restrictive Covenant") without fully and timely satisfying the terms of this Addendum.

C.     <u>Terms of Forbearance Agreement</u>.  As a mitigation of this irreparable harm, AEFA agrees to forbear from enforcement of its rights against Advisor under the Restrictive Covenant if Advisor timely and fully complies with the following conditions:

1.     <u>Two Weeks' Notice</u>. Advisor must provide AEFA with at least two-weeks' written notice of the termination of the Franchise Agreement ("Termination Notice"), with a copy to be delivered personally to the Advisor's Group Vice President ("GVP") designate, or if no designate is timely provided, to the Advisor's immediate AEFA leader, and, in either event, a copy, by facsimile or overnight mail, to AEFA Corporate Office, Licensing Unit.

2.     As of the date of the Termination Notice, the Advisor must:

    (a)     <u>Length of Service</u>.  Have served at least six consecutive years as an advisor for AEFA.

    (b)     <u>Compliance Obligations</u>.  Not be subject to discipline as a result of a violation of the Compliance Rules as defined in Section 3, of the Franchise Agreement ("Compliance Rules").  This discipline may include, but not be limited to, suspension, strict supervision, involuntary termination or otherwise "permitted to resign".

American Express Financial Advisors Inc.                                                          Addendum 3-R
Franchise Agreement – 10/25/99

IN WITNESS of the provisions of this Contract Addendum as described above, you and AEFA have entered into this Addendum with the understanding that it becomes effective on the date(s) previously specified herein.

Independent Advisor

By: _____
Name: _____
Title: ADVISOR
Date: 01 / 07 / 2000
Social Security No.: _____
Advisor No.: 72242

American Express Financial Advisors Inc.

By: _____
Name: _____
Title: Assistant Secretary
Date: MAR 2 2 2000

IDS Life Insurance Company

By: _____
Name: _____
Title: _____
Date: _____

IDS Life Insurance Company of New York

By: _____
Name: _____
Title: _____
Date: _____

(To be executed in duplicate – one copy to be returned to Advisor.)

American Express Financial Advisors Inc.                                    Addendum 3-R
Franchise Agreement - 10/25/99

45

Ex. A - 66

## EXHIBIT II
## INDEPENDENT FINANCIAL ADVISOR COMPLIANCE CERTIFICATION

By signing below, I acknowledge:

1.    I have received, reviewed and understand all of the terms of the Independent Financial Advisor Business Franchise Agreement;

2.    I have personally reviewed and understand all of the information in American Express Financial Advisors Inc.'s ("AEFA") Uniform Franchise Offering Circular ("UFOC") and any state-specific Addendum to the UFOC;

3.    I understand that AEFA may terminate the Independent Financial Advisor Business Franchise Agreement or refuse to renew it if I do not meet certain performance standards;

4.    I have signed the Independent Financial Advisor Business Franchise Agreement and Addendum (if any) on _____, _____, and acknowledge that no Agreement or Addendum is effective until signed and dated by AEFA;

5.    I understand that this is a highly competitive business, that I have no exclusive territory or customers, that among my competitors will be other businesses which AEFA operates and/or are affiliated with AEFA, as well as other franchisees;

6.    I understand that AEFA's affiliates also sell the same or similar products and services that I will be selling through other distribution channels, including national media, direct marketing, telemarketing, on-line services, brokers, dealers, agents, independent dealers, and franchised offices; and

7.    In the course of my relationship with AEFA, I have received over the years various information and documents relating to revenues, expenses and profits relating to the AEFA financial advisor business. I understand that such information was of a generic nature and did not relate to my specific circumstances or those of any other AEFA advisor, nor was the information designed to permit me to make any determination of my future financial performance as an AEFA franchisee. I have not relied on any of this information in reaching my decision to purchase this franchise.

Independent Advisor
_____

By: _____
Name: ▮
Title: ADVISOR
Date: 01/07/2000
Social Security No.: ▮
Advisor No.: 722▮

# IDS LIFE INSURANCE COMPANY

## Independent Advisor Agreement

This is an Agreement, made at Minneapolis, Minnesota, by and between IDS Life Insurance
Company and you, _____.

(Print Full Name)

executed and effective as of the date shown on the last line of this Agreement. It defines your
relationship with IDS Life as an Independent Advisor. Both you and IDS Life promise to comply
with the terms of this Agreement and any properly executed Riders to this Agreement.

**Section I - Definitions:**

1. For purposes of this Agreement, the terms listed below have the special meanings shown.

   (a) "IDS Life" means IDS Life Insurance Company.

   (b) "IDSL-NY" means IDS Life Insurance Company of New York.

   (c) "Affiliate" means any partnership, business, trust, company or corporation affiliated with
   IDS Life at any time while this Agreement is in effect.

   (d) "Independent Advisor" means Independent Advisor or Sales Representative.

   (e) "Service Date" is ____03/09/1988____.

   (f) "Services" means financial planning, advisory, securities brokerage, tax or other financial
   services.

   (g) "Products" means certificates, stock, other securities or investments, lending products, life
   insurance and annuity policies and contracts, and other insurance products.

   (h) "Records and Materials" means all records, files, manuals, blanks, forms, materials,
   supplies, stationery, literature, seminar materials, computer software, licenses, papers and
   books that IDS Life or an Affiliate furnishes or leases to you for use, with or without
   charge, or that you create or prepare, including notes, memos and works of authorship, in
   connection with the performance of this Agreement.

   (i) "Service Period" means any two-week period coinciding with IDS Life's regular biweekly
   commission period for Independent Advisors.

   (j) "Training Period" means the time while you are being trained by IDS Life. It begins on
   your Service Date. Unless IDS Life extends your Training Period, it ends after completion
   of the 26th Service Period following your Service Date - or at the termination of this
   Agreement, if that occurs first. IDS Life may disregard any time that you are disabled in
   determining the end of your Training Period.

8.  "Greater Force"

   (a)  If an act or condition beyond your or IDS Life's reasonable control prevents, restricts or
        interferes with fulfilling the terms of this Agreement, the obligation to fulfill the
        Agreement will be suspended to the extent appropriate. State or government action and
        national disaster are examples of acts or conditions beyond reasonable control.

   (b)  For suspension of the Agreement to occur, the party affected must:

        (1)  Notify the other party promptly about the act or condition and its effect,

        (2)  Make its best effort to avoid or remove the case of the suspension, and

        (3)  Promptly continue fulfilling the terms of the Agreement when the cause of the
             suspension is removed.

In witness of the provisions of this Agreement as described above, you and IDS Life have entered
into this Agreement with the understanding that it becomes effective on

| Independent Advisor | IDS Life Insurance Company |
|---|---|
| By: | By: |
| Name: | Name: |
| Title: ADVISOR | Title: Assistant Secretary |
| Date: 01/07/2000 | Date: MAR 2 9 2000 |
| Social Security No.: | |
| Advisor No.: 96072 | |

(To be executed in duplicate - One copy to be returned to Advisor)

# EXHIBIT B

1632 <<CLIENT_ID>> <<CHECK_DIGIT>> 001

| NOTICE OF A DATA BREACH |
| --- |



<<Mail Date>>

<<FIRST_NAME>> <<LAST_NAME>>
<<ADDRESS1>>
<<ADDRESS2>>
<<CITY>>, <<STATE>> <<ZIP>>

Dear <<FIRST_NAME>> <<LAST_NAME>>:

**What Happened?**
I am writing to inform you of an incident involving your personal information. Your former Ameriprise Financial advisor left Ameriprise for LPL Financial during the period 2018-2020. In connection with that transition, your former advisor shared certain confidential personal information about you and your account(s) that exceeded the limited scope of information your former advisor was permitted to use for transition purposes. As indicated in the Ameriprise privacy notice, this information should have been limited to your name, address, email address, phone number and account title. Ameriprise recently became aware of this unauthorized disclosure and wanted to notify you of the incident.

**What Information Was Involved?**
In addition to your name, address, email address and phone number, the following data elements were provided to the other financial firm: <<DATA_COMPROMISED>>.

**What We Are Doing.**
To the extent you continue to maintain one or more accounts with us, we have taken steps to protect your accounts from unauthorized activity, which includes instructing our service associates to use extra caution when verifying callers and to confirm the signature on written requests related to your accounts.

As a precaution, Ameriprise Financial is providing you an opportunity to enroll in an independently operated credit monitoring program for <<YEARS>> at no expense to you.  This program is administered by Equifax, one of the three national credit reporting agencies.  Equifax Complete™ Premier will provide you with an "early warning system" which alerts you to any changes to your credit file.  The following page of this letter includes the features of the Equifax Service and the promotional code you need to use to enroll

**What You Can Do.**
None of us like to hear about incidents involving our personal information. And in situations like this, taking a few prudent steps can further protect you against the potential misuse of your information. That's why we recommend the following actions:

- Register a Fraud Alert or Security Freeze with the three major credit bureaus. Contact information is on the Additional Resources page.
- Thoroughly review your account statements and transaction confirmations.
- Closely monitor all of your personal accounts (e.g. checking and savings, credit cards, etc.) to make sure there is no unauthorized activity.
- Review any solicitations you receive in the near future.
- If you notice any unusual activity, contact your advisor or, if you continue to maintain one or more accounts with us, the Ameriprise Financial Customer Service at (800) 862-7919 immediately. We are here to help.

**For More Information.**
Please do not hesitate to contact Ameriprise Financial Customer Service at (800) 862-7919, and ask for the Privacy and Security queue. Please accept my sincere apology regarding this situation and any inconvenience it may cause you.

Sincerely,

Global Privacy Office
Ameriprise Financial, Inc.

© 2025 Ameriprise Financial, Inc. All rights reserved

1632 <<CLIENT_ID>> <<CHECK_DIGIT>> 001

1632 <<CLIENT_ID>> <<CHECK_DIGIT>> 001

# EQUIFAX®

**Enter your Activation Code: <<GIFT_CODE>>**

## Equifax Complete™ Premier

*Note: You must be over age 18 with a credit file to take advantage of the product

## Key Features

- Annual access to your 3-bureau credit report and VantageScore[1] credit scores
- Daily access to your Equifax credit report and 1-bureau VantageScore credit score
- 3-bureau credit monitoring[2] with email notifications of key changes to your credit reports
- WebScan notifications[3] when your personal information, such as Social Security Number, credit/debit card or bank account numbers are found on fraudulent Internet trading sites
- Automatic fraud alerts[4], which encourages potential lenders to take extra steps to verify your identity before extending credit, plus blocked inquiry alerts and Equifax credit report lock[5]
- Identity Restoration to help restore your identity should you become a victim of identity theft, and a dedicated Identity Restoration Specialist to work on your behalf
- Up to $1,000,000 of identity theft insurance coverage for certain out of pocket expenses resulting from identity theft[6].
- Lost Wallet Assistance if your wallet is lost or stolen, and one-stop assistance in canceling and reissuing credit, debit and personal identification cards.

## Enrollment Instructions

Go to **www.equifax.com/activate**

Enter your unique Activation Code listed above, then click "Submit" and follow these 4 steps:

1. **Register:**
   Complete the form with your contact information and click "Continue".
   *If you already have a myEquifax account, click the 'Sign in here' link under the "Let's get started" header.*
   *Once you have successfully signed in, you will skip to the Checkout Page in Step 4*

2. **Create Account:**
   Enter your email address, create a password, and accept the terms of use.

3. **Verify Identity:**
   To enroll in your product, we will ask you to complete our identity verification process.

4. **Checkout:**
   Upon successful verification of your identity, you will see the Checkout Page.
   Click 'Sign Me Up' to finish enrolling.

   **You're done!**
   The confirmation page shows your completed enrollment.
   Click "View My Product" to access the product features.

---

[1]The credit scores provided are based on the VantageScore® 3.0 model. For three-bureau VantageScore credit scores, data from Equifax®, Experian®, and TransUnion® are used respectively. Any one-bureau VantageScore uses Equifax data. Third parties use many different types of credit scores and are likely to use a different type of credit score to assess your creditworthiness. [2]Credit monitoring from Experian and TransUnion will take several days to begin. [3]WebScan searches for your Social Security Number, up to 5 passport numbers, up to 6 bank account numbers, up to 6 credit/debit card numbers, up to 6 email addresses, and up to 10 medical ID numbers. WebScan searches thousands of Internet sites where consumers' personal information is suspected of being bought and sold, and regularly adds new sites to the list of those it searches. However, the Internet addresses of these suspected Internet trading sites are not published and frequently change, so there is no guarantee that we are able to locate and search every possible Internet site where consumers' personal information is at risk of being traded. [4]The Automatic Fraud Alert feature is made available to consumers by Equifax Information Services LLC and fulfilled on its behalf by Equifax Consumer Services LLC. [5]Locking your Equifax credit report will prevent access to it by certain third parties. Locking your Equifax credit report will not prevent access to your credit report at any other credit reporting agency. Entities that may still have access to your Equifax credit report include: companies like Equifax Global Consumer Solutions, which provide you with access to your credit report or credit score, or monitor your credit report as part of a subscription or similar service; companies that provide you with a copy of your credit report or credit score, upon your request; federal, state and local government agencies and courts in certain circumstances; companies using the information in connection with the underwriting of insurance, or for employment, tenant or background screening purposes; companies that have a current account or relationship with you, and collection agencies acting on behalf of those whom you owe; companies that authenticate a consumer's identity for purposes other than granting credit, or for investigating or preventing actual or potential fraud; and companies that wish to make pre-approved offers of credit or insurance to you. To opt out of such pre-approved offers, visit www.optoutprescreen.co [6]The Identity Theft Insurance benefit is underwritten and administered by American Bankers Insurance Company of Florida, an Assurant company, under group or blanket policies issued to Equifax, Inc., or its respective affiliates for the benefit of its Members. Please refer to the actual policies for terms, conditions, and exclusions of coverage. Coverage may not be available in all jurisdictions.

1632 <<CLIENT_ID>> <<CHECK_DIGIT>> 001

1632 <<Client ID>> <<Check Digit>> 001

## Additional Resources

| Contact/Resource | Phone Number | Web | Address |
|---|---|---|---|
| **Federal Trade Commission**<br>• Helpful information on ID Theft | (877) 438-4338 | identitytheft.gov | 600 Pennsylvania Avenue, NW Washington, DC 20580 |
| **Equifax**<br>• Register a Fraud Alert or Security Freeze | (888) 378-4329 | equifax.com | P.O. Box 740241 Atlanta, GA 30374 |
| **Experian**<br>• Register a Fraud Alert or Security Freeze | (888) 397-3742 | experian.com | P.O. Box 9554 Allen, TX 75013 |
| **Transunion**<br>• Register a Fraud Alert or Security Freeze | (800) 916-8800 | transunion.com | 2 Baldwin Place P.O. Box 1000 Chester, PA 19022 |
| **Identity Theft Resource Center** | (888) 400-5530 | idtheftcenter.org | 2514 Jamacha Rd Ste 502-525 El Cajon, CA 92019-4492 |
| **OnGuard Online**<br>• Online Safety Resources | | onguardonline.gov | |

## AMERIPRISE RESOURCES

| Resource | Web |
|---|---|
| **Privacy, Security & Fraud Center**<br>• Link to our Privacy Notice<br>• How we protect your information<br>• Reporting and Preventing Fraud | ameriprise.com/privacy-security-fraud |
| **Online Security Guarantee** | ameriprise.com/privacy-security-fraud/online-security-guarantee |

## SECURITY FREEZE

Consumers can place a security freeze at no cost on their credit reports through the three major credit bureaus. A security freeze prohibits a credit reporting agency from releasing any information from a consumer's credit report without written authorization. However, please be aware that placing a security freeze on your credit report may delay, interfere with, or prevent the timely approval of any requests you make for new loans, credit mortgages, employment, housing or other services.

To place a freeze, write, go online or call the three credit bureaus below. Documents will be requested to verify your identity and address, possibly including but not limited to: copies of your Social Security card, paystub, state driver's license, or utility bill.

| Contact/Resource | Phone Number | Web | Address |
|---|---|---|---|
| **Equifax Security Freeze** | (888) 378-4329 | equifax.com | P.O. Box 105788 Atlanta, GA 30348-5788 |
| **Experian Security Freeze** | (888) 397-3742 | experian.com/freeze/center.html | P.O. Box 9554 Allen, TX 75013 |
| **Trans Union Security Freeze** | (800) 916-8800 | transunion.com/credit-freeze | P.O. Box 160 Woodlyn, PA 19094 |

1632 <<Client ID>> <<Check Digit>> 001

Residents of **Iowa, Maryland, North Carolina, New York, Kentucky, Rhode Island and Oregon**:

The Identity Theft Unit in your state gives you step-by-step advice on how to protect yourself and help you to address some of the issues that identity theft causes. Report suspected identity theft to your local law enforcement, the Attorney General and the Federal Trade Commission. Below are the mailing address, website, and phone number for the Office of the Attorney General of your state.

| State | Phone Number | Web | Address |
|---|---|---|---|
| Iowa | (515) 281-5044<br>(800) 373-5044 | iowaattorneygeneral.gov | Office of the Attorney General of IA<br>Hoover State Office Building<br>1305 E. Walnut Street<br>Des Moines, IA 50319 |
| New York | (800) 697-1220 | dos.ny.gov/consumerprotection | New York Department of State<br>Division of Consumer Protection<br>One Commerce Plaza,<br>99 Washington Ave<br>Albany, NY 12231-0001 |
|  | (800) 771-7755 | ag.ny.gov | Office of the Attorney General of NY<br>The Capitol<br>Albany, NY 12224-0341 |
| North Carolina | (877) 5-NO-SCAM<br>Toll-free within<br>North Carolina<br>(919) 716-6000 | ncdoj.gov | Office of the Attorney General of NC<br>Consumer Protection Division<br>9001 Mail Service Center<br>Raleigh, NC 27699-9001 |
| Oregon | (503) 378-4400 | doj.state.or.us | Oregon Department of Justice<br>1162 Court Street NE<br>Salem, OR 97301-4096 |
| Maryland | (410) 576-6491 | oag.state.md.us | Office of the Attorney General of MD<br>200 St. Paul Place<br>Baltimore, MD  21202 |
| Kentucky | (502) 696-5300 | ag.ky.gov | Office of the Attorney General of KY<br>700 Capitol Avenue, Suite 118<br>Frankfort, Kentucky 40601 |
| Rhode Island | (401) 274-4400 | riag.ri.gov | Office of the Attorney General of RI<br>150 South Main Street<br>Providence, Rhode Island 02903 |
| District of Columbia | (202) 727-3400 | oag.dc.gov | Office of the Attorney General of DC<br>441 4th Street, NW<br>Washington, DC 20001 |

Residents of **New Mexico:**

The federal Fair Credit Reporting Act provides you certain rights regarding your credit. You may review these rights at https://files.consumerfinance.gov/f/201504_cfpb_summary_your-rights-under-fcra.pdf

Residents of **Massachusetts and Rhode Island:**

As a resident of Massachusetts or Rhode Island, you have the right to obtain any police report filed regarding this incident. If you are the victim of identity theft, you also have the right to file a police report and obtain a copy of it.

# EXHIBIT C

**Ameriprise Financial Services, LLC**
70100 Ameriprise Financial Center
Minneapolis, MN 55474
ameriprise.com

April 7, 2022



## NOTICE OF DATA BREACH

Dear Karen,

**What Happened?**
I am writing to inform you of an incident involving your personal information. Unfortunately, it has been determined that there has been unauthorized access to your information.

**What Information Was Involved?**

Name, account number and Social Security Number.

**What We Are Doing.**
We have taken steps to protect your accounts from unauthorized activity, which includes instructing our service associates to use extra caution when verifying callers and to confirm the signature on written requests related to your accounts.

As a precaution, Ameriprise Financial is providing you an opportunity to enroll in an independent credit monitoring program for two years at no expense to you. This program is administered by **EZ Shield, Inc.** The services include **resolution assistance** by certified fraud experts, **internet monitoring**, which will alert you if your information is being traded on the dark web, and **credit monitoring** to keep you informed of changes to your information within the Experian credit bureau.

• To take advantage of these services, please go to myidentity.ezshield.com/protection and insert code: ███████████

**What You Can Do.**

We recommend the following:

• Register a fraud alert or security freeze with the three major credit bureaus. Contact information for each  is included on the Additional Resources page.
• Thorough and timely review of your account statements and transaction confirmations.
• Closely monitor your personal accounts (e.g. checking and savings, credit cards, etc.) to make sure there is no unauthorized activity.
• Review any solicitations you receive in the near future.

- Be vigilant if you receive a call from someone who claims to represent Ameriprise Financial. If you have any doubts about the caller, hang up and call your financial advisor to verify the validity of the call.
- **If you notice any unusual activity, contact your financial advisor or Ameriprise Financial Customer Service at 800.862.7919 immediately. We are here to help.**

**For More Information.**
Please accept my sincere apology regarding this situation and any inconvenience it may cause you. Ameriprise Financial is committed to protecting your privacy and online security is a top priority for us.  Please do not hesitate to contact Kelly D Fox at 508.695.2336 with any questions or to request additional assistance.

Sincerely,

Kathleen Dedenbach
Vice President & Chief Counsel
Global Chief Privacy Officer
Ameriprise Financial, Inc.

Ameriprise Financial Services, LLC. Member FINRA and SIPC. © 2011-2022 Ameriprise Financial, Inc. All rights reserved.

**Ameriprise** Financial

## Additional Resources

| Contact/Resource | Phone Number | Web | Address |
|---|---|---|---|
| **Federal Trade Commission** Helpful information on ID Theft | 877.438.4338 | identitytheft.gov | 600 Pennsylvania Avenue, NW Washington, DC 20580 |
| **Equifax** Register a Fraud Alert or Security Freeze | 800.525.6285 | equifax.com | P.O. Box 740241 Atlanta, GA  30374 |
| **Experian** Register a Fraud Alert or Security Freeze | 888.397.3742 | experian.com | P.O. Box 9554 Allen, TX 75013 |
| **Transunion** Register a Fraud Alert or Security Freeze | 800.680.7289 | transunion.com | 2 Baldwin Place P.O. Box 1000 Chester, PA  19022 |
| **Identity Theft Resource Center** | 888.400.5530 | idtheftcenter.org | 3625 Ruffin Road #204 San Diego, CA 92123 |
| **OnGuard Online** Online Safety Resources | | onguardonline.gov | |

**Ameriprise Resources**

| Resource | Web |
|---|---|
| **Privacy, Security & Fraud Center** Link to our Privacy Notice How we protect your information Reporting and Preventing Fraud | ameriprise.com/privacy-security-fraud |
| **Online Security Guarantee** | ameriprise.com/privacy-security-fraud/online-security-guarantee |

**Security Freeze**

Many state laws also allow consumers to place a security freeze on their credit reports. A security freeze prohibits a credit reporting agency from releasing any information from a consumer's credit report without written authorization. However, please be aware that placing a security freeze on your credit report may delay, interfere with, or prevent the timely approval of any requests you make for new loans, credit mortgages, employment, housing or other services.
To place a freeze, write, go online or call the three credit bureaus below. Documents will be requested to verify your identity and address, possibly including but not limited to: copies of your Social Security card, paystub, state driver's license, or utility bill.

| Contact/Resource | Phone Number | Web | Address |
|---|---|---|---|
| Equifax Security Freeze | 800.349.9960 | equifax.com | P.O. Box 105788 Atlanta, GA 30348-5788 |
| Experian Security Freeze | 888.397.3742 | experian.com/freeze/ center.html | P.O. Box 9554 Allen, TX 75013 |
| Trans Union Security Freeze | 888.909.8872 | transunion.com/ credit-freeze | P.O. Box 160 Woodlyn, PA 19094 |

Residents of **Massachusetts** and **Rhode Island**:

As a resident of Massachusetts or Rhode Island, you have the right to obtain any police report filed regarding this incident. If you are the victim of identity theft, you also have the right to file a police report and obtain a copy of it.

Residents of **Iowa, Maryland, North Carolina, New York, Kentucky, Rhode Island and Oregon**:

The Identity Theft Unit in your state gives you step-by-step advice on how to protect yourself and help address some of the issues that identity theft causes. Report suspected identity theft to your local law enforcement, the Attorney General and the Federal Trade Commission. Below is the mailing address, website, and phone number for the Attorney General office in  your state.



| State | Phone Number | Web | Address |
|---|---|---|---|
| Iowa | 515.281.5044<br>800.373.5044 | iowaattorneygeneral.gov | Office of the Attorney General of IA<br>Hoover State Office Building<br>1305 E. Walnut Street<br>Des Moines, IA 50319 |
| New York | 800.697.1220 | dos.ny.gov/<br>consumerprotection | New York Department of State Division of Consumer Protection<br>One Commerce Plaza,<br>99 Washington Ave<br>Albany, NY 12231-0001 |
|  | 800.771.7755 | ag.ny.gov | Office of the Attorney General of NY<br>The Capitol<br>Albany, NY 12224-0341 |
| North Carolina | (877) 5-NO-SCAM<br>Toll-free within North Carolina<br>919.716.6000 | ncdoj.gov | Office of the Attorney General of NC<br>Consumer Protection Division<br>9001 Mail Service Center<br>Raleigh, NC 27699-9001 |
| Oregon | 503.378.4400 | doj.state.or.us | Oregon Department of Justice<br>1162 Court Street NE<br>Salem, OR 97301-4096 |
| Maryland | 410.576.6491 | oag.state.md.us | Office of the Attorney General of MD<br>200 St. Paul Place<br>Baltimore, MD  21202 |
| Kentucky | 502.696.5300 | ag.ky.gov | Office of the Attorney General of KY<br>700 Capitol Avenue, Suite 118<br>Frankfort, Kentucky 40601 |
| Rhode Island | 401.274.4400 | riag.ri.gov | Office of the Attorney General of RI<br>150 South Main Street<br>Providence, Rhode Island 02903 |

| | | | |
|---|---|---|---|
| **District of Columbia** | 202.727.3400 | oag.dc.gov | Office of the Attorney General of DC<br>441 4th Street, NW<br>Washington, DC 20001 |

2189523CCCPRIVACYNOTIFICATION/^^LETTERID^^

1632 <<Client ID>> <<Check Digit>> 001

**NOTICE OF A DATA BREACH**



**28234**

<<Mail Date>>

<<First Name>> <<Last Name>>
<<Client Address 1>>
<<Client Address 2>>
<<City>>, <<ST>> <<ZIP>>

Dear <<First Name>> <<Last Name>>:

**What Happened?**
I am writing to inform you of an incident involving your personal information. Unfortunately, it has been determined that there has been unauthorized access to your information.

**What Information Was Involved?**
Could have involved your name, address, date of birth, account numbers and social security number.

**What We Are Doing.**
We have taken steps to protect your accounts from unauthorized activity, which includes instructing our service associates to use extra caution when verifying callers and to confirm the signature on written requests related to your accounts.

As a precaution, Ameriprise Financial is providing you an opportunity to enroll in an independently operated credit monitoring program for two years at no expense to you. This program is administered by Equifax, one of the three national credit reporting agencies. Equifax Complete™ Premier will provide you with an "early warning system" which alerts you to any changes to your credit file. The following page of this letter includes the features of the Equifax Service and the promotional code you need to use to enroll

**What You Can Do.**
None of us like to hear about incidents involving our personal information. And in situations like this, taking a few prudent steps can further protect you against the potential misuse of your information. That's why we recommend the following actions:

- Register a Fraud Alert or Security Freeze with the three major credit bureaus. Contact information on the Additional Resources page.
- Thoroughly review your account statements and transaction confirmations.
- Closely monitor all of your personal accounts (e.g. checking and savings, credit cards, etc.) to make sure there is no unauthorized activity.
- Review any solicitations you receive in the near future.
- Be vigilant if you receive a call from someone who claims to represent Ameriprise Financial. If you have any doubts about the caller, hang up and call your advisor to verify the validity of the call.
- If you notice any unusual activity, contact your advisor or Ameriprise Financial Customer Service at (800) 862-7919 immediately. We are here to help.

**For More Information.**
Please do not hesitate to contact your advisor, Richard Stearns, at 978.692.0621 with any questions. Please accept my sincere apology regarding this situation and any inconvenience it may cause you.

Sincerely,

Robert Severson
Global Privacy Office
Ameriprise Financial, Inc.

© 2022 Ameriprise Financial, Inc. All rights reserved

1632 <<Client ID>> <<Check Digit>> 001



**Enter your Activation Code:** ***<ACTIVATION CODE>***

## Equifax Complete™ Premier
*Note: You must be over age 18 with a credit file to take advantage of the product

## Key Features

- Annual access to your 3-bureau credit report and VantageScore[1] credit scores
- Daily access to your Equifax credit report and 1-bureau VantageScore credit score
- 3-bureau credit monitoring[2] with email notifications of key changes to your credit reports
- WebScan notifications[3] when your personal information, such as Social Security Number, credit/debit card or bank account numbers are found on fraudulent Internet trading sites
- Automatic fraud alerts[4], which encourages potential lenders to take extra steps to verify your identity before extending credit, plus blocked inquiry alerts and Equifax credit report lock[5]
- Identity Restoration to help restore your identity should you become a victim of identity theft, and a dedicated Identity Restoration Specialist to work on your behalf
- Up to $1,000,000 of identity theft insurance coverage for certain out of pocket expenses resulting from identity theft[6].
- Lost Wallet Assistance if your wallet is lost or stolen, and one-stop assistance in canceling and reissuing credit, debit and personal identification cards.

## Enrollment Instructions

Go to **www.equifax.com/activate**

Enter your unique Activation Code listed above, then click "Submit" and follow these 4 steps:

1. **Register:**
   Complete the form with your contact information and click "Continue".
   *If you already have a myEquifax account, click the 'Sign in here' link under the "Let's get started" header.*
   *Once you have successfully signed in, you will skip to the Checkout Page in Step 4*
2. **Create Account:**
   Enter your email address, create a password, and accept the terms of use.
3. **Verify Identity:**
   To enroll in your product, we will ask you to complete our identity verification process.
4. **Checkout:**
   Upon successful verification of your identity, you will see the Checkout Page.
   Click 'Sign Me Up' to finish enrolling.
   **You're done!**
   The confirmation page shows your completed enrollment.
   Click "View My Product" to access the product features.

---

[1]*The credit scores provided are based on the VantageScore® 3.0 model. For three-bureau VantageScore credit scores, data from Equifax®, Experian®, and TransUnion® are used respectively. Any one-bureau VantageScore uses Equifax data. Third parties use many different types of credit scores and are likely to use a different type of credit score to assess your creditworthiness.* [2]*Credit monitoring from Experian and TransUnion will take several days to begin.* [3]*WebScan searches for your Social Security Number, up to 5 passport numbers, up to 6 bank account numbers, up to 6 credit/debit card numbers, up to 6 email addresses, and up to 10 medical ID numbers. WebScan searches thousands of Internet sites where consumers' personal information is suspected of being bought and sold, and regularly adds new sites to the list of those it searches. However, the Internet addresses of these suspected Internet trading sites are not published and frequently change, so there is no guarantee that we are able to locate and search every possible Internet site where consumers' personal information is at risk of being traded.* [4]*The Automatic Fraud Alert feature is made available to consumers by Equifax Information Services LLC and fulfilled on its behalf by Equifax Consumer Services LLC.* [5]*Locking your Equifax credit report will prevent access to it by certain third parties. Locking your Equifax credit report will not prevent access to your credit report at any other credit reporting agency. Entities that may still have access to your Equifax credit report include: companies like Equifax Global Consumer Solutions, which provide you with access to your credit report or credit score, or monitor your credit report as part of a subscription or similar service; companies that provide you with a copy of your credit report or credit score, upon your request; federal, state and local government agencies and courts in certain circumstances; companies using the information in connection with the underwriting of insurance, or for employment, tenant or background screening purposes; companies that have a current account or relationship with you, and collection agencies acting on behalf of those whom you owe; companies that authenticate a consumer's identity for purposes other than granting credit, or for investigating or preventing actual or potential fraud; and companies that wish to make pre-approved offers of credit or insurance to you. To opt out of such pre-approved offers, visit www.optoutprescreen.co* [6]*The Identity Theft Insurance benefit is underwritten and administered by American Bankers Insurance Company of Florida, an Assurant company, under group or blanket policies issued to Equifax, Inc., or its respective affiliates for the benefit of its Members. Please refer to the actual policies for terms, conditions, and exclusions of coverage. Coverage may not be available in all jurisdictions.*

## Additional Resources

| Contact/Resource | Phone Number | Web | Address |
|---|---|---|---|
| **Federal Trade Commission**<br>• Helpful information on ID Theft | (877) 438-4338 | identitytheft.gov | 600 Pennsylvania Avenue, NW Washington, DC 20580 |
| **Equifax**<br>• Register a Fraud Alert or Security Freeze | (800) 525-6285 | equifax.com | P.O. Box 740241 Atlanta, GA 30374 |
| **Experian**<br>• Register a Fraud Alert or Security Freeze | (888) 397-3742 | experian.com | P.O. Box 9554 Allen, TX 75013 |
| **Transunion**<br>• Register a Fraud Alert or Security Freeze | (800) 680-7289 | transunion.com | 2 Baldwin Place P.O. Box 1000 Chester, PA 19022 |
| **Identity Theft Resource Center** | (888) 400-5530 | idtheftcenter.org | 3625 Ruffiin Road #204 San Diego, CA 92123 |
| **OnGuard Online**<br>• Online Safety Resources | | onguardonline.gov | |

## AMERIPRISE RESOURCES

| Resource | Web |
|---|---|
| **Privacy, Security & Fraud Center**<br>• Link to our Privacy Notice<br>• How we protect your information<br>• Reporting and Preventing Fraud | ameriprise.com/privacy-security-fraud |
| **Online Security Guarantee** | ameriprise.com/privacy-security-fraud/online-security-guarantee |

## SECURITY FREEZE

Many state laws also allow consumers to place a security freeze on their credit reports. A security freeze prohibits a credit reporting agency from releasing any information from a consumer's credit report without written authorization. However, please be aware that placing a security freeze on your credit report may delay, interfere with, or prevent the timely approval of any requests you make for new loans, credit mortgages, employment, housing or other services.

To place a freeze, write, go online or call the three credit bureaus below. Documents will be requested to verify your identity and address, possibly including but not limited to: copies of your Social Security card, paystub, state driver's license, or utility bill.

| Contact/Resource | Phone Number | Web | Address |
|---|---|---|---|
| **Equifax Security Freeze** | (800) 349-9960 | equifax.com | P.O. Box 105788 Atlanta, GA 30348-5788 |
| **Experian Security Freeze** | (888) 397-3742 | experian.com/freeze/center.html | P.O. Box 9554 Allen, TX 75013 |
| **Trans Union Security Freeze** | (888) 909-8872 | transunion.com/credit-freeze | P.O. Box 160 Woodlyn, PA 19094 |

Residents of **Iowa, Maryland, North Carolina, New York, Kentucky, Rhode Island and Oregon**:

The Identity Theft Unit in your state gives you step-by-step advice on how to protect yourself and help you to address some of the issues that identity theft causes. Report suspected identity theft to your local law enforcement, the Attorney General and the Federal Trade Commission. Below are the mailing address, website, and phone number for the Office of the Attorney General of your state.

| State | Phone Number | Web | Address |
|---|---|---|---|
| Iowa | (515) 281-5044<br>(800) 373-5044 | iowaattorneygeneral.gov | Office of the Attorney General of IA<br>Hoover State Office Building<br>1305 E. Walnut Street<br>Des Moines, IA 50319 |
| New York | (800) 697-1220 | dos.ny.gov/consumerprotection | New York Department of State<br>Division of Consumer Protection<br>One Commerce Plaza,<br>99 Washington Ave<br>Albany, NY 12231-0001 |
| | (800) 771-7755 | ag.ny.gov | Office of the Attorney General of NY<br>The Capitol<br>Albany, NY 12224-0341 |
| North Carolina | (877) 5-NO-SCAM<br>Toll-free within<br>North Carolina<br>(919) 716-6000 | ncdoj.gov | Office of the Attorney General of NC<br>Consumer Protection Division<br>9001 Mail Service Center<br>Raleigh, NC 27699-9001 |
| Oregon | (503) 378-4400 | doj.state.or.us | Oregon Department of Justice<br>1162 Court Street NE<br>Salem, OR 97301-4096 |
| Maryland | (410) 576-6491 | oag.state.md.us | Office of the Attorney General of MD<br>200 St. Paul Place<br>Baltimore, MD 21202 |
| Kentucky | (502) 696-5300 | ag.ky.gov | Office of the Attorney General of KY<br>700 Capitol Avenue, Suite 118<br>Frankfort, Kentucky 40601 |
| Rhode Island | (401) 274-4400 | riag.ri.gov | Office of the Attorney General of RI<br>150 South Main Street<br>Providence, Rhode Island 02903 |
| District of Columbia | (202) 727-3400 | oag.dc.gov | Office of the Attorney General of DC<br>441 4th Street, NW<br>Washington, DC 20001 |

Residents of **Massachusetts and Rhode Island:**

As a resident of Massachusetts or Rhode Island, you have the right to obtain any police report filed regarding this incident. If you are the victim of identity theft, you also have the right to file a police report and obtain a copy of it.

**Ameriprise Financial Services, LLC**
70100 Ameriprise Financial Center
Minneapolis, MN 55474
ameriprise.com

February 28, 2023

Client Name

Dear Client Name,                          **NOTICE OF DATA BREACH**

**What Happened?**
I am writing to inform you of an incident involving your personal information. Unfortunately, it has been determined that there has been unauthorized access to your information.

**What Information Was Involved?**

Name, address, account number, and social security number.

**What We Are Doing.**
We have taken steps to protect your accounts from unauthorized activity, which includes instructing our service associates to use extra caution when verifying callers and to confirm the signature on written requests related to your accounts.

As a precaution, Ameriprise Financial is providing you an opportunity to enroll in an independent credit monitoring program for two years at no expense to you. This program is administered by **EZ Shield, Inc.** The services include **resolution assistance** by certified fraud experts, **internet monitoring**, which will alert you if your information is being traded on the dark web, and **credit monitoring** to keep you informed of changes to your information within the Experian credit bureau.

- To take advantage of these services, please go to myidentity.ezshield.com/protection and insert code: Code

**What You Can Do.**

We recommend the following:

- Register a fraud alert or security freeze with the three major credit bureaus. Contact information for each  is included on the Additional Resources page.
- Thorough and timely review of your account statements and transaction confirmations.
- Closely monitor your personal accounts (e.g. checking and savings, credit cards, etc.) to make sure there is no unauthorized activity.
- Review any solicitations you receive in the near future.

- Be vigilant if you receive a call from someone who claims to represent Ameriprise Financial. If you have any doubts about the caller, hang up and call your financial advisor to verify the validity of the call.
- **If you notice any unusual activity, contact your financial advisor or Ameriprise Financial Customer Service at 800.862.7919 immediately. We are here to help.**

**For More Information.**
Please accept my sincere apology regarding this situation and any inconvenience it may cause you. Ameriprise Financial is committed to protecting your privacy and online security is a top priority for us. Please do not hesitate to contact Jake Basiliere at 617.500.4225 with any questions or to request additional assistance.

Sincerely,

Kathleen Dedenbach
Vice President & Chief Counsel
Global Chief Privacy Officer
Ameriprise Financial, Inc.

Ameriprise Financial Services, LLC. Member FINRA and SIPC. © 2011-2023 Ameriprise Financial, Inc. All rights reserved.

**Ameriprise** ✪
*Financial*

## Additional Resources

| Contact/Resource | Phone Number | Web | Address |
|---|---|---|---|
| **Federal Trade Commission** Helpful information on ID Theft | 877.438.4338 | identitytheft.gov | 600 Pennsylvania Avenue, NW Washington, DC 20580 |
| **Equifax** Register a Fraud Alert or Security Freeze | 800.525.6285 | equifax.com | P.O. Box 740241 Atlanta, GA  30374 |
| **Experian** Register a Fraud Alert or Security Freeze | 888.397.3742 | experian.com | P.O. Box 9554 Allen, TX 75013 |
| **Transunion** Register a Fraud Alert or Security Freeze | 800.680.7289 | transunion.com | 2 Baldwin Place P.O. Box 1000 Chester, PA  19022 |
| **Identity Theft Resource Center** | 888.400.5530 | idtheftcenter.org | 3625 Ruffin Road #204 San Diego, CA 92123 |
| **OnGuard Online** Online Safety Resources | | onguardonline.gov | |

**Ameriprise Resources**

| Resource | Web |
|---|---|
| **Privacy, Security & Fraud Center** Link to our Privacy Notice How we protect your information Reporting and Preventing Fraud | ameriprise.com/privacy-security-fraud |
| **Online Security Guarantee** | ameriprise.com/privacy-security-fraud/online-security-guarantee |

**Security Freeze**

Many state laws also allow consumers to place a security freeze on their credit reports. A security freeze prohibits a credit reporting agency from releasing any information from a consumer's credit report without written authorization. However, please be aware that placing a security freeze on your credit report may delay, interfere with, or prevent the timely approval of any requests you make for new loans, credit mortgages, employment, housing or other services.

To place a freeze, write, go online or call the three credit bureaus below. Documents will be requested to verify your identity and address, possibly including but not limited to: copies of your Social Security card, paystub, state driver's license, or utility bill.

| Contact/Resource | Phone Number | Web | Address |
|---|---|---|---|
| Equifax Security Freeze | 800.349.9960 | equifax.com | P.O. Box 105788 Atlanta, GA 30348-5788 |
| Experian Security Freeze | 888.397.3742 | experian.com/freeze/center.html | P.O. Box 9554 Allen, TX 75013 |
| Trans Union Security Freeze | 888.909.8872 | transunion.com/credit-freeze | P.O. Box 160 Woodlyn, PA 19094 |

Residents of **Massachusetts** and **Rhode Island**:

As a resident of Massachusetts or Rhode Island, you have the right to obtain any police report filed regarding this incident. If you are the victim of identity theft, you also have the right to file a police report and obtain a copy of it.

Residents of **Iowa, Maryland, North Carolina, New York, Kentucky, Rhode Island and Oregon**:

The Identity Theft Unit in your state gives you step-by-step advice on how to protect yourself and help address some of the issues that identity theft causes. Report suspected identity theft to your local law enforcement, the Attorney General and the Federal Trade Commission. Below is the mailing address, website, and phone number for the Attorney General office in your state.



| State | Phone Number | Web | Address |
|---|---|---|---|
| Iowa | 515.281.5044<br>800.373.5044 | iowaattorneygeneral.gov | Office of the Attorney General of IA<br>Hoover State Office Building<br>1305 E. Walnut Street<br>Des Moines, IA 50319 |
| New York | 800.697.1220 | dos.ny.gov/consumerprotection | New York Department of State Division of Consumer Protection<br>One Commerce Plaza,<br>99 Washington Ave<br>Albany, NY 12231-0001 |
| | 800.771.7755 | ag.ny.gov | Office of the Attorney General of NY<br>The Capitol<br>Albany, NY 12224-0341 |
| North Carolina | (877) 5-NO-SCAM<br>Toll-free within North Carolina<br>919.716.6000 | ncdoj.gov | Office of the Attorney General of NC<br>Consumer Protection Division<br>9001 Mail Service Center<br>Raleigh, NC 27699-9001 |
| Oregon | 503.378.4400 | doj.state.or.us | Oregon Department of Justice<br>1162 Court Street NE<br>Salem, OR 97301-4096 |
| Maryland | 410.576.6491 | oag.state.md.us | Office of the Attorney General of MD<br>200 St. Paul Place<br>Baltimore, MD  21202 |
| Kentucky | 502.696.5300 | ag.ky.gov | Office of the Attorney General of KY<br>700 Capitol Avenue, Suite 118<br>Frankfort, Kentucky 40601 |
| Rhode Island | 401.274.4400 | riag.ri.gov | Office of the Attorney General of RI<br>150 South Main Street<br>Providence, Rhode Island 02903 |

| **District of Columbia** | 202.727.3400 | oag.dc.gov | Office of the Attorney General of DC<br>441 4th Street, NW<br>Washington, DC 20001 |

2195194CCCPRIVACYNOTIFICATION/14159329

2024-069



**Ameriprise Financial Services, LLC**
70100 Ameriprise Financial Center | Minneapolis, MN 55474

January 12, 2024



## NOTICE OF DATA BREACH

Dear ,

**What Happened?**
I am writing to inform you of an incident involving your personal information. Unfortunately, it has been determined that there has been unauthorized access to your information.

**What Information Was Involved?**

Name, address, date of birth, account number and social security number.

**What We Are Doing.**
We have taken steps to protect your accounts from unauthorized activity. This includes instructing our service associates to use extra caution when verifying callers and confirming the signature on written requests related to your accounts.

As a precaution, Ameriprise Financial is providing you an opportunity to enroll in an independently operated credit monitoring program for two years at no expense to you. This program is administered by

**Equifax**, one of the three national credit reporting agencies. **Equifax Complete™ Premier** will provide you with an "early warning system" that alerts you to any changes to your credit file. The following page of this letter includes the features of the Equifax Service and the promotional code you need to use to enroll.

**What You Can Do.**
In situations like this, taking a few prudent steps can help protect you against the potential misuse of your information. We recommend you:

- Register a fraud alert or security freeze with the three major credit bureaus. Contact information for each is included on the Additional Resources page enclosed.
- Thoroughly review your account statements and transaction confirmations.
- Closely monitor your personal accounts (e.g. checking and savings, credit cards, etc.) to make sure there is no unauthorized activity.
- Closely review any solicitations you receive in the near future.
- Be vigilant if you receive a call from someone who claims to represent Ameriprise Financial. If you have any doubts about the caller, hang up and call your financial advisor to verify the validity of the call.

- **If you notice any unusual activity, please contact your financial advisor or Ameriprise Financial Customer Service at 800.862.7919 immediately. We are here to help.**

**For More Information.**
Please do not hesitate to contact Brian F Costello at 413.848.4220 with any questions or to request additional assistance.

Please accept my sincere apology regarding this situation and any inconvenience it may cause you. Ameriprise Financial is committed to protecting your privacy and online security is a top priority for us.

Sincerely,

Jen Swihart
Sr. Investigator
Ameriprise Financial, Inc.

Ameriprise Financial Services, LLC. Member FINRA and SIPC. © 2011-2024 Ameriprise Financial, Inc. All rights reserved.

2179236CCCPRIVACYNOTIFICATION/^^LETTERID^^

**Ameriprise** ✱
*Financial*

**Equifax**®                               Enter your Activation Code ▮▮▮▮▮▮▮▮

## Equifax Complete™ Premier

Note: You must be over age 18 with a credit file to take advantage of the product

### Key Features

- Annual access to your 3-bureau credit report and VantageScore[1] credit scores
- Daily access to your Equifax credit report and 1-bureau VantageScore credit score
- 3-bureau credit monitoring[2] with email notifications of key changes to your credit reports
- WebScan notifications[3] when your personal information, such as Social Security Number, credit/debit card or bank account numbers are found on fraudulent Internet trading sites
- Automatic fraud alerts[4], which encourages potential lenders to take extra steps to verify your identity before extending credit, plus blocked inquiry alerts and Equifax credit report lock[5]
- Identity Restoration to help restore your identity should you become a victim of identity theft, and a dedicated Identity Restoration Specialist to work on your behalf
- Up to $1,000,000 of identity theft insurance coverage for certain out of pocket expenses resulting from identity theft[6]
- Lost Wallet Assistance if your wallet is lost or stolen, and one-stop assistance in canceling and reissuing credit, debit and personal identification cards

### Enrollment Instructions

Go to*www.equifax.com/activate*
Enter your unique Activation Code listed above then click "Submit" and follow these 4 steps:

1. **Register:**
   Complete the form with your contact information and click "Continue".
   If you already have a myEquifax account, click the **Sign in here** link under the **Let's get started** header.
   Once you have successfully signed in, you will skip to the Checkout Page in Step 4.
2. **Create Account:**
   Enter your email address, create a password and accept the terms of use.
3. **Verify Identity:**
   To enroll in your product, we will ask you to complete our identity verification process.
4. **Checkout:**
   Upon successful verification of your identity, you will see the Checkout page.
   Click "Sign Me Up" to finish enrollment.
   **You're done!**
   The Confirmation page shows your completed enrollment.
   Click "View My Product" to access the product features.

[1]The credit scores provided are based on the VantageScore® 3.0 model. For three-bureau VantageScore credit scores, data from Equifax®, Experian®, and TransUnion® are used respectively. Any one-bureau VantageScore uses Equifax data. Third parties use many different types of credit scores and are likely to use a different type of credit score to assess your creditworthiness. [2]Credit monitoring from Experian and TransUnion will take several days to begin. [3]WebScan searches for your Social Security Number, up to 5 passport numbers, up to 6 bank account numbers, up to 6 credit/debit card numbers, up to 6 email addresses, and up to 10 medical ID numbers. WebScan searches thousands of Internet sites where consumers' personal information is suspected of being bought and sold, and regularly adds new sites to the list of those it searches. However, the Internet addresses of these suspected Internet trading sites are not published and frequently change, so there is no guarantee that we are able to locate and search every possible Internet site where consumers' personal information is at risk of being traded. [4]The Automatic Fraud Alert feature is made available to consumers by Equifax Information Services LLC and fulfilled on its behalf by Equifax Consumer Services LLC. [5]Locking your Equifax credit report will prevent access to it by certain third parties. Locking your Equifax credit report will not prevent access to your credit report at any other credit reporting agency. Entities that may still have access to your Equifax credit report include: companies like Equifax Global Consumer Solutions, which provide you with access to your credit report or credit score, or monitor your credit report as part of a subscription or similar service; companies that provide you with a copy of your credit report or credit score, upon your request; federal, state and local government agencies and courts in certain circumstances; companies using the information in connection with the underwriting of insurance, or for employment, tenant or background screening purposes; companies that have a current account or relationship with you, and collection agencies acting on behalf of those whom you owe; companies that authenticate a consumer's identity for purposes other than granting credit, or for investigating or preventing actual or potential fraud; and companies that wish to make pre-approved offers of credit or insurance to you. To opt out of such pre-approved offers, visit www.optoutprescreen.co [6]The Identity Theft Insurance benefit is underwritten and administered by American Bankers Insurance Company of Florida, an Assurant company, under group or blanket policies issued to Equifax, Inc., or its respective affiliates for the benefit of its Members. Please refer to the actual policies for terms, conditions, and exclusions of coverage. Coverage may not be available in all jurisdictions.



**Additional Resources**

| Contact/Resource | Phone Number | Web | Address |
|---|---|---|---|
| **Federal Trade Commission** Helpful information on ID Theft | 877.438.4338 | identitytheft.gov | 600 Pennsylvania Avenue, NW Washington, DC 20580 |
| **Equifax** Register a Fraud Alert or Security Freeze | 888.378.4329 | equifax.com | P.O. Box 740241 Atlanta, GA 30374 |
| **Experian** Register a Fraud Alert or Security Freeze | 888.397.3742 | experian.com | P.O. Box 9554 Allen, TX 75013 |
| **Transunion** Register a Fraud Alert or Security Freeze | 800.916.8800 | transunion.com | 2 Baldwin Place P.O. Box 1000 Chester, PA19022 |
| **Identity Theft Resource Center** | 888.400.5530 | idtheftcenter.org | 2514 Jamacha Rd Ste 502-525 El Cajon, CA 92019-4492 |
| **OnGuard Online** Online Safety Resources | | onguardonline.gov | |

**Ameriprise Resources**

| Resource | Web |
|---|---|
| **Privacy, Security & Fraud Center** | ameriprise.com/privacy-security-fraud |
| **Online Security Guarantee** | ameriprise.com/privacy-security-fraud/online-security-guarantee |

**Security Freeze**

Consumers can place a security freeze at no cost on their credit reports through the three major credit bureaus. A security freeze prohibits a credit reporting agency from releasing any information from a consumer's credit report without written authorization. However, please be aware that placing a security freeze on your credit report may delay, interfere with, or prevent the timely approval of any requests you make for new loans, credit mortgages, employment, housing or other services.To place a freeze, write, go online or call the three credit bureaus below. Documents will be requested to verify your identity and address, possibly including but not limited to: copies of your Social Security card, paystub, state driver's license, or utility bill.

| Contact/Resource | Phone Number | Web | Address |
|---|---|---|---|
| **Equifax Security Freeze** | 888.378.4329 | equifax.com | P.O. Box 105788 Atlanta, GA 30348-5788 |
| **Experian Security Freeze** | 888.397.3742 | experian.com /freeze/center.html | P.O. Box 9554 Allen, TX 75013 |
| **Trans Union Security Freeze** | 800.916.8800 | transunion.com/ credit-freeze | P.O. Box 160 Woodlyn, PA 19094 |

Residents of **Massachusetts** and **Rhode Island**:
As a resident of Massachusetts or Rhode Island, you have the right to obtain any police report filed regarding this incident. If you are the victim of identity theft, you also have the right to file a police report and obtain a copy of it.

Residents of **Iowa**, **Maryland**, **North Carolina**, **New York**, **Kentucky**, **Rhode Island** and **Oregon**:
The Identity Theft Unit in your state gives you step-by-step advice on how to protect yourself and help address some of the issues that identity theft causes. Report suspected identity theft to your local law enforcement, the Attorney General and the Federal Trade Commission. Below is the mailing address, website, and phone number for the Attorney General office in your state.

**Residents of New Mexico:**
"The federal Fair Credit Reporting Act provides you certain rights regarding your credit. You may review these rights at https://files.consumerfinance.gov/f/201504_cfpb_summary_your-rights-under-fcra.pdf."



| State | Phone Number | Web | Address |
|---|---|---|---|
| Iowa | 515.281.5044<br>800.373.5044 | iowaattorneygeneral.gov | Office of the Attorney General of IA<br>Hoover State Office Building<br>1305 E. Walnut Street<br>Des Moines, IA 50319 |
| New York | 800.697.1220 | dos.ny.gov/<br>consumerprotection | New York Department of State<br>Division of Consumer Protection<br>One Commerce Plaza,<br>99 Washington Ave<br>Albany, NY 12231-0001 |
|  | 800.771.7755 | ag.ny.gov | Office of the Attorney General of NY<br>The Capital Albany, NY 12224-0341 |
| North Carolina | (877) 5-NO-SCAM<br>Toll-free within<br>North Carolina<br>919.716.6000 | ncdoj.gov | Office of the Attorney General of NC<br>Consumer Protection Division<br>9001 Mail Service Center<br>Raleigh, NC 27699-9001 |
| Oregon | 503.378.4400 | doj.state.or.us | Oregon Department of Justice<br>1162 Court Street<br>NE Salem, OR 97301-4096 |
| Maryland | 410.576.6491 | oag.state.md.us | Office of the Attorney General of MD<br>200 St. Paul Place<br>Baltimore, MD 21202 |
| Kentucky | 502.696.5300 | ag.ky.gov | Office of the Attorney General of KY<br>700 Capitol Avenue, Suite 118<br>Frankfort, Kentucky 40601 |
| Rhode Island | 401.274.4400 | riag.ri.gov | Office of the Attorney General of RI<br>150 South Main Street<br>Providence, Rhode Island 02903 |
| District of Columbia | 202.727.3400 | oag.dc.gov | Office of the Attorney General of DC<br>441 4th Street, NW<br>Washington, DC 20001 |